UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TIMOTHY M. COHANE,

                    Plaintiff,

          v.                                    **DECISION & ORDER**
                                                04-CV-181S

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, TOM HOSTY,
STEPHANIE HANNA, and
JACK FRIEDENTHAL,

                    Defendants.

## I.  INTRODUCTION

In this case, Plaintiff Timothy Cohane, a former basketball coach, alleges that

Defendants deprived him of his liberty interest in his reputation without due process of law

in violation of 42 U.S.C. § 1983.  In addition, Plaintiff alleges that Defendants tortiously

interfered with his contractual relationship with the State University of New York at Buffalo

("SUNY Buffalo").  Currently before this Court is Defendants' Motion to Dismiss pursuant

to Rule 12 (b)(6) of the Federal Rules of Civil Procedure.

## II.  BACKGROUND

### A.    Facts

The following facts, which are alleged in the Complaint, are assumed true for

purposes of the instant motion.  Plaintiff served as head coach of the men's intercollegiate

National Collegiate Athletic Association ("NCAA") Division I basketball team at SUNY

Buffalo from 1993 through December 3, 1999.  (Compl., ¶ 5).  The NCAA, an

unincorporated association, is charged with marketing, governing, controlling and operating

1

the multi-billion dollar college sports industry, including all aspects of intercollegiate sports and athletics departments operating at SUNY Buffalo.  (Compl., ¶¶ 6 & 8).  Plaintiff alleges that Tom Hosty and Stephanie Hanna acted as directors of the NCAA enforcement staff, and that Jack Friedenthal acted as Chairman of the NCAA's Committee on Infractions during the time relevant to this action.  (Compl., ¶¶ 10, 11).

After SUNY Buffalo hired Plaintiff as the head coach of its men's basketball team in 1993, the team progressed from an NCAA team without a league to the East Coast Conference, and finally to the Mid American Conference.  (Compl., ¶ 25).  On January 29, 1999, SUNY Buffalo approved Plaintiff's contract extension through April 13, 2002. (Compl., ¶ 26).  On August 9, 1999, Rob Fournier ("Fournier"), a Mid American Conference employee, authored and signed a letter to the NCAA, wherein he confirmed his prior phone call to the NCAA on August 3, 1999, regarding an alleged infraction, and referred to documentation that SUNY Buffalo had provided.  (Compl., ¶ 27).  Specifically, the letter stated as follows:

> "As a consequence of the sensitive personal and private issues to be protected, the Conference will undertake this process in the coming weeks by submitting affidavits, interviewing affected parties, and insuring due process . . . . Toward that end, we will utilize when necessary the full services and cooperation of personnel at the University at Buffalo including New York State legal counsel."

(Compl., ¶ 27).

On December 3, 1999, Plaintiff attended a meeting during which SUNY Buffalo's counsel advised him that according to the NCAA, it was assumed that he was guilty of major NCAA rule violations, and that he and his staff should be forced to resign.  (Compl., ¶ 28).  Plaintiff was forced to resign that day pursuant to a written contract that included a

release for any actions committed by Plaintiff on or before October 3, 1999.  (Compl., ¶¶ 28, 64).  On December 22, 1999, Fournier advised SUNY Buffalo on behalf of MAC and NCAA that although Cohane's departure was characterized as a resignation, "it has the effect of a change of leadership."  (Compl., ¶ 30).

Between January 16, and 18, 2000, the MAC Committee on Infractions held a hearing at which representatives of the MAC schools judged the MAC investigation and report issued by Fournier.  (Compl., ¶ 31).  SUNY Buffalo officials and representatives of the NCAA participated in the case against Plaintiff.  (Compl., ¶ 31).  According to a December 7, 1999 notification, the MAC adopted the procedures of Article 32 of the NCAA by-laws, which govern such investigations, including issues related to conflicts of interest, information gathering, verification and access to records, and disclosure of information. (Compl., ¶ 29, 34).

In the Spring of 2000, after the completion of the basketball season and after some of the student athletes had exhausted their NCAA eligibility, the NCAA enforcement staff requested interviews with the student athletes to discuss Plaintiff.  (Compl., ¶ 35).  When the student athletes refused to interview, SUNY officials threatened that if they did not comply with the NCAA's request, the issuance of their degrees would be at risk.  (Compl., ¶ 35).

On January 29, 2001, Defendants Hosty and Hanna issued a case summary to be used by the NCAA Committee on Infractions during a hearing scheduled for February 9, 2001.  (Compl., ¶ 36).  In preparing the case study, Defendants used and relied upon information provided by SUNY officials, including affidavits which Defendants allegedly knew contained coerced, falsified or otherwise tainted information.  (Compl., ¶ 36).  At the

3

February 9, 2001 hearing, Defendants acted in conjunction with SUNY officials to introduce this tainted and false evidence against Plaintiff.  (Compl., ¶ 37).

In a written press and internet report dated March 21, 2001 ("Infractions Report"), the NCAA and Chairman Friedenthal found that Plaintiff had acted "evasive, deceptive and not credible" and "contrary to the principles of ethical conduct."  (Compl., ¶ 38). Specifically, the NCAA found Plaintiff guilty of "major violations" for conduct that it has uniformly ruled to constitute "minor violations" in over 300 cases before and since. (Compl., ¶ 39).  Based on these findings, the NCAA sanctioned Plaintiff by prohibiting him from coaching at any NCAA school.  (Compl., ¶ 38).  Immediately following the release of the NCAA report, the NCAA and SUNY held a joint press conference, at which school officials declared that "[SUNY] accepts  the report and its findings in its entirety."  (Compl., ¶ 41).  Plaintiff requested but was denied participation in the joint press conference. (Compl., ¶ 41).

On August 20, 2001, the NCAA Appeals Committee ("Appeals Committee") reviewed the findings of the March 21, 2001 report, and on October 12, 2001, reprimanded the Committee on Infractions, stating that "many aspects of the case were troublesome." (Compl., ¶¶ 43, 44).  Specifically, the Appeals Committee reprimanded the Committee on Infractions for not interviewing key witnesses, conducting an inconsistent investigation, and employing troublesome language and rationale regarding its findings of unethical conduct. (Compl., ¶ 44).  Specifically, the Appeals Committee cautioned that "a person['s] assertion of innocence[,] however vigorous[,] against charges of a violation should not ordinarily be the subject of an unethical conduct finding."  (Compl., ¶ 44).

While admitting in writing on October 12, 2001, that a finding of ethical conduct

4

constitutes a "stain on the reputation and career" of the violator, the NCAA failed to remove Plaintiff's ethical violation from its records, including its website.  (Compl., ¶¶ 42, 45, 46).  In addition, the ethical charges remain part of Plaintiff's permanent personnel file maintained by SUNY Buffalo.  (Compl., ¶ 42).  As such, the NCAA's stigmatizing report continues to be disclosed to all of Plaintiff's prospective employers.  (Compl., ¶ 42).

## B.    Procedural Background

Plaintiff commenced this case by filing a Complaint in the United States District Court for the Western District of New York on March 19, 2004.  On October 4, 2004, Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]   On March 4, 2005, this case was reassigned from Senior United States District Judge John T. Curtin to the undersigned.

## III.  DISCUSSION

## A.    Motion to Dismiss Standard

Rule 12 (b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12 (b)(6).  When resolving a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-moving party.  Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996); see also Press v. Quick & Reilly, Inc., 218 F.3d 121, 128 (2d Cir. 2000) (noting that factual

---

[1]According to the official docket in this case, Defendants erroneously filed a Memorandum of Law as a Motion to Dismiss on October 1, 2004.  Defendants filed a proper Motion to Dismiss, along with the previously filed Memorandum of Law on October 4, 2004.  As such, there is only one dispositive motion pending before this Court. The Clerk of the Court is directed to terminate the erroneously identified Motion to Dismiss (Docket No. 14), as it is duplicative of a document attached to the properly filed Motion (Docket No. 15).

In support of their motion, Defendants filed a Memorandum of Law and a Reply Memorandum of Law. Plaintiff filed a Memorandum of Law, an Affidavit, and a Sur-reply Memorandum of Law in opposition to the Motion.

allegations in the complaint must be accepted as true on a motion to dismiss).  A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir.1994) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957)).

In order to survive a motion to dismiss, a plaintiff must assert a cognizable claim and allege facts that, if true, would support such a claim.  See Boddie v. Schnieder, 105 F.3d 857, 860 (2d Cir. 1997).  At the same time, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to survive a motion to dismiss." Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) (internal citations omitted).  Ultimately, in the context of such a motion, "[t]he issue is not whether a plaintiff will or might ultimately prevail on her claim, but whether she is entitled to offer evidence in support of the allegations in the complaint." Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 62 (2d Cir. 1997) (citation omitted).

## B.    Defendants' Motion to Dismiss

Plaintiff asserts two causes of action against Defendants.  In the first cause of action, brought pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Defendants violated his constitutional right to due process.  In Plaintiff's second cause of action, he claims that Defendants tortiously interfered with his contractual relationship with SUNY.

Defendants argue that both causes of action should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  Specifically, Defendants contend that they are not state actors subject to liability under 42 U.S.C. § 1983. Second, Defendants argue that both of Plaintiff's claims are barred by the applicable statute of limitations.  Finally, Defendants propose that should this Court find that Plaintiff's

common law tortious interference claim is timely, it should nonetheless decline to exercise supplemental jurisdiction over this state law claim.  This Court will address each cause of action in turn.

### 1.    42 U.S.C. § 1983: State Action Requirement

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws.  See 42 U.S.C. § 1983; Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 137 (2d Cir. 1999).  On its own, Section1983 does not provide a source of substantive rights, but rather, provides a method for vindicating federal rights conferred elsewhere in the federal statutes and the Constitution.  See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)). Accordingly, in reviewing claims brought pursuant to Section 1983, it is necessary to precisely identify the constitutional violations alleged.  See Baker, 443 U.S. at 140.  Here, Plaintiff's claim is that Defendants violated his Fourteenth Amendment right to due process.

The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV.  There are two broad categories of due process claims — substantive and procedural.  A substantive due process claim is based upon the deprivation of a constitutionally protected life, liberty, or property interest.  See B.D. v. DeBuono, 130 F. Supp. 2d 401, 431 (S.D.N.Y. 2000).  A procedural due process violation occurs when the Government deprives a person of a protected life, liberty, or property interest without first providing that person with notice and an opportunity to be heard.  Id. at 432-33.

7

The fundamental purpose of Section 1983 is "to provide compensatory relief to those deprived of their federal rights by state actors."  Kia P. v. McIntyre, 235 F.3d 749, 755 (2d Cir. 2000) (quoting Felder v. Casey, 487 U.S. 131, 141, 108 S. Ct. 2302, 2308, 101 L. Ed. 2d 123 (1988)).  Accordingly, a court assessing the viability of a Section 1983 claim must first determine whether the actions alleged were committed under color of state law. Carlos v. Santos, 123 F.3d 61, 65 (2d Cir. 1997).  "The traditional definition of acting under color of state law requires that the defendant in a [Section] 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  Kern v. City of Rochester, 93 F.3d 38, 43 (2d Cir. 1996) (quoting West v. Atkins, 487 U.S. 42, 49, 108 S. Ct. 2250, 2255, 101 L. Ed. 2d 40 (1988)).

With respect to the Fourteenth Amendment, there exists a clear dichotomy between state action, which is subject to scrutiny under the due process clause, and "private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be."  NCAA v. Tarkanian, 488 U.S. 179, 191, 109 S. Ct. 454, 461, 102 L. Ed. 2d 469 (1988) (citing Shelly v. Kramer, 334 U.S. 1, 13, 68 S. Ct. 836, 842, 92 L. Ed 11961 (1948); Jackson v. Metro. Edison Co., 419 U.S. 345, 349, 95 S. Ct. 449, 452, 42 L. Ed. 2d 447 (1974)).  As a general matter, the protections provided by the Fourteenth Amendment do not extend to private conduct which abridges constitutional rights.  Tarkanian, 488 U.S. at 191 (citing Burton v. Wilmington Parking Auth., 365 U.S. 715, 722, 81 S. Ct. 856, 860, 6 L. Ed. 2d 45 (1961)).  Accordingly, for the purposes of this Court's analysis, the "under-color-of-law requirement of 42 U.S.C. § 1983 and the state-action requirement of the Fourteenth Amendment are equivalent."  Tarkanian, 488 U.S. at 182 n.4 (citing Lugar v. Edmonson Oil Co., 457 US 922, 928-935, 102 S. Ct. 2744, 2749-2752, 73 L. Ed. 2d 482

(1982)).

It is only under rare circumstances that a private entity may be considered a "state actor" for purposes of Section 1983.  Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992).  Private action is considered "state action" if and only if, there is such a "close nexus between the State and the challenged action that seemingly private behavior 'may be fairly treated as that of the State itself.'"  Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295, 121 S. Ct. 924, 930, 148 L. Ed 2d 807 (2001) (quoting Jackson, 419 U.S. at 351).  "From the range of circumstances that could point toward the State behind an individual face," however, "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government."  Brentwood Acad., 531 U.S. at 295-96.

Numerous Supreme Court cases have identified the "host of facts that can bear on the fairness of such an attribution."  Brentwood Acad., 531 U.S. at 296.  For example, when the challenged activity results from the State's exercise of "coercive power," Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S. Ct. 2777, 2786, 73 L. Ed. 2d 534 (1982), or when a nominally private entity is "entwined with governmental policies," or when government is "entwined in [its] management or control," Evans v. Newton, 382 U.S. 296, 299, 301, 86 S. Ct. 486, 489, 15 L. Ed. 2d 373 (1966), state action may be found.

In this context, the Supreme Court has explicitly held that the NCAA is not a state actor within the meaning of Section 1983.  Tarkanian, 488 U.S. at 199.  Tarkanian arose when the NCAA's Committee on Infractions investigated the allegedly improper recruiting practices of the University of Nevada, Las Vegas ("UNLV"), and discovered several violations committed by Jerry Tarkanian, UNLV's enormously successful basketball coach.

Tarkanian, 488 U.S. at 179.  Following the investigation, the Committee imposed numerous sanctions upon UNLV, and "requested it to show cause why the additional penalties should not be imposed if it failed to suspend Tarkanian during [the] probationary period." Tarkanian, 488 U.S. at 179.  Faced with a potential demotion and drastic pay cut, Tarkanian brought suit against the NCAA alleging that it had deprived him of his due process rights in violation of 42 U.S.C. § 1983.  Tarkanian, 488 U.S. at 179.

The Supreme Court held that "the NCAA's participation in the events that led to Tarkanian's suspension did not constitute 'state action' prohibited by the Fourteenth Amendment and was not performed 'under color of' state law within the meaning of [Section] 1983." Tarkanian, 488 U.S. at 179.  Further, the Court held that the NCAA could not be "deemed to be a state actor on the theory that it misused power it possessed by virtue of state law, since UNLV's decision to suspend Tarkanian, while in compliance with the NCAA's rules and recommendations, did not turn the NCAA's conduct into action under color of [State] law." Tarkanian, 488 U.S. at 179.  The Court opined that "it would be more appropriate to conclude that UNLV has conducted its athletic program under color of the policies adopted by the NCAA, rather than that those policies were developed and enforced under color of [State] law." Tarkanian, 488 U.S. at 199.

In holding the NCAA's investigation, enforcement proceedings, and consequent recommendations did not constitute state action, the Court reasoned that "UNLV delegated no power to the NCAA to take specific action against any University employee; UNLV and the NCAA acted as adversaries throughout the proceedings; the NCAA enjoyed no governmental powers to facilitate its investigation; and the NCAA did not - indeed, could not - directly discipline Tarkanian, but could only threaten additional sanctions against UNLV if the University chose not to suspend its coach." Tarkanian, 488 U.S. at 180.

Furthermore, the Court reasoned, even assuming that "the power of the NCAA [was] so great that [the University] had no practical alternative but to comply with the Association's demands, it did not follow that the NCAA was therefore acting under color of state law." Tarkanian, 488 U.S. at 180.

Tarkanian compels the same conclusion in the instant case.  That is, this Court finds that the NCAA, including its employees, did not engage in state action by investigating Plaintiff regarding his alleged infractions, however unfairly, by publishing a report concluding that he was guilty of such infractions, or by recommending that SUNY force him to resign.  This Court is not persuaded by Plaintiff's argument that SUNY's cooperation, complicity, or conspiracy with the NCAA transformed its otherwise private conduct into state action.[2]   As the Supreme Court articulated in Tarkanian, "[j]ust as a state-compensated public defender acts in a private capacity when he or she represents a private client in a conflict with the State . . . the NCAA is properly viewed as a private actor at odds with the State when it represents the interests of its entire membership in an

_____

[2]In support of his argument, Plaintiff cites to Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 121 S. Ct. 924, 148 L. Ed 2d 807 (2001).  Unlike the case at bar, Brentwood involved an athletic association that regulated interscholastic sports among the private and public schools *in a single state*, Tennessee.  The Court found under the circumstances in Brentwood that the athletic association's nominally private character was "overborne by the pervasive entwinement of public institutions and public officials in its composition and workings," leading to a conclusion of state action. Brentwood, 531 U.S. 289.  The Brentwood Court took pains to distinguish Tarkanian, stating that in the previous case "the NCAA's policies were shaped not by the University of Nevada alone, but by several hundred member institutions, most of them having no connection to Nevada, and exhibiting no color of Nevada law." Brentwood, 531 U.S. 289.  Unlike the athletic association in Brentwood, the NCAA promulgates and enforces its rules and otherwise acts on behalf of its collective nationwide membership, "speaking through an organization that is independent of any particular state." Tarkanian, 488 U.S. at 193. Accordingly, the NCAA cannot be characterized as a nominally private actor that is so pervasively intertwined with any state such that it is subject to liability under 42 U.S.C. § 1983.

Plaintiff also cites to Lugar v. Edmonson Oil Co., 457 US 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982), for the proposition that where state and private actors engage in joint activity, as SUNY Buffalo and the NCAA did here, the private actor's conduct may be construed as state action.  However, Lugar is "explicitly limited to the particular context of prejudgment attachment." Wilson v. Pfieffer, 565 F. Supp. 115, 118 (S.D.N.Y. 1983).  Nor do the other cases cited by Plaintiff, Tancredi v. Metropolitan Life Ins. Co., 316 F.3d 308 (2d Cir. 2003) and Lloyd v. Botanical Gardens, No. 03 7557, 2004 WL 2093468, at *5 (S.D.N.Y. Sept. 17, 2004), compel the conclusion that the NCAA's conduct constituted state action here.

investigation of one public university." 488 U.S. at 196 (internal citations omitted); see also McRae v. Sweet, No. 91-CV-1403, 1991 WL 274261, at *4 (N.D.N.Y. Dec. 17, 1991) ("[T]he independent nature of the NCAA was finally decided by the Supreme Court in 1988, in Tarkanian."). Consistent with this characterization, this Court finds that the NCAA conducted its investigation of SUNY Buffalo, a public university, and its coach, in the interests of the entire NCAA membership. See Tarkanian, 488 U.S. at 193.

Under the circumstances, it cannot be said that SUNY Buffalo's alleged complicity in this investigation somehow transforms the NCAA's well-establish private conduct into state action for purposes of Section 1983. Assuming the truth of Plaintiff's allegations, as it must, this Court finds that the NCAA's actions cannot reasonably be attributable to New York State such that liability may be imposed upon it under 42 U.S.C. § 1983. Accordingly, Plaintiff's due process claim brought pursuant to Section 1983 will be dismissed.

**2.    State Claim for Tortious Interference with Contractual Relations: Statute of Limitations**

To prevail on a claim for tortious interference with a contract, a plaintiff must establish: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to the plaintiff. Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996) (citing Israel v. Wood Dolson Co., 1 N.Y.2d 116, 120 (1956)). Under New York law, such claims are governed by the three year statute of limitations applicable to injury to property. See N.Y. C.P.L.R. § 214(4); Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 92 (1993). The statute of limitations on a tortious interference claim accrues "when the claim becomes enforceable, i.e., when

all elements of the tort can be truthfully alleged in a complaint." <u>Kronos</u>, 81 N.Y.2d at 94.

In the instant case, Plaintiff alleges that two contracts existed between himself and SUNY Buffalo:  his employment contract, which SUNY extended until April 13, 2002; and the contract executed on the day of his resignation, December 3, 1999, which contained a release for any of Plaintiff's actions that occurred prior to that date.  (<u>Compl.</u>, ¶¶ 59, 64). Plaintiff claims that the NCAA had actual knowledge of both of these contracts. (<u>Compl.</u>, ¶¶ 62, 65).   Nonetheless, Plaintiff alleges, the NCAA induced SUNY to breach its employment contract with him by forcing his resignation on December 3, 1999. (<u>Compl.</u>, ¶ 63).  Further, he contends that the NCAA caused SUNY to breach its contract of release by engaging the University in a "continuous pattern of wrongful, improper or egregious conduct" against Plaintiff, which took place between December 4, 1999, and March 21, 2001.  (<u>Compl.</u>, ¶¶ 66, 67).  As previously noted herein, Plaintiff filed his Complaint on March 19, 2004.

Based on the foregoing, this Court finds that Plaintiff's tortious interference claim is barred by the applicable statute of limitations.  With respect to Plaintiff's employment contract, any tortious interference claim based on breach of contract clearly accrued on December 3, 1999, the date he was forced to retire, and expired three years later, on December 4, 2003, several months before he filed his Complaint on March 19, 2004. Likewise, this Court finds that any such claim based on SUNY's contract to release Plaintiff for actions he committed prior to his resignation on December 3, 1999, accrued between January 16, 2000, and January 18, 2000, when SUNY participated in the case against Plaintiff at a hearing conducted by the Committee on Infractions.  Put another way, all of the facts necessary to a cause of action sounding in tortious interference with this contract existed no later than January 2000, and Plaintiff could have sought relief at that juncture.

13

See Spinap Corp. Inc. v. Cafagno, 302 A.D.2d 588, 588 (2d Dep't 2003) (citing Ackerman v. Price Waterhouse, 84 N.Y.2d 535, 541 (1994)).  His failure to file suit until March 19, 2004, renders his claim untimely.

This Court is not persuaded by Plaintiff's argument that his claim is timely based on a continuing violation theory.  Under New York law, tortious interference with a contract is not a continuing tort for statute of limitations purposes.  Spinap Corp., 302 A.D.2d at 588 (citing Bloomfield Bldg. Wreckers, Inc. v. City of Troy, 41 N.Y.2d 1102, 1103 (1977)).   As such, Plaintiff's claim, filed more than three years after the events which gave rise  to it, is barred by the statute of limitations.  Thus, Plaintiff's remaining state law claim for tortious interference with contractual relations will be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted. Specifically, Plaintiff's federal claim is dismissed because Defendants are not state actors subject to liability under 42 U.S.C. § 1983.  Further, Plaintiff's state law claim based on tortious interference with contractual relations is dismissed because it is barred by the applicable statute of limitations.

## V.  ORDERS

IT HEREBY IS ORDERED that Defendants' Motion to Dismiss (Docket No. 15) is GRANTED.

FURTHER, the Clerk of Court is directed to terminate Defendants' erroneously identified Motion to Dismiss (Docket No. 14), as duplicative of the Memorandum of Law appearing at Docket Number 15.

FURTHER, that the Clerk of the Court shall take the steps necessary to close this

case.

SO ORDERED.

Dated:      September 26, 2005
            Buffalo, New York

                                        /s/William M. Skretny
                                      WILLIAM M. SKRETNY
                                    United States District Judge