**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

─────────────────────────────

**TIMOTHY M. COHANE,**

                           **Plaintiff,**                **04-CV-0181S(Sr)**

**v.**

**NATIONAL COLLEGIATE ATHLETIC**
**ASSOCIATION,**
**TOM HOSTY,**
**STEPHANIE HANNAH and**
**JACK FRIEDENTHAL,**

                           **Defendants.**

─────────────────────────────

**TIMOTHY M. COHANE,**

                           **Plaintiff,**                **04-CV-0943S(Sr)**

**v.**

**WILLIAM R. GREINER, President of the**
**State University of New York at Buffalo,**

**DENNIS BLACK, Vice President**
**for Student Affairs,**

**ROBERT ARKEILPANE, Athletic Director,**

**WILLIAM MAHER, Compliance Director,**

**ERIC EISENBERG,**

**MID AMERICAN CONFERENCE, by its**
**Commissioner, Richard Chryst, and**

**ROBERT FOURNIER, Esq.,**

                           **Defendants.**

─────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

These cases were referred to the undersigned by the Hon. William M. Skretny, pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. 04-CV-181 at Dkt. #114 & 04-CV-943 at Dkt. #200.

By Decision and Order entered April 18, 2013, the Court consolidated 04-CV-943 into 04-CV-181. Dkt. #137. Accordingly, this Report, Recommendation and Order will incorporate the arguments set forth in the motions for summary judgment in both actions and replace the prior Report, Recommendation and Order on defendants' motion for summary judgment in 04-CV-943. For the following reasons, it is recommended that defendants' motions be granted. 04-CV-181 at Dkt. #112 & 04-CV-943 at Dkt. #189 & 197.

## BACKGROUND

Plaintiff Timothy Cohane was hired as the head coach for the basketball team at the State University of New York at Buffalo ("SUNY Buffalo"), in 1993. Dkt. #196-1.[1]

On October 16, 1997, SUNY Buffalo Athletic Director ("AD"), Nelson Townsend issued the following memorandum to plaintiff:

> On Friday, October 10, 1997, Compliance Director William Regan entered the Triple Gym and observed our men's basketball team engaged in a pick-up game. In attendance was Frank Valenti, assistant coach, observing the action. This is in violation of NCAA regulations, which prohibits a coach from being present during a full

---

[1] Unless otherwise indicated, docket citations are to 04-CV-934.

> team out-of-season workout.[2] This violation takes place almost in
> defiance of the memos issued to coaches dated September 16, 1997
> and October 2, 1997.
>
> I am consequently suspending Coach Frank Valenti for a period of 10
> days with pay, starting October 20, 1997. . . .
>
> The violation cited above is major and I have acted accordingly.  It is
> your responsibility in the future to assure that no further violations are
> committed.

Dkt. #238, p.65. Coach Valenti explained that he was not observing or coaching the

players, but was in the gym for less than 90 seconds after the team began to play their

pick-up game because he ran into Jonathan Kleidon, who had just had arthroscopic

surgery.  Dkt. #238, p.67.  Coach Cohane informed AD Townsend that although "[n]o one

is more in favor of strict compliance than I am . . . this is not a major violation and the

punishment is too harsh."  Dkt. #238, p.69.


        In March of 1998, AD Townsend suffered a heart attack and Robert  Arkeilpane

was appointed Interim Athletic Director ("IAD").  Dkt. #231-23, pp.2-3 & Dkt. #230, p.1.

Coach Cohane acknowledges conflict between himself and IAD Arkeilpane, explaining

that he "publicly protested the forced resignation of UB's women's basketball coach,"

which he felt was "based solely upon the complaints of disgruntled student-athletes" and

that he objected to IAD Arkeilpane's policy demanding that all coaches operating a

summer sports camp on the SUNY Buffalo campus assess a $30 camper fee.  Dkt. #196-

---

[2] NCAA bylaws prohibit members of the coaching staff from observing student-athletes
in any basketball activities prior to the start of preseason basketball even if such activities are
not arranged by the coaching staff. 04-CV-181 at Dkt. #122-11. However, individual skill-related
instruction is permitted during this time frame, providing it is limited to no more than four
student-athletes at a time. 04-CV-181 at Dkt. #122-12.

8, pp.9-10.  Coach Cohane also objected to IAD Arkeilpane's decision to reassign Assistant Coach Ron Torgalski to the baseball program and use funds from the basketball budget to compensate him after plaintiff removed him as an assistant basketball coach. Dkt. #196-8, p.10.

Plaintiff recruited Eric Eisenberg to join the men's basketball coaching staff in the spring of 1998. Dkt. #241-2, p.189.  Plaintiff explained that he met Eric Eisenberg at the Final Four in San Antonio and spoke to him about the possibility of employment because SUNY Buffalo was looking to improve recruiting in New York City, where Eisenberg coached high school.  Dkt. #196-5, p.20.  Eric Eisenberg alleges that Coach Cohane offered him the job on the condition that Mike McKie, a player Eric Eisenberg was coaching in high school, join the SUNY Buffalo basketball program.  Dkt. #241-2, p.18. Plaintiff states that Eric Eisenberg agreed to coach at SUNY Buffalo regardless of whether Mike McKie came to SUNY Buffalo, but that he could not accept the position at SUNY Buffalo until his contract at Tilden High School expired that summer.  Dkt. #196-5, p.22. Although plaintiff hired Eisenberg to recruit players like Mike McKie, and hoped Mike McKie would come to SUNY Buffalo, he denied any *quid pro quo*.  Dkt. #196-5, p.22. Mike McKie was accepted at SUNY Buffalo on August 14, 1998 and Eric Eisenberg's appointment at SUNY Buffalo became effective August 16, 1998.  Dkt. #241-3, p.23.

SUNY Buffalo joined the Mid-American Athletic Conference, Inc. ("MAC"), in 1998.  Dkt. #199-1, p.10.  Plaintiff recalled that, prior to SUNY Buffalo joining the MAC, IAD Arkeilpane told him "that he had a friend in the MAC, Rob Fournier."  Dkt. #196-5,

p.170.  Arkeilpane denies any interaction with Mr. Fournier beyond their professional interactions within the MAC.  04-CV-181 at Dkt. #118-1, p.18.

The MAC is incorporated in the state of Ohio as a not-for-profit organization. Dkt. #231-9.  The MAC is a member of the National Collegiate Athletic Association ("NCAA"), and members of the MAC must be Division I-A members of the NCAA.  Dkt. #199-1, ¶¶ 8 & 14.  MAC membership encompasses thirteen universities[3] from six states. Dkt. #199-1, ¶ 11.

Pursuant to the MAC Constitution, members ascribe to "[c]ompliance with and vigilant enforcement of [MAC] and NCAA rules."  Dkt. #199-1, p.10.  Failure to achieve and maintain NCAA Division I-A standards may result in a recommendation that the member institution be placed on probation, be charged a financial assessment and/or removed from membership.  Dkt. #199-1, p.12.  Imposition of such sanctions requires the affirmative vote of not less than two-thirds of all full active members present and voting except the offending member.  Dkt. #199-1, p.12.

The MAC Committee on Infractions ("MAC COI"), is responsible for determining
whether specific violations have occurred in NCAA and/or MAC rules.
The committee shall determine whether the violations were
inadvertent or willful; whether the violations involved individuals (who
are either specific student-athletes or institutional staff members), or a

---

[3] Ohio University, Miami University (OH), Western Michigan University, Kent State University (OH), The University of Toledo (OH), Bowling Green State University (OH), Central Michigan University, Eastern Michigan University, Ball State University (IN), The University of Akron (OH), Marshall University (WV), Northern Illinois University and SUNY Buffalo

> member institution, or both individuals and a member institution;
> determine penalties and corrective action; determine whether the
> violations were self-reported; and determine whether the action taken
> should be public or private.

Dkt. #199-1, pp.38 & 42.  Although the MAC COI has authority to assess penalties and

corrective action with respect to individuals and to require member institutions to declare

student-athletes ineligible for intercollegiate athletic competition,

> The Infractions Committee shall have no direct authority to assess
> penalties against institutional staff members.  A member institution,
> however, shall be responsible for the action of its staff members in
> abiding by conference rules.  If a staff member is deemed responsible
> for violations of conference rules, the Infractions Committee shall
> recommend to the member institution involved that appropriate
> disciplinary action against the offending staff member or members be
> taken.

Dkt. #199-1, p.43.  Institutional staff members and student-athletes are considered to have

engaged in unethical conduct if they refuse to furnish information relative to an

investigation of a possible violation of an NCAA or conference regulation when requested

to do so by an official representative of the conference.  Dkt. #199-1, p.43.


IAD Arkeilpane hired Bill Maher as the Assistant Athletic Director ("AAD"), for

Compliance in September of 1998.  Dkt. # 268-1, p.14.  Meanwhile, the relationship

between plaintiff and IAD Arkeilpane continued to be difficult, as evidenced by the

following letter from plaintiff to SUNY Buffalo President William Greiner dated November

19, 1998:

> working for Bob Arkeilpane the past few months . . . has been the
> worst experience of my professional life.  He has been controlling,
> manipulative, and immature.  It is obvious to me and my staff that he
> does not want me to be the basketball coach.  In an effort to
> accomplish that end, he has attempted to build a case to either want
> me to leave or fire me.  His efforts have become a disruption to our

> basketball program.  I will not bore you with the details.  I am sure that
> you will agree that over the past 5-1/2 years, 99% of the time, I
> have represented the institution with dignity and class. . . . Like all public
> figures, I am scrutinized and like all, I make mistakes.  If I push too
> hard on behalf of the student athlete or with admissions, it is because
> I believe in the vision you and I shared in April of 1993.  Bob
> Arkeilpane is attempting to not honor the good faith commitment to
> me provided by Nelson Townsend with your knowledge 'til the year
> 2002.  That was a commitment to coach.  . . . .

Dkt. #196-5, pp.176-77.

IAD Arkeilpane testified at his deposition that it was his recommendation that

Coach Cohane be removed as head coach following the 1998-1999 season, but

President Greiner refused.  Dkt. #231-13, p.2; Dkt. #231-15, pp.5-6; Dkt. #231-18, p.2; 04-

CV-181 at Dkt. #118-1, p.126.  President Greiner recalled IAD Arkeilpane expressing

reservations about Coach Cohane's behavior during a game and at a press event, but by

letter dated January 29, 1999, President Greiner approved plaintiff's contract extension

through April 13, 2002.  Dkt. #196-8, p.12 & 04-CV-181 at Dkt. #119-5, pp.41-44.  The

following month, Robert Arkeilpane was named Athletic Director.  Dkt. #231-23, pp.2-3 &

Dkt. #230, p.1.

By letter dated February 9, 1999, Interim MAC Commissioner Rob Fournier

informed AD Arkeilpane that it had been independently confirmed that during the course of

basketball game between SUNY Buffalo and Northern Illinois University on January 28,

1999, Coach Cohane "reacted during a time-out in a manner that is contrary to the

sportsmanship code of the Conference and the demeanor expected by

administrators/coaches who represent the [MAC]" and issued a Letter of Caution.  Dkt.

#190, p.15.  In response, by letter to Coach Cohane dated March 4, 1999, AD Arkeilpane

emphasized that

> the inappropriate language and comments you made at the Athletic
> Awards Banquet in May and at the Mid-American Conference
> basketball media event in October will not be tolerated. While I also
> understand your explanation of what occurred on the sidelines at
> Northern Illinois between you and your players at the end of January,[4]
> regardless, I was very disturbed to see you on videotape shoving a
> player from behind.  Any similar incidents to those documented above
> will be grounds for immediate removal from your duties as our men's
> basketball coach.

Dkt. #190, p.17; 04-CV-181 at Dkt. #118-1, pp.47-51.


By Memorandum dated March 11, 1999, AD Arkeilpane assigned AAD Maher to

supervise Coach Cohane.  Dkt. #192, p.15.  On March 18, 1999, AAD Maher observed

Coach Cohane watching two prospects on an official visit participate in athletic activities.[5]

Dkt. #192, ¶ 7.


In April of 1999, a caller to a local sports talk radio show claimed that Coach

Cohane conducted an illegal workout of Canisius High School student Brian Keenan.  Dkt.

#221-5, p.3.  AAD Maher spoke with Brian and his father, Tom Keenan, on May 4, 1999.

Dkt. #221-5, p.3.  Mr. Keenan reported that he had accompanied Brian on an unofficial

visit to SUNY Buffalo on March 17, 1999 and that Coach Cohane was in the gym to

---

[4] Coach Cohane acknowledged that the videotape looks bad, but explained that he was
attempting to rally the players and get them into the huddle.  Dkt. #196-5, p.149.

[5] NCAA bylaws limit a prospect's participation in physical workouts or other recreational
activities during a campus visit to activities which are not organized or observed by the
coaching staff and not designed to test the athletic abilities of the prospective student-athlete.
04-CV-181 at Dkt. #122-13.

provide them with an unofficial visit form, but did not observe Brian playing with student-athletes. Dkt. #221-5. Brian Keenan also denied being observed by Coach Cohane during his visit on March 17, 1999 or his subsequent visit on April 18, 1999. Dkt. #221-5, p.3. However, Former Assistant Coach Torgalski informed AAD Maher that Coach Cohane remained in the gym while Brian and other prospects played against student-athletes. Dkt. #221-5, p.5.

On May 18, 1999, AAD Maher conducted an exit interview of student-athlete Nate Johnson, who alleged that SUNY Buffalo coaches were present during off season workouts of the men's basketball team and that coaches had arranged for prospects to play in scrimmages and be evaluated by coaches. Dkt. #192, ¶ 8; Dkt. #235-3, p.2. On May 21, 1999, AD Arkeilpane and AAD Maher met with Nate Johnson, who informed them that team members typically played in pick up games with prospects so that coaches could observe the prospects. Dkt. #190, ¶ 12; Dkt. #221-5, p.4. In an affidavit dated August 20, 1999, Nate Johnson stated that

> 2. While being recruited in the Spring of 1996, I made an official visit to [SUNY Buffalo] and practiced with various varsity members of the men's basketball team which activities were observed by Head Coach Tim Cohane and other UB assistants. The team members I recall being present were: Robert Harris, Mike Martinho, Matt Clemens, Tati Hadavi, Kit Sweny & Racine Young. . . .
>
> 3. During my enrollment period at [SUNY Buffalo], I participated in numerous practice/scrimmages outside the playing and practice season that were observed by Head Coach Tim Cohane and his assistants. These practices were organized at the direction of the coaching staff. . . .
>
> 4. During my enrollment period at [SUNY Buffalo], I participated in workouts with invited recruits on campus visits (official and unofficial) whose practice activities were observed by members of the UB coaching staff including Head Coach Tim Cohane.

> 5. During an official visit by prospect Michael Machreiner (July 1997), I scrimmaged with this recruit and other members of the UB men's basketball team during which I injured my shoulder. The team members I recall being present on that date were Robert Harris, Modie Cox & Matt Clemens. This activity was observed by Head Coach Tim Cohane and other UB assistants. I was also told by Head Coach Tim Cohane not to disclose how this injury occurred but to instead indicate it was the result of an accident that occurred during a summer workout on my own when no coaches were present. During the event four UB coaches were present . . .

Dkt. #241-1, p.13. Former Assistant Coach Fred Batchelor confirmed that Nate Johnson was injured while playing with a prospect from Germany and indicated that such tryouts, at which staff, including Coach Cohane, were present were "a regular occurrence." Dkt. #221-5, p.7. Student-athlete Robert Harris also advised AAD Maher that coaches observed prospects play with student-athletes on many occasions. Dkt. #236-9, p.12.

As part of his inquiry into Nate Johnson's allegations, AAD Maher met with SUNY Buffalo student-manager Sidney Brown on July 27, 1999 and noted that Sidney Brown recalled that Coach Eisenberg called him over to the gym door to ask him to make sure that Terrell and Brian played during a visit on March 17, 1999, but denied observing any other coaches in the gym. Dkt. #261, p.36 & 04-CV-181 at Dkt. #118-6, pp.18-20. Sidney Brown informed AAD Maher that he was aware that coaches were not permitted to be in the gym during visits or out of season and indicated that Coach Valenti "was good with the rules." Dkt. #261, p.36. By telephone conversation on July 29, 1999, Matt Clemens also indicated to AAD Maher that coaches were not in the gym during the July 1997 visit by prospect Michael Machreiner and that he did not recall coaches ever being in the gym during a visit or out of season. Dkt. #261, p.36.

By letter dated August 4, 1999, AD Arkeilpane advised MAC Commissioner Rick

Chryst that:

> As a follow-up to the information we have previously submitted regarding the alleged violations by our men's basketball program, at this time, I would like to formally request the assistance of the [MAC] compliance officer, Rob Fournier.
>
> It seems clear that there is enough information to warrant further investigation, and I am certain we would benefit from Rob's experience and objectivity in matters such as this.
>
> In return, you can expect the complete cooperation of [SUNY Buffalo] in helping to resolve this issue as fairly and expeditiously as possible. Toward that end, we are prepared to provide whatever assistance is necessary.

Dkt. #227, p.5.

By letter dated August 9, 1999, MAC Senior Associate Commissioner ("SAC")

Rob Fournier advised David Price, Vice President for Enforcement at the NCAA:

> The purpose of this communication is to provide a written record to my telephone call last week (3 August 1999) with [NCAA Enforcement staff] representative Chris Strobel regarding an alleged infraction involving one of our Conference institutions – [SUNY Buffalo].  As a result of documentation offered by the school, and after an initial review of information, the Conference will undertake a formal examination and investigation to ascertain any possible wrongdoing, and to that end submit a report to the national office.  If during the course of that review it is discovered that an infraction(s) has occurred, the Conference will promptly detail that event and determine corrective measures through our regular reporting mechanism.

Dkt. #227, p.4.

SAC Fournier explained that the MAC would not conduct an "institutional

investigation unless requested to do so by a member institution pursuant to NCAA and

MAC rules of self-reporting alleged rule violations." Dkt. #255, ¶ 21. SAC Fournier obtained a complete team roster for the prior four or five years from AAD Maher and relied upon SUNY Buffalo for administrative and logistical support, including scheduling of interviews with student-athletes and staff, use of office space at SUNY Buffalo and typing of affidavits, but made his own decisions as to who should be interviewed and the questions asked during the interview. Dkt. #196-23, p.5 & Dkt. #257, ¶ 4. SAC Fournier Dkt. #255, ¶ ¶ 6-7. However, SAC Fournier declared that "in conducting the institutional investigation of the UB men's basketball team in the fall of 1999 on behalf of the MAC, I had no authority to compel persons to give statements or to appear at interviews." Dkt. #255, ¶ 21. AAD Maher declares that he attended "many of the interviews." Dkt. #192, ¶ 13 & Dkt. #196-12, p.53.

SAC Fournier taped most of the initial interviews, reviewed the tapes, drafted the affidavits and presented them to the student-athletes for review, and then provided the affidavits to Dennis Black, SUNY Buffalo Vice President for Student Affairs, who met with the student-athletes at SUNY Buffalo, advised them of the significance of the affidavit and escorted them to a notary who witnessed their signature. Dkt. #196-12, pp.21 & 25-27. VP Black stated that he was unaware of the substance of the allegations involved in the investigation and did not read the affidavits but asked the student-athletes to sit with him

> and read it to themselves. I then explained to them the importance of providing . . . full and accurate information and asked them to make sure that the material that they were reviewing accurately and fully reflected their information.
>
> Several of the students made adjustments to the material again at that time. In one case the individual, I believe, struck out a line, and in another case or two, individuals replaced or added words to it.

One or two discussed at least semantics, the meaning of a particular word. But I think it is important to understand that the students spent some time. . . . I would say that the shortest meeting of this type that I had with a student was about five minutes and the longest was up to twenty minutes.

Again, that was an opportunity for the students to really do two things . . . [t]o understand the process that they were engaged in and the importance of providing full and accurate information, and to give them another opportunity to carefully review the material to make sure it accurately reflected their opinion or the materials that they saw.

Once that was done, we then had the students move with the affidavit to another location where again they were given an opportunity to review it as part of the signature and notarization process.

Dkt. #196-12, pp.23-24.


On September 30, 1999, Coach Cohane called the team together during weight training, informed them that he was aware that they had been instructed to meet with SAC Fournier and advised them

that they should be aware that Mr. Arkeilpane wanted to fire me as everybody in Alumni Arena and most of the people around here knew. And they should not . . . feel intimidated, that they've done nothing wrong, that in my opinion, they had a right to counsel before they answered any questions because one of the players had told somebody that they said their scholarship was in jeopardy . . . and I said if there's an athletic director person there, such as Bob Arkeilpane or Bill Maher, don't let them trick you because they're trying to get me fired and that was my advice. I told them to be forthright, I told them to not be intimidated, and don't let them be tricked.

Dkt. #196-5, p.40; *See* Dkt. #196-6, p.24. SAC Fournier met with Coach Cohane and Coach Eisenberg on September 30, 1999. Dkt. #222-4.

In a note dated October 1, 1999, AAD Maher documented a meeting AD
Arkeilpane and AAD Maher conducted with the student-athletes to reassure them that they
were not in jeopardy of losing their grants; emphasize the need for them to be truthful and
forthcoming in their responses to the investigation; reassure the student-athletes "that the
investigation was being conducted by the [MAC] and [SUNY Buffalo]" and to advise them
that they were under no obligation to discuss their response to this investigation with
anyone else.  Dkt. #236-10, p.1.

On or about October 3, 1999, Assistant Coach Dean Cooper informed Coach
Cohane that he was taking a job with the Houston Rockets.  Dkt. #196-5, p.108.  As a
replacement, Coach Cohane wanted to hire Mitch Gillam, a high school coach in
Cleveland, Ohio, who had previously played for plaintiff.  Dkt. #196-5, p.108.

In a press release dated October 5, 1999, SUNY Buffalo acknowledged self
reporting alleged NCAA rules violations in its men's basketball program to the MAC, which
was conducting a review of the allegations and compiling a report to be shared with SUNY
Buffalo and the NCAA.  Dkt. #261, p.34.  The press release provides no details regarding
the alleged violations.  Dkt. #261, p.34.

By letters addressed to student-athletes Nikolai Alexeev, Louis Campbell, Ryan
Chaffe, Damien Foster, Carlton Fox, Robert Harris, Kerry Hendrickson, Brian Keenan,
Jonathon Kleidon, Davis Lawrence, Maliso Libomi-Mampuya, Michael McKie, Michael
Sinclair, Clement Smith and Alexei Vassiliev dated October 6, 1999, AD Arkeilpane stated:

I appreciate you taking time the other day to answer questions regarding a review of NCAA/[MAC] regulations as they affect our athletic department.  It is our policy to be open, forthright and cooperate fully with these organizations. Our position is to always be in strict conformity with the requirements of the NCAA and what is expected of all our coaches, administrators and student-athletes. More importantly, if we are at fault, we acknowledge the error and correct the problem.

I want to assure you that your responses to this inquiry will in NO way jeopardize any financial aid (athletic scholarship) that you may presently be receiving.  It is, however, vitally important that you have been, and continue to be, truthful and honest in your discussion with the [MAC] regarding this matter.  The administration at [SUNY Buffalo] in conjunction with the [MAC] is continuing to review the information provided during the interviews last week.

Dkt. #192, p.23.


On Thursday, October 7, 1999, Coach Cohane and Coach Eisenberg met at a local restaurant.  Dkt. #241-2, p.17.  Plaintiff explained that they met to discuss allegations that Coach Eisenberg had been in a hotel room with underage girls during a SUNY Buffalo basketball tournament in Hawaii.[6]  Dkt. #196-5, p.26.  In a note dated Friday, October 8, 1999, AAD Maher indicates that he, AD Arkeilpaine and Coach Eisenberg met to discuss the meeting between Coach Cohane and Coach Eisenberg and that Coach Eisenberg was informed "that he worked for the University and would remain employed as a coach for the foreseeable future."  Dkt. #236-10, p.3. In a note dated Monday, October 11, 1999, AAD

---

[6] By affidavit dated June 21, 2011, submitted in support of plaintiff's response to defendants' motions for summary judgment, Daniel Valenti, former team manager for the men's basketball team and Coach Valenti's son, sets forth the details of this allegation.  Dkt. #219, pp.1-3.  A photograph of Coach Eisenberg with the shows one girl with her arm around Coach Eisenberg standing between Coach Eisenberg's legs, Coach Eisenberg sitting on a bed with an arm around each girl, and another girl sitting on the bed with one leg across Coach Eisenberg's knee. girls.  Dkt. #219, p.5.

Maher indicates that he

> contacted Rob Fournier at the [MAC to] inform him of the discussions
> that transpired on Friday involving Eric and Tim. Suggested that the
> statements be secured in an affidavit as soon as possible. I then
> drew up the affidavit and presented it to Eric. Eric contacted his
> attorney and had the statement reviewed. Once one small edit was
> made, Eric signed the affidavit and it was sent to Rob Fournier.

Dkt. #261, p.21. In the affidavit, dated October 11, 1999, Coach Eisenberg asserts that

Coach Cohane offered to "absolve the personal loan that he has provided me in the

amount of $40,987.30" and pay his expenses to move to Brooklyn if Coach Eisenberg

resigned from the men's basketball program and amended his statement to SAC Fournier

so that Coach Cohane "would appear to have not been involved in any improprieties."

Dkt. #193, p.6. Plaintiff denies these allegations. Dkt. #196-5, p.29.


Coach Cohane introduced Mitch Gillam to AAD Maher on October 8th or 9th as a

potential replacement to Coach Cooper. Dkt. #196-5, p.108-109. Mitch Gillam quit his job

and moved to Buffalo to be able to start practice with the team, but when Coach Cooper

officially resigned on October 14, 1999, AAD Maher informed Coach Cohane that AD

Arkeilpane would not allow Coach Cohane to hire him. Dkt. #196-5, pp. 110.


On October 15, 1999, plaintiff met with President Greiner to inform him of the

incident in Hawaii involving Coach Eisenberg. Dkt. #196-20, p.5. President Greiner

recalled that plaintiff "made some allegations about this incident and behaviors" but did not

"remember the particulars" and did not recall plaintiff making the allegations to him

directly. Dkt. #245-11, p.7.

-16-

Effective October 18, 1999, President Greiner instituted protocols

- prohibiting changes in the status of men's basketball staff "except with the full knowledge and express concurrence of the Director of Athletics and the Senior Vice President;"

- directing attendance of the Director of Athletics or his designee at all practices, games and team meetings;

- prohibiting contact or conversation between coaches/staff of the men's basketball program and team members outside of the presence of the Director of Athletics or his designee except during practices, games and team meetings;

- directing a meeting between the Vice President for Student Affairs and the team, outside of the presence of coaches and athletic staff, to explain to team members their rights and duties as UB students and student-athletes with respect to the MAC investigation; and

- prohibiting any change of status for any member of the men's basketball team "except with the full knowledge and express concurrence of the Director of Athletics, the Senior Vice President, and the Vice President for Student Affairs."

Dkt. #227, p.8. President Greiner testified that he implemented the protocols so that the men's basketball program could "be closely supervised on a daily basis by a representative of the athletics department other than the head coach" because he "was concerned that the head coach would . . . cause further injury to the university." Dkt. #258-1, p.3. President Greiner felt that Coach Cohane had "challenged the right of the university to exercise institutional control." Dkt. #258-1, p.3. Specifically, President Greiner testified that Coach Cohane "declared his position that he owned . . . the basketball program and I and the rest of the institution really should have very little to say about it." 04-CV-181 at Dkt. #119-5, pp.91-93.

The following day, VP Black sent a letter informing members of the UB men's basketball team that President Greiner had asked him to meet with them to review the MAC investigation to date, review the new UB men's basketball operating protocols, encourage students' continued cooperation with the MAC investigation and advise students of their rights and responsibilities as UB students and student-athletes. Dkt. #245-12, p.3. The meeting was scheduled for October 20, 1999. Dkt. #245-12, p.3. Mr. Black subsequently reported, *inter alia*, that

> The team members were advised that UB expects the MAC representative to return to campus next week for more interviews, to request students to review and sign affidavits based on the conversations, and to then conclude the investigation. The prospect of [the] MAC finding be[ing] issued to the campus approximately one week later was shared, as was the need for full cooperation to bring this to a speedy but fair conclusion.
>
> The team members were assured that cooperation with the MAC review and their honesty would fully protect both their student status and their financial aid status.

Dkt. #245-12, p.2.

In an affidavit dated October 22, 1999, Fred Batchler, Assistant Coach for the men's basketball team from 1996-1998, stated:

> 2. While I was a member of the coaching staff it was a common practice for the coaches to be present when student-athletes practiced prior to the start of official practice. Coach Cohane made it a point to be there when the student-athletes practiced.
>
> 3. When prospects came in for visits (official and unofficial) it was important for Coach Cohane to be present to watch them scrimmage (play in practices) with other members of the team. . . . It was an opportunity to see prospects on visits without having to go see them off-campus at their games. The scrimmages in those situations were usually an hour and a

-18-

half.  The coaches would talk about how the students performed in those arrangements when we met later.

4. One specific instance I remember when a student-athlete visited campus and played with members of the team that was observed by Coach Cohane was when a prospect from Germany arrived (Michael Machreiner).  He practiced one-on-one with an assistant coach (Ron Torgalski) and then practiced with members of the team.  I remember this specific case because one of our players (Nate Johnson) got hurt in the scrimmage.  Coach Cohane was present.

* * *

6. In the preseason (prior to the start of official practice), student-athletes would be arranged on specific teams so the coaches could see them play together.  These "captain practices" would have teams that the managers would communicate lineups.  The coaches observed these activities.  After Bill Regan (former compliance director) had been pressing this issue about coaches being present, Coach Cohane warned us that "you were on your own if you got caught."  Coach Valenti became the "sacrificial lamb" when he got caught one day at a practice.  No other coaches were present on this occasion although on other occasions me and Coach Cohane would run out of different exits so as not to get caught by Mr. Regan.

Dkt. #241-2, p.13.

In an affidavit dated October 22, 1999, student-athlete Nikolai Alexeev stated that no coaches were present when he played against prospects during informal scrimmages during the past year nor were any coaches ever present during informal five-on-five scrimmages prior to October 15th.  Dkt. #241-2, p.10.

In an affidavit dated October 22, 1999, Sidney Brown, student-manager for the men's basketball team during the 1998-1999 season, stated

-19-

Last spring (1999), I was instructed by Coach Cohane[7] to make sure that two prospects visiting campus on the same day played against each other. The two recruits were Terel Ware and Brian Keenan. . . . Coach Cohane watched us practice/scrimmage and it was Cohane who wanted me to make sure the two played against each other. [8]

Dkt. #241-2, p.15.

In an affidavit dated October 23, 1999, student-athlete Alex Vasiliev stated that he had played against prospects in informal scrimmages in the past year, but "[n]o coaches were present when this activity took place" and that he had participated with various team members in informal five-on-five activities in the gym prior to October 15th, but "[n]o coaches were ever present when these activities took place." Dkt. #241-3, p.3.

In an affidavit dated October 25, 1999, Blake Johnson, a member of the Kent State University men's basketball team, stated that he visited SUNY Buffalo in the Spring

---

[7] This affidavit conflicts with AAD Maher's note that on July 27, 1999, Sidney Brown recalled that Coach Eisenberg called him over to the gym door to ask him to make sure that Terrell and Brian played during a visit and that he did not observe any other coaches in the gym. Dkt. #261, p.36. At his interview with the NCAA Enforcement staff, Mr. Brown "explained that a more accurate statement would be that Cohane provided the instruction to Eisenberg who passed the directive to Brown" and at his deposition Mr. Brown further explained that he assumed that it came from Coach Cohane because he was the coach, but did not intend to imply that Coach Cohane was the one who told that to him directly. 04-CV-181 at Dkt. #118-7, pp.12-13.

[8] In an affidavit dated June 20, 2011, submitted in support of plaintiff's response to defendants motions for summary judgment, Sidney Brown affirms that this affidavit "was untruthful and factually inaccurate," explaining that he "did feel some pressure while being interviewed by Mr. Fournier" and stating that he did "not understand why Mr. Maher, who had previously conducted an interview with me, would permit me to be placed in a position where an inaccurate statement would be signed, especially when the October 29 [sic], 1999 statement was wholly inconsistent with the truthful and accurate information I provided Mr. Maher during my July 27, 1999 interview." Dkt. #215. At his deposition, Mr. Brown reiterated that the statements that Coach Cohane watched the scrimmage and wanted to make sure that Ware and Keenan played against each other was not true. 04-CV-181 at Dkt. #118-6, pp.23-24.

of 1999 and

> was escorted into the gymnasium where other members of the [SUNY Buffalo] basketball team and other junior college team players were playing a five-on-five scrimmage/pickup game. Coach Cohane was present. Coach Cohane asked me if I was going to play in the activity. When I indicated that I would not, his response was to the effect that ". . . if I was not going to play, then how were they going to be able to give me a scholarship. We have to see you play now."

Dkt. #241-2, p.26. Blake Johnson stated that Ricky Williams and Ricardo Jackson, players he knew from junior college, were also present and that Coach Cohane was in the gym the during the approximately 15 minutes that he remained in the gym. Dkt. #241-2, p.26.

In an affidavit dated October 27, 1999, student-athlete Mike McKie stated that Coach Cohane met with the team prior to their meeting with SAC Fournier and implied that "we should know better than to disclose" NCAA rule violations. Dkt. #241, p.1. Mike McKie also stated that Coach Cohane observed him practice with members of the men's basketball team during an unofficial visit in 1998 and that Coach Cohane often watches players scrimmage before October 15th. Dkt. #241, p.1. Following one such scrimmage, Mike McKie affirms that Coach Cohane told him he was impressed with how McKie had played that day and commented that he had really gotten better. Dkt. #241, p.1.

In an affidavit dated October 27, 1999, student-athlete Robert Harris stated:

> 2. As a member of the UB basketball team, team members would often play against prospects when they came to campus for official and unofficial visits. . . . The coaches would always watch the prospects play against us. Coach Cohane would always watch the prospects play against us – sometimes on the third floor track and sometimes he would just be on the floor.

4. Prior to the start of official practice (October 15), we would scrimmage as a team in five on five drills/games. Coach Cohane would be present for these scrimmages. If we played in the main gym, you could see Coach Cohane looking down, if in the triple gym, sometimes Coach Cohane would be on the court or looking through the windows.

5. I remember one time a fight breaking out in one of these pre-season scrimmages (five on five prior to October 15) between Ryan Peterson and Scott McMillin. I remember Scott looking up at Cohane on the track and yelling ". . . there goes your senior leadership." The coaches were always watching – sometimes two or three at a time. It did not matter if you played at either 4:00 PM or 9:00 PM at night, coaches were always visible and sometimes just sat on the bench.

6. As we got closer to the start of official practice (after October 15), Coach Cohane would go onto the court when we were playing. He might tell us that we needed to make five (5) passes before you could shoot or if a player was late getting down court, you were supposed to wait until everyone was down to your end of the court.

7. I remember after Coach Valenti was caught by the compliance director (Bill Regan) for being in the gym when we were practicing pre-season and Coach Cohane made a big joke ". . . that you had to be quicker in the future." The players laughed about the incident. I can remember managers running into the gym to warn the coaches and Coach Cohane if someone was coming.

Dkt. #241, pp.56-57.

In an affidavit dated October 27, 1999, student-athlete Louis Campbell stated:

2. I have participated in numerous workouts with prospects who have made official and unofficial visits to campus since I enrolled in 1997. During most (if not all) of these visits Coach Cohane would be present and observed the prospects playing.

3. The team would get together informally prior to the start of
   official practice (October 15th) and scrimmage in a five on five
   situation. Many times Coach Cohane would observe these
   activities and he would be present for periods of time.
   Sometimes Coach Cohane would talk to me about how I
   played during these scrimmage games and things I needed to
   work on.

4. Mike McKie had told me that Coach Valenti tried to get him to
   alter his recollection of the facts for this investigation for the UB
   men's basketball program – that he would get him to change
   his story or not admit to things he knew.

Dkt. #241-2, p.16.


In an affidavit dated October 27, 1999, student-athlete Rick Fox stated that he

"played against some of the proposition 48 student-athletes (Mike McKie, Clement Smith)

in the triple gym" when he came on his unofficial visit but "did not see any coaches present

in the gym." Dkt. #241-2, p.21. He also denied that any coaches were present when he

participated with team members in informal five-on-five activities in the gym prior to

October 15th. Dkt. #241-2, p.21.


In an affidavit dated October 27, 1999, Brian Keenan, a non-scholarship walk-on

player, stated:

2. I was on UB's campus maybe seven or eight times in the spring
   of 1999 by invitation of Coach Cohane. He would call my
   father and invite me to practice to play against other recruits.
   Cohane was always present to watch these activities.[9] He led
   me to believe if I was better than the other recruits I played
   against I would get a scholarship. After about the seventh or
   eighth visit I stopped coming. I always asked about the
   scholarship, but Cohane would have an excuse.

---

[9] This conflicts with Brian Keenan's statements as set forth in AAD Maher's notes of May
4, 1999. Dkt. #221-5, p.3.

*  *  *

4.  One Saturday this fall (1999) I remember Coach Cohane in the gym watching us play five-on-five (prior to October 15th). I could not play (blisters on my feet) and we talked on the sidelines. Cohane was there about an hour and a half.

5.  Coach Cohane was upset with me for talking regarding this investigation. The day after my interview he called me into his office and told me he was disappointed in what I told. I explained I was not going to lie.

6.  The day after the first players were interviewed, we had a team meeting in the weight room. Coach Cohane started the meeting by telling everyone (including those not yet interviewed) that the players did not have to talk to anyone regarding this investigation. Team members did not have to answer any questions.

7.  Players felt intimidated by Coach Cohane's comments in the weight room regarding the investigation. Cohane's comments gave the impression that if this investigation did not go well for him, we might be playing for another coach and [illegible] our positions/playing time may be altered.

Dkt. #241-2, p.28.


In an affidavit dated October 27, 1999,[10] student-athlete Jonathan Kleidon

stated:

2.  I have participated in numerous workouts with prospects . . . since I enrolled in 1996. During some of these visits Coach Cohane would be present and observed the prospects playing.

_____

[10] Although Jon Kleidon originally signed an affidavit indicating he had not seen anything that would support a finding of NCAA violations, he subsequently left a note asking SAC Fournier to call him, at which time he indicated that he had not been honest and provided the information contained in the October 27, 1999 affidavit. Dkt. #242-12, pp.14-17. SAC Fournier did not include the original affidavit in his MAC report, but recalled evidence of Jon Kleidon's differing testimony at the MAC hearing. Dkt. #242-12, pp.16-20. The original affidavit does not appear to be in the record before the Court.

3. The team would get together informally prior to the start of
   official practice (October 15th) and scrimmage in five on five
   situations.  Sometimes Coach Cohane would observe these
   activities and he would be present for extended periods of
   time.[11]

Dkt. #241-2, p.29.

---

[11] As noted *infra*, Jonathan Kleidon provided an affidavit dated December 30, 1999 in
response to the MAC report and on behalf of plaintiff in which he states, *inter alia*, "[i]t was
never my impression that [coaches were present in the gym during scrimmages or visits by
prospective players] to evaluate, coach or have tryouts."  Dkt. #238, p.41. Thereafter, by
affidavit dated June 20, 2011, submitted in support of plaintiff's response to defendants'
motions for summary judgment, Jonathan Kleidon explains:

> 9. In mid-October of 1999, I spoke with Mr. Maher about the investigation.  Mr.
> Maher implied that if I did not change my testimony to conform to the testimony
> of other players who apparently testified against Coach Cohane, that I would be
> at "risk of losing [my] scholarship and eligibility."  I asked him if he really meant it
> and he stated, "If you don't cooperate, then you risk losing your scholarship and
> eligibility."  He made it sound as if the violations against Coach Cohane were a
> done deal and that I was the only person who was not testifying against Coach
> Cohane.

> * * *

> 13.  In late October of 1999 when the MAC interviewed me a second time about
> Coach Cohane's alleged NCAA violations, I was very scared of losing my
> scholarship because of Mr. Maher and Mr Arkeilpane's comments and actions.
> When the interview began, Mr. Fournier continually pointed to and mentioned
> NCAA Rule 10.1 during my testimony.  Mr. Fournier informed me that other
> players had testified against Coach Cohane and that if my testimony differed
> from theirs, I was threatening my scholarship and eligibility due to NCAA Rule
> 10.1.  After approximately a ½ hour of this type of interviewing by Mr. Fournier, I
> felt threatened and agreed with Mr. Fournier's version of the events in order to
> preserve my scholarship.  After rehearsing his questions and answers with me,
> Mr. Fournier claimed he did not realize the tape recorder had not been turned on.
> I was under the impression that the entire interview had been recorded, as the
> first interview was.  Mr. Fournier then activated the tape recorder and took an
> approximately 5 minute tape recorded interview.  During this tape recorded
> interview I gave inaccurate answers for the fear of losing my scholarship. I then
> signed an affidavit consistent with what they wanted me to say.  I only changed
> my original affidavit because I did not want to lose my scholarship and eligibility
> in my senior season.

Dkt. #238, p.41. When questioned about the tape recording during the NCAA COI proceedings,
SAC Fournier explained that Mr. Kleidon

> specifically asked me not to turn [the tape recorder] on.  It was a confessional of
> the soul that everything had happened, and finally at one point I said, "Jon, I am
> going to turn the tape recorder on now, so you can speak for the record."

Dkt. #196-12, p.56.

In an affidavit dated October 27, 1999, Trainer Karl Kozlowski stated:

1. Prior to the start of official practice (October 15th) in the fall of 1997 I would come in early to the office. Managers would be posted outside the doors to stand guard so that no one could get in (to the triple gym). I could hear the voices of coaching staff members that sounded like a team practicing inside.

2. I told the Compliance Director (Bill Regan) about the activity going on inside the gym prior to October 15th. I had a good rapport with the team managers and asked them what was going on inside the triple gym. They told me they were just standing there watching out for people so that the team could practice without being detected. Aaron Sideon was one of the managers who told me that the coaches were inside conducting the practices.

3. I did see Coach Cohane and Valenti in the triple gym conducting the practice activities prior to October 15th. I could at other times detect their voices coming from the gym. The players even told me they were involved in full practices conducted by Coach Cohane prior to October 15th. I was concerned about injuries since no training staff member was present.

Dkt. #241-2, p.30.

In an affidavit dated October 27, 1999, Patricia Lynch, former secretary for the

men's basketball team, affirmed that she

often observed Coach Cohane in the gym watching the men's basketball team play five-on-five prior to the start of official practice. I once asked the former Compliance Director Mike Gentile if this was permissible for Coach Cohane to do. He said it was not allowed and had approached Coach Cohane about this.

Coach Cohane would watch the prospects play against team members in the gym when they visited campus. I remember specifically a prospect from California because I took him a note in the gym where he was standing. Often I would bring him messages while various recruits were playing.

Dkt. #241, p.3.

In an affidavit dated October 27, 1999, student-athlete Davis Lawrence stated:

2. While being recruited in the Spring of 1998, I made an unofficial visit to [SUNY Buffalo] and practiced with various, varsity members of the men's basketball team which activities were observed by Head Coach Tim Cohane. He was the only coach in the gym and I talked with him after the games. He said I played like Mookie Blylock. Two other prospects played with me in those games – Kerry Hendrickson and Mike McKie.

3. When the players participate in scrimmages pre-season in the gym, I will often see Coach Cohane watching us. One time he told me he was "impressed" with how I played on a Saturday [and] that I had "really gotten better."

Dkt. #241-2, p.31. In his own handwriting, Davis Lawrence added that

6. Coach Cohane wanted to know what was said on my part after the investigation. Coach Cohane also told us in a team meeting, we did not have to talk to the investigator and we should let him know if we are contacted in the future to give testimony.

7. Last year during conditioning, Mike McKie, Clement Smith and myself worked out with the regular team members.[12]

8. Last [S]pring workout [sic] with a coach arranged by Coach Cohane who was doing (big man drills) with Clement and Mike.

Dkt. #241-2, p.31.


In an affidavit dated October 27, 1999, student-athlete Mike Sinclair stated that he had played against prospects in informal scrimmages and participated in informal five-on-five activities in the gym prior to October 15th in the past year, but no coaches were present. Dkt. #241-2, p.37.

---

[12] Mike McKie, Clement Smith and Davis Lawrence were non qualifiers, *i.e.*, did not meet academic standards, and were not, therefore, permitted to play or practice with the team during the 1998-1999 season.

In an affidavit dated October 27, 1999, student-athlete Clement Smith stated:

2.   I remember last spring playing in a pickup game with Rick Fox
     who was visiting campus and some other UB players (Mike
     McKie).  Coach Cohane watched us play - not on the court, but
     up in the stands.

                              * * *

4.   Coach Cohane brought me into his office and asked me about
     what I told Rob Fournier during my interview.  He also had a
     meeting with the team when the investigation was being
     conducted.  Coach Cohane let the team know that "they did
     not have to talk with Fournier."

5.   Sometimes when we played on Saturdays this fall (prior to the
     start of the official practice), Coach Cohane and Coach Valenti
     would be present.  Not on the court, but in the stands or in the
     doorway watching us play.

Dkt. #241-2, p.42.


In an affidavit dated October 28, 1999, student-athlete Maliso Libomi stated:

2.   I have participated in numerous workouts with prospects who
     have made official and unofficial visits to campus since I
     enrolled in 1997.  During most (if not all) of these visits Coach
     Cohane would be present and observed prospects playing.[13]
     The captains would call and tell me I had to play because the
     coach wanted me to play against the recruit.  I was the host

_____

[13] In an affidavit dated December 30, 1999, presumably obtained by plaintiff, Maliso
Libomi stated that he "did not mean to imply that [Coach Cohane] was conducting practices and
tryouts" or "breaking NCAA rules" when he testified earlier about Coach Cohane being in the
gym.  Dkt. #238, p.46. Subsequently, by affidavit dated June 30, 2011, submitted in support of
plaintiff's response to defendants' motions for summary judgment, Maliso Libomi stated that his
affidavit of October 28, 1999 was not accurate, nor did it comport with his taped interview with
Mr. Fournier and AAD Maher, but that he signed it because he "was lead to believe by Mr.
Dennis Black that everyone was saying Cohane was observing players play and if I didn't sign
the affidavit I might lose my scholarship."  Dkt. #218, p.2.  SAC Fournier agrees that the tape of
his interview with Maliso Libomi on September 29, 1999 does not contain any suggestion that
Maliso Libomi was aware of coaches observing prospects playing and suggests that Mr. Libomi
may have met with him on another date and asked not to be recorded or may have
"rehabilitated . . . or added to his communication."  Dkt. #242-12, pp.201, 206 & 208.

last year for a recruit from Canada and Coach Cohane was present while we were playing basketball with the recruit.

3.  The basketball team would get together informally prior to the start of official practice (October 15th) and scrimmage in five on five situations.  Many times Coach Cohane would observe these activities and he would be present for extended periods of time.  Sometimes after these scrimmages, Coach Cohane would ask us how a given person played today, what do I think about this player, his strength, what this person needs to improve on . . . . talk to me about my game – I've got a lot of things to work on to improve my game.

Dkt. #241-2, p.32.


In an affidavit dated October 28, 1999, student-athlete Kerry Hendrickson

stated:

2.  Coach Cohane wanted to know what I said in my interview (for the NCAA investigation) and he talked to people one-on-one and wanted to know what happened.  This was on the day which we took team pictures and it was after Rob Fournier told us not [to] talk about the investigation.  Mike (McKie) and Lou (Campbell) got the same questions from Coach Cohane.  Coach Cohane told us that we did not have to talk to Fournier/Maher if we did not want to. He told the team that we should let him (Cohane) know what was going on. . . .

3.  As a team, we agreed not to talk around Alex Vassaliev, Damien Foster and Nick Alexeev because they would report our conversations back to Coach Cohane. They (those three) are fearful of losing their scholarship or getting dismissed from the team or being sent back to Russia.  We decided to just not talk to them about things we knew especially after what Mike McKie had reported made it back to Cohane from either Alex or Nick.

Dkt. #241-2, p.25.


In an affidavit dated October 29, 1999, student-athlete Damien Foster denied that

any coaches were present when he played against prospects in informal scrimmages in the

past year or participated in informal five-on-five activities in the gym prior to October 15th.

Dkt. #241-2, p.19.


In an affidavit dated October 29, 1999, Former Assistant Coach Ron Torgalski

stated that during his tenure as assistant coach during the 1993 through 1998 seasons:

2.  Coach Cohane regularly brought prospects to campus to watch
    them play pickup games against/with current team members.
    Despite our best efforts to recruit during the year, he would bring
    four or five prospects in to see them personally since he did not
    usually go out during the season.  It was his intention to always
    have the team members play with the prospects when they
    visited either on official or unofficial visits.  Coach Cohane knew
    of this activity.

3.  When prospects visited it was always arranged for them to have
    time to play against our team members - even if it meant an
    activity at ten o'clock at night.  Coach Cohane knew how it was
    arranged and he discussed it at times during staff [meetings] of
    the basketball coaches (men).  Sometimes a captain was called
    to setup a "run" at a certain time - which was a tryout with a
    certain prospect and the team.

4.  If a staff member brought up that it was improper to have
    prospects play with our team members and to watch this activity,
    his response was that " . . . the best thing we do on our visits is
    to have these kids play against our kids." Coach Cohane would
    watch these activities.  In only rare instances would a prospect
    not play – when they were coming off an injury for instance.
    Coach Cohane's attitude changed regarding a prospect who
    came to campus that he did not see participate against the team
    members in a practice activity.  An example was prospect Blake
    Johnson (who eventually enrolled at Kent) who could not play
    when he came to campus because of an injury and Coach
    Cohane was not interested after he visited.

                              * * *

6.  Sometimes Coach Cohane would actually be on the court when
    the prospects played and would watch the games with parents
    or coaches who were there on the visit.  In the Spring of 1998
    some prospects came to campus (Jackson, Williams) and

Coach Cohane was down there on the court. In 1997 (August) a prospect from Germany participated in a scrimmage in which one of our players got hurt (Nate Johnson) and Coach Cohane was on the court.

7. I remember Coach Cohane positioning individuals (managers) to watch the gymnasium so that administrators would not discover what was going on [on] the court (improper practices outside the playing season). One time Bill Regan (former compliance director) caught one of the coaches on the court (Valenti) but it had no effect on Coach Cohane – he still went and observed practices outside the playing and practice season and recruits when they visited campus.

8. Coach Cohane would often organize practices prior to start of official practice (October 15). He would have five or six players in for drills. I remember one time him instructing Coach Valenti to "feed someone the ball in the low post" as part of a drill. He was constantly in the gym watching the team in scrimmage-like activities (five on five) prior to October 15 and instructing the captains who should play against each other and various matchups.

Dkt. #239, pp.36-37.


In an affidavit dated November 3, 1999, Scott McMillin stated that he was a member of the men's basketball team from 1996-1998 and a graduate assistant since the fall of 1998, had played against prospects in informal scrimmages and participated in informal five-on-five activities in the gym prior to October 15th during his tenure as a student athlete, and that "[t]o the best of my knowledge, no coaches were present" when such activities took place. Dkt. #241-2, p.36.


In an affidavit dated November 11, 1999, AAD Maher's predecessor, William Regan stated that he was Director of Compliance at SUNY Buffalo from June 1997 to

August 1998 and that

2. One of the recurring concerns that I had while at Buffalo was the rumor that the men's basketball team was practicing impermissibly prior to start of official practice. I had repeatedly discussed this issue with the men's staff including written correspondence detailing the application of this legislation.

3. I had reason to suspect that such impermissible practice/scrimmages were occurring in that members of the men's basketball team were being witnessed by the coaching staff outside the gym. I discovered Coach Valenti by coming in an outside door. I said nothing, but immediately went upstairs and reported this event to the director of athletics Nelson Townsend. At a later meeting, Coach Valenti stated he was in there to arrange Midnight Madness.

4. The above violation was reported and discussed with Coach Cohane and then athletics director Nelson Townsend. Coach Valenti was suspended for a few days, but Mr. Townsend told me that the violation did not need to be reported – that such an acknowledment would only look bad as we were preparing to enter the [MAC] (as a new school).

5. I once discovered a schedule of pickup games to be played by then current members of the basketball team which were to take place prior to the start of official practice. The communication was on the desk of one of the coaches in the basketball office although I ever actually saw the activity or can attest if the activity took place.

7. I suspected that improper tryouts were occurring with prospects who arrived on campus for visits after the injury to Nate Johnson in the summer of 1997. I discussed this incident with athletic trainer Mike Rielly that this expense could not be paid since it was not athletically-related. I thought that this refusal to pay the expense of this injury from practicing against a prospect would finally bring this issue to a resolution. However Nate Johnson refused to discuss the specifics of the injury as he was still on scholarship at the time and a part of the team.

Dkt. #241-2, p.40.

NCAA Enforcement staff representative Chris Strobel noted the following regarding a telephone call from Mr. Fournier on November 11, 1999:

> [SAC Fournier] wants to tell university legal counsel that he talked with NCAA and that good chance a show cause order would be issued against coach by NCAA (cause university wants to use conference report to fire him).

Dkt. #261, p.87.  SAC Fournier recalls that someone from the NCAA first mentioned the possibility of a show cause order against SUNY Buffalo and that he inquired about a show cause order so that he could advise SUNY Buffalo that the NCAA believed the violations were serious enough to warrant such a penalty against SUNY Buffalo, but denies seeking a show cause order against plaintiff.  Dkt. #255, ¶ 14.  AAD Maher denies any conversation with SAC Fournier indicating that SUNY Buffalo desired to use the MAC report to terminate plaintiff or that SAC Fournier ever informed him that the NCAA was likely to issue a show cause order against plaintiff.  Dkt. #235-5, p.3.

AAD Maher conducted a tape recorded interview with Nadav Goldschmied, a volunteer team manager and Canisius College student, on the Canisius College campus on Sunday, November 14, 1999.  Dkt. #261, pp.27 & 29.

SAC Fournier presented his report ("MAC 18 report"), to SUNY Buffalo on November 16, 1999, identifying the following allegations of misconduct against the men's basketball program at SUNY Buffalo:

1.  intentional and evaluative observation of preseason five-on-five games by Coach Cohane and other assistant coaches over the course of many seasons;

2.  coordinated participation of prospects in informal pick up games with team members which were observed by Coach Cohane and other members of the coaching staff for evaluative purposes;

3.  Coach Cohane permitted an additional staff member to assist in drills/skill-related activities with academically ineligible members of the basketball team during the 1998-1999 season;

4.  excessive number of coaches permitted to conduct on-court practice activities;

5.  playing and practice season in excess of weekly hour limitations going back to 1995-1996 academic year;

6.  impermissible benefits provided to prospects;

7.  student-athletes were allowed to store personal items at Coach Cohane's home during summer vacation;

8.  non-qualifiers present at regular season practices and pre-season conditioning activities;

9.  impermissible use of telephones to make long distance calls at SUNY Buffalo expense;

10. pre-school barbecue for student-athletes and their parents/friends conferred an impermissible benefit;

11. Mike McKie's enrollment secured by Coach Cohane's offer of employment to Eric Eisenberg;

12. impermissible inducement to prospects to enroll at SUNY Buffalo by inviting recruits to participate in workouts/scrimmages;

13. excessive number of student-athletes participating in pre-season skill sessions prior to start of official practice;

14. Coach Cohane and Coach Valenti attempted to impede the investigation;

15. SUNY Buffalo's failure to report Coach Valenti's presence in the gym during a pre-season scrimmage in the Fall of 1997 which resulted in Coach Valenti's suspension;

16. Failure of Coach Cohane and Coach Valenti to respond truthfully to questions posed during the course of this investigation;

17. Failure of Coach Cohane and Coach Valenti to disclose NCAA violations; and

18. Coach Cohane's admission to loaning student-athlete Modie Cox $12,000 to secure his release from jail.[14]

Dkt. #229-11, pp.13-23. Each allegation was accompanied by a description of the evidence obtained during the course of the investigation. For example, with respect to the first allegation, SAC Fournier outlined the following:

> A number of affidavits address the presence of Coach Cohane and Coach Valenti at these activities. These observations were for periods of time which would reflect an evaluative or informational component. Certainly the statements provided reflect an acknowledgment that the coaches who witnessed these activities were present for more than a "brief period of time." Additionally, it corroborates a pattern that has continued unabated for a period of time despite the imposition of a previous corrective measure (see allegation #15). Former assistants, as well as former and current student-athletes, have offered testimony that the above activities were observed by both coaches Cohane and Valenti. Coach Cooper was adamant about his non-involvement in these observation activities emphasizing that he knew such participation was not permitted within NCAA legislation. Assistant coach Eric Eisenberg admits a knowledge of Coach Cohane's attendance. Team trainer Karl Kozlowski has provided an affidavit that in the Fall of 1997, prior to the start of official practice, he would see managers posted as guards outside the gymnasium doors early in the morning and voices of coaching staff members inside the facility conducting what in his perception was practice activities. However, Kozlowski was not admitted inside the gymnasium. Former director of compliance Bill Regan recounted how he was thwarted in his attempts to directly confront this allegation until he surreptitiously entered the gymnasium the day he confronted Coach Valenti (see allegation #15).
> . . .

---

[14] The NCAA Case Summary concluded that although plaintiff acknowledged providing $12,000 to Cox during the summer of 1997 so that Cox could post bond on criminal charges and pay for his legal counsel, "[t]his provision of money occurred after Cox had left the institution and had exhausted his NCAA eligibility, and as such, the enforcement staff did not regard this as a violation of NCAA legislation." 04-Civ-181 at Dkt. #112-21, p.37.

Of all the current student-athletes on the team, Jon Kleidon has the longest continuous tenure. He acknowledges that these observed performances have gone on for each year he has been in the program (1996 season to the present) and that Coach Cohane regularly watched these activities. Robert Harris, who was recruited by Coach Cohane and is still enrolled at [SUNY Buffalo] and was a team member as early as 1995, noted that as the team got closer to the start of official practice, Coach Cohane would often be present on the court to give specific instructions (i.e. telling the players to make a certain number of passes before you shoot).

Former student-athletes Nate Johnson, Koran Godwin, Rob Harris and Zaid Alkhas all acknowledge that these activities were observed by Coach Cohane and therefore would date these impermissible observations back to at least the Fall of 1995.[15] The testimony of former assistants Fred Batchler and Ron Torgalski further substantiates the regularity of this involvement over the years. Ron Torgalski admitted that Coach Cohane would sometimes arrange who should play in certain match-ups in these activities.

A number of current student-athletes have observed Coach Cohane in one of the two gymnasiums this year while the team played informally. Many of these student-athletes related specific instances when Coach Cohane spoke to them as part of this activity.

Mike McKie: "he told me he was impressed with how I played and that I had really gotten better."

Louis Campbell: "Coach (Cohane) would talk to me about how I played during these scrimmages and what I needed to improve upon."

Brian Keenan: "Coach Cohane watched the team play one Saturday, but I could not participate because of blisters on my feet. We talked together on the sidelines."

Davis Lawrence: Coach Cohane told me how impressed he was with my play and how I had really gotten better."

---

[15] As subsequently amended *infra*, the MAC 20 report inserted the following:

Former student-athlete Ryan Peterson, interviewed by the NCAA at Seton Hall, has confirmed that these activities [observation of pre-season five-on-five play] took place and were regularly observed by Coach Cohane.

Dkt. #227, p.16.

Maliso Libomi, "Coach would tell me things I needed to improve upon - I have a lot of things to work on to improve my game."

The above statements would appear to indicate that not only did Coach Cohane observe these activities, but took the time to comment on the play of specific student-athletes which would indicate an evaluative observation of these activities.[16]

Two current, foreign student-athletes (Nikolai Alexeev and Alexi Vasiliev) did not see Coach Cohane during these activities. Likewise, Mike Sinclair and first year student-athlete Rick Fox also did not see any coaches present.[17] Former student-athlete Matt Clemens (1995 - 1997) also did not observe the coaches present during these activities (although no affidavit was obtained). Current administrative assistant and former student-athlete Scott McMillan has no knowledge of these observed activities by the coaching staff.

Dkt. #229-11, pp.13-14. Plaintiff's counsel acknowledged receipt of the report on

November 18, 1999. Dkt. #194, p.12.


Shortly after the issuance of his report, SAC Fournier recalls that AAD Maher

telephoned him to report an allegation of improper scouting[18] of an opponent by Mitch

Gillam. Dkt. #245-18, p.23. SAC Fournier directed AAD Maher to investigate the

allegation, but did not investigate it himself because his report was completed. Dkt. #245-

19, p.24.

_____

[16] As subsequently amended *infra*, the MAC 20 report inserted the following:

First year participant Rick Fox observed Coach Cohane in the facility for these workouts. Two other student-athletes, Mike Sinclair and transfer Damien Foster, could neither confirm [n]or deny such activities took place.

Dkt. #227, p.16.

[17] As subsequently amended *infra*, the MAC 20 report deleted this sentence.

[18] NCAA bylaws prohibit off campus, in person, scouting of opponents. 04-CV-181 at Dkt. #122-10, p.5.

In an affidavit dated November 17, 1999,[19] Coach Eisenberg stated that Damon Escoffery participated in scrimmages with various team members during an official visit in January of 1999 and that "Coach Cohane observed this activity for an extended, evaluative period of time." Dkt. #193, p.7. Coach Eisenberg reported that

> Coach Cohane referred to this investigation as "bullshit." He tried to intimidate both Assistant Coach Dean Cooper and myself. Tim Cohane tried to get me to alter my testimony by offering to absolve a $28,000 financial debt that I owe him.

Dkt. #193, p.7.


In a second affidavit dated November 17, 1999,[20] Clement Smith stated that Coach Cohane called him into his office and asked him what kind of questions he was asked during the interview with Rob Fournier and told him that he "did not have to give statements/answers as part of this inquiry if I was requested to do so in the future." Dkt. #241-2, p.43. Clement Smith also stated that he

> worked out with Nadav Goldschmied in the triple gym last year [as a nonqualifier] during the season. It was usually Nadav Goldschmied, Mike McKie and myself. Sometimes Davis Lawrence would join us. We did the drills the team did in practice. We worked on low-post moves. We met regularly and did what the team did so we did not fall behind.

Dkt. #241-2, p.43.

---

[19] SAC Fournier declares that he drafted this affidavit prior to the submission of the MAC 18 report. Dkt. #255, ¶ 11.

[20] SAC Fournier declares that he drafted this affidavit prior to the submission of the MAC 18 report. Dkt. #255, ¶ 11.

In a second affidavit dated November 17, 1999,[21] Mike McKie stated:

2.  I worked out with Nadav Goldschmied in the Spring of 1999 [as a nonqualifier] along with Clement Smith and Davis Lawrence. Nadav Goldschmied was working with us on drills the team was working on so that we would not fall too far behind. We worked in the triple gym. . . . It was during the season when the rest of the team were doing the same drills in practice. I know that when this took place the basketball season was not over.

3.  Coaches told us we had to be at these workouts with Nadav Goldschmied. We met three times a week for approximately three weeks. It stopped when classes got hectic for us.

4.  I remember Coach Cohane telling me that Nadav Goldschmied knew the stuff from the team's practices. Nadav Goldschmied attended the teams' practices. [He] taught us stuff like "post moves" and "drop step" and other things from practices. . . .

5.  Coach Valenti told me prior to my interview as part of this investigation that I was not to say that I used the telephones in the basketball office. Valenti talked to me before the interview - trying to "get things straight, try to say the right things." As an example I remember your [sic] not allowed to come over to a coaches house or coaches are not allowed to give you a ride in the car or your [sic] not allowed to use the telephone.

6.  Coach Cohane approached me after the first interview as part of this investigation and told me that I did not have to say anything. I could simply tell you that I had nothing to say and I would not get in trouble. It would not hurt me if I did not say anything.

Dkt. #240, p.19.


In a second affidavit dated November 17, 1999,[22] Former Assistant Coach Ron

Torgalski stated:

_____

[21] SAC Fournier declares that he drafted this affidavit prior to the submission of the MAC 18 report. Dkt. #255, ¶ 11.

[22] SAC Fournier declares that he drafted this affidavit prior to the submission of the MAC 18 report. Dkt. #255, ¶ 11.

During preseason conditioning activities (prior to the start of official practice) often times Coach Cohane would insert additional student-athletes into the individual skill sessions.  At that time, only three student-athletes were permitted in a facility for a workout.  Coach Cohane would put additional student-athletes into these skill-relate[d] sessions exceeding the permissible number.

Dkt. #240-1, p.58.


In an affidavit dated November 18, 1999,[23] Zaid Alkhas stated that as a member

of the men's basketball team:

2. we often played against prospects when they visited campus.  It was only on rare occasions that we did not play against these recruits.  Coach Cohane let us know we had to play in these arrangements.  Coach Cohane was always around to watch us play.  We usually played for at least an hour.  I remember specifically playing against: Clayton Lea, Bodgan Karebin, Kiran Godwin and Louis Campbell when they came to campus for visits.

3. When I was a member of the team at Buffalo, we would get together informally prior to October 15 (the first day of official practice) and we would play five-on-five games.  It wasn't until later in my enrollment did I find out that coaches were not permitted to be present when we played.  The coaches (Cohane and Valenti) were around so much, I thought our activity was a regular part of practice.  Sometimes after these games Cohane would tell me what I needed to work on to get better – drop step, box-out, shooting.  I think that is why my sophomore year when regular practice began that I was in the position that I was.  After watching me play in the pre-season, he had made up his mind that I should be on the second team.  The coaches (Cohane and Valenti) even watched these games after the regular season ended (in the Spring) and we still got together to play.  I saw Coach Cohane in the ma[i]n gym standing up on the track for three or four games each time that we played.

Dkt. #241-2, p.11.

---

[23] SAC Fournier declares that he drafted this affidavit prior to the submission of the MAC 18 report.  Dkt. #255, ¶ 11.

In a notation dated November 18, 1999, NCAA Enforcement staff representative Chris Strobel indicated that SUNY Buffalo wanted "to wipe staff clean" but SAC Fournier "gave credit to one assistant for providing info" so David Price, NCAA Vice-President for Enforcement Services, agreed that there may be "some middle ground if coach [has] been cooperative." Dkt. #235-24, p.2.

By letter dated November 22, 1999, President Greiner appointed VP Black to "act as the presidential designee for the purpose of the campus investigation into alleged improprieties in the UB men's basketball program" and directed him "to undertake a review of the allegations and to make recommendations of staff discipline, if appropriate." Dkt. #191, p.49.

By Memorandum dated November 23, 1999, VP Black reported to President Greiner that he and five other members of SUNY Buffalo's Administrative and Public Safety staff verified documents obtained during the MAC investigation, interviewed witnesses, including student-athletes McKie, Keenan and Hendrickson; Trainer Kozlowski and Assistant Coach Eisenberg and collected additional affidavits and documentation. Dkt. #191, pp.36-37.

By letter dated November 24, 1999, plaintiff was directed to meet with VP Black and Associate Counsel Rosenthal on Monday, November 29, 1999 for questioning "regarding possible violations of NCAA bylaws in the men's basketball program, alleged acts of interference to the ongoing [MAC] investigation, alleged acts of retaliation against

individuals cooperating with the ongoing [MAC] investigation, and violations of the October 18, 1999 protocols for men's basketball operations imposed by President Greiner." Dkt. #241-4, p.41. Associate Counsel Rosenthal responded to plaintiff's counsel's request for copies of the affidavits in support of the MAC report by informing plaintiff's counsel that "there is no legal or contractual obligation to turn over [supporting documentation to the MAC report] prior to or at the interrogation" related to discipline under Article 19 of the collective bargaining agreement. Dkt. #192, p.96 & Dkt. #194, p.12.

In accordance with Article 19 of the State UUP collective bargaining agreement, VP Black conducted an interrogation of plaintiff on November 29, 1999 with respect to alleged improprieties in the men's basketball program. Dkt. #196-5. Mr. Black advised that SUNY Buffalo "is considering suspending you pursuant to the provisions of Article 19 of the agreement and a decision on whether to issue a notice of discipline or a suspension will be made after considering responses to my questions today." Dkt. #196-5, p.2. Plaintiff was represented by counsel and provided a copy of the MAC 18 report. Dkt. #196-5, pp.11-12.

From the outset, plaintiff asserted that he intended

to prove that this is a conspiracy by an athletic director who is on record that when he was going to become the athletic director, he was going to have me fired. And he conspired with others in the administration and he conspired with my assistant coach who was led to believe that regardless of what happened, I was going to be fired and, therefore, there was an opening for him to become the coach.[24]

_____

[24] Fred Batchler recalled Coach Eisenberg speculating that he might get the head coaching job and offering him an assistant coaching position. Dkt. #196-20, p.5. AAD Maher agreed that "[i]t was clear Rock Eisenberg wanted to land a position but Bob and I both talked numerous times that that wasn't going to happen." Dkt. #234-19, p.2. However, AD Arkeilpane denied any conversation with Coach Eisenberg about his interest in becoming the head coach

-42-

And most of these allegations are results of this conspiracy . . . .

Dkt. #196-5, p.10.  Plaintiff noted that

> McKie and Hendrickson played at Tilden High School for Rock
> Eisenberg and Smith and Davis were recruited by Rock Eisenberg.
> They're all from Brooklyn.

Dkt. #196-5, p.45.  Plaintiff also noted his suspicion that "Keenan was recruited by Rock

Eisenberg because he was friendly with his father and promised him a job if he got the job

at Buffalo."  Dkt. #196-5, p.45.


With respect to the observation of five-on-five scrimmages, plaintiff explained

that he "never . . . witnessed five-on-five with the purpose of evaluating."  Dkt. #196-5,

p.47.  Plaintiff further explained that it was permissible for him to observe and instruct

student-athletes outside of five-on-five play, stating

> let's supposing they play two-on-two, okay.  Then they go and play
> five-on-five and I see Louis the next day, he stops by the office.  I
> say, Louis, you know you're looking good, you're looking strong, work
> on your jump shot . . . That's where I think . . . the confusion is.

Dkt. #196-5, pp.49-51.  Plaintiff reiterated that any comments with regard to student-

athlete performance referenced his observation of individual or small group workouts and

scrimmages, not five-on-five scrimmages.  Dkt. #196-5, pp.54-56.  With respect to Brian

Keenan's allegation that plaintiff sat on the sidelines with him, for example, plaintiff

asserted that he was observing the student-athletes engaged in individual workouts,

which was permissible.  Dkt. #196-5, pp.53-54.  Plaintiff also noted that

———————————————

and "didn't believe" that Coach Eisenberg applied for the job.  Dkt. #196-12. In any event, AD
Arkeilpane did not believe Rock Eisenberg was "head coaching material at a division one level
at that point in time."  04-CV-181 at Dkt. #118-1, p.70.  Coach Eisenberg testified at his
deposition that he had applied for the position of head coach, but didn't think he would get the
job given the circumstances.  Dkt. #232-6.

> in reading the allegations [in the MAC report] there's four or five kids
> that said that did not happen.  To me that just proves that it's all a
> matter of perception.

Dkt. #196-5, p.52.


With respect to prospects, plaintiff emphasized that it was permissible for them to play, so long as the scrimmage was not designed to evaluate their play.  Dkt. #196-5, p.62.  Although denying that prospects were allowed to play for tryout purposes, plaintiff explained that it was very important to him that the students play when they visit because it is the most important means of demonstrating SUNY Buffalo's basketball culture and allowing both the current team and the prospect to assess their potential fit within that culture.  Dkt. #196-5, p.63.


With respect to Damon Escoffery, plaintiff stated that he was in his office when someone told him that the prospect had punched out a manager, prompting him to enter the gym.  Dkt. #196-5, p.64.  With respect to the allegations of Patricia Lynch, plaintiff stated that she didn't work on Saturdays, which is when the prospects visit.  Dkt. #196-5, p.65. With respect to Nate Johnson, plaintiff surmised that he was attempting to obtain insurance coverage for his shoulder injury.  Dkt. #196-5, p.77.


With respect to Nadav Goldschmied, plaintiff explained that schools can have an unlimited number of students as volunteer managers, but are limited in the number of coaches they are allowed to pay.  Dkt. #196-5, p.91. Plaintiff stated that Mr. Goldschmied was a manager who was knowledgeable about basketball and was appropriately involved in running drills, although plaintiff denied instructing him to work with players.  Dkt. #196-

5, pp.93 & 96.[25]  Plaintiff repeatedly noted that Mr. Goldschmied had denied the allegations to AAD Maher, but that his denials were not included in the report.  Dkt. #196-5, p.94.

Plaintiff emphasized that the report was biased, as evidenced by the fact that individuals who "gave positive testimony for me or against the allegations are not included."  Dkt. #196-5, p.170.  For example, plaintiff noted that the manager allegedly posted at the gym door as a guard, Aaron Seidon, denied the allegation, but was not included in the report.  Dkt. #196-5, p.101.  He further explained that players did not scrimmage in the morning, but that mornings were for conditioning with coaches, which was permitted for up to two hours a week, and that managers could have been posted simply to keep the gym closed to the public.  Dkt. #196-5, p.101-06.

Although noting that "the issue of scouting" was not in the MAC 18 report,[26] VP Black asked plaintiff: "Who is Mitch Gillam and why does everybody want me to know about Mitch Gillam . . . ."  Dkt. #196-5, p.107.  Plaintiff explained his desire to have Mitch Gillam ready to go as soon as Coach Cooper resigned and AD Arkeilpane's refusal to hire Mitch Gillam, leaving Mitch Gillam "in Buffalo without a job and without an income."  Dkt. #196-5, pp.110-112.  Plaintiff denied that Mitch Gillam was scouting on behalf of SUNY

_____

[25]  The MAC report explains that "NCAA legislation does not permit either a volunteer coach nor a manager to perform duties consistent with coaching instruction."  Dkt. #227, pp.19-20.

[26] Although not reported to the NCAA until January 3, 2000, *infra*, SUNY Buffalo completed an NCAA Self Report Violation Form detailing scouting violations involving Mitch Gillam on December 1, 1999.  Dkt. #241, p.242.

Buffalo or that he provided scouting information to plaintiff, explaining that Mitch Gillam

went

> to the Niagara basketball game, as a free citizen is allowed to, now
> Niagara tapes Mitch Gillam, sends it over to Arkeilpane, to his great
> glee and joy . . . well, you broke the protocols, what's Mitch Gillam
> doing scouting? We have him on tape. I said, hey Bob, Mitch Gillam
> should be working here, then he wouldn't be able to scout. He's a
> free citizen, he can go where ever he wants, when he wants to. Then
> Maher says I saw him in your office this morning. I know what he was
> doing, telling you about Niagara. I said hey Bill, he can come in my
> office anytime he wants to . . . he's a free citizen, don't play with his
> civil rights, you've abused 'em enough and like I said of all the things
> that's happened, this is the most disgraceful. You gotta guy sittin'
> here for two months, without a job, lead [sic] up to believe by this
> University or its representative that he was hired here.

Dkt. #196-5, pp.112-113.

At approximately 8:00 a.m. on December 1, 1999, a uniformed police officer

delivered to plaintiff's home a letter of suspension without pay and a mandate for plaintiff

to stay off SUNY Buffalo property. Dkt. #196-20, p.7 & Dkt. #234-4, p.2.

By Memorandum dated December 1, 1999, President Greiner and AD

Arkeilpane advised SAC Fournier that

> We have your report of November 16, 1999, detailing infractions
> within the University at Buffalo's men's basketball program. Based
> on the information and documentation provided, as well as our own
> internal review, the university accepts the report and acknowledges
> the findings detailed therein. The University will proceed with
> corrective measures premised on the severity of the charges, as well
> as precedents from prior cases of similar violations of NCAA rules.
> We are fully committed to work with the [MAC] and NCAA to
> determine the appropriate corrective measures and the time line for
> implementation.

> Although the men's basketball coach denies any improprieties, we
> have suspended the coach and are implementing disciplinary
> proceedings seeking to terminate his employment.

Dkt. #261, p.58.


In a Memorandum of Understanding ("MOU"), between SUNY Buffalo, Timothy

Cohane and Frank Valenti dated December 3, 1999, plaintiff agreed to resign from his

position at SUNY Buffalo and SUNY Buffalo agreed to pay plaintiff the remainder of his

contract, $265,000. Dkt. #194, p.5. In addition, plaintiff was afforded "the opportunity to

provide to the University his written response to the allegations set forth in the preliminary

report dated November 11, 1999 of the [MAC]," which SUNY Buffalo agreed to transmit to

the MAC. Dkt. #194, p.5. Coach Valenti agreed to resign from his coaching position and

accept alternate duties within SUNY Buffalo for a period ending no later than December

31, 2000, as well as a lump sum payment of $25,000. Dkt. #194, p.5. It was further

agreed that Mitch Gillam would be afforded the opportunity to become an employee of

SUNY Buffalo, with duties not related to the athletic department, until June 30, 2000 or so

long as it took to compensate him in the amount of $25,500. Dkt. #194, p.6. Plaintiff

executed a mutual general release releasing SUNY Buffalo from all claims arising out of,

relating to or in connection with any act, omission, statement, occurrence, obligation or

condition existing as of or prior to the execution of the MOU. Dkt. #194, p.8.


In a press release dated December 8, 1999, SUNY Buffalo "acknowledged

findings detailed in a report from the [MAC] citing infractions of [NCAA] rules and

regulations, as well as those of the MAC, in its men's basketball program and . . . pledged

to implement corrective measures." Dkt. #196-31. The press release indicates that "[a]mong the NCAA infractions cited are improper recruitment, practice and try-out activities; exceeding coaching limitations; impermissible benefits to prospects, enrolled and former student athletes; failure of individuals to cooperate in the investigation, and failure of the university to report a prior infraction." Dkt. #196-31.

By Memorandum dated December 8, 1999, President Greiner informed SAC Fournier that plaintiff had resigned effective December 3, 1999 and Reggie Witherspoon, coach of the men's basketball program at Erie Community College, had been appointed as the interim head coach of SUNY Buffalo's men's basketball program, with Eric Eisenberg continuing as assistant coach and Frank Valenti being reassigned outside of the Athletics Department. Dkt. #226-7.

> In a note dated Monday, December 8, 1999, AAD Maher indicates that
>
> With the approval of Rob Fournier, I addressed the team with respect to their signed affidavits. It had previously been stated that based on the statements that [sic] submitted and the review of the taped testimony[,] several of the team members had been less than truthful. As they had been given previously, the opportunity to review their statements was presented to them. This same opportunity had been given to them by both President Greiner and myself prior to this meeting. When addressing the team in the locker room, I instructed them that there had been conflicting information submitted and that those who it can be determined have been less than truthful in this process would face eligibility consequences. I further informed them that the University would be accepting the report submitted by the MAC and that any opportunity [to] revise their statements would likely not exist once that report is accepted. I told them that I would be available to allow them to review their statements if they so desired.
>
> Following the meeting, Rick Fox and Alex Vassiliev asked to review [their] statements. Rick indicated that he wanted to alter his

statement and I informed him that was possible and he should come to my office to do that. Alex reviewed his statement and was comfortable with it.

In my office Rick indicated that he was aware that during his visit, Mike McKie and Clement Smith had stated that they saw Tim Cohane present. Rick's concern was that he did not see coach Cohane in the gym during his visit and that statement would [contradict] the statement of McKie and Smith. I informed him that he should [sign] a statement was truthful from his perspective and not be concerned with the statements of the others. He revised his statement to read that he did see Coach Cohane in the gym during preseason activities, but did not recall him being present while he participated in activities during his unofficial visit. I revised that statement and told Rick to stop by the following day to take the statement to be notarized.

When Rick left my office, Jon Kleidon[27] came in and indicated that he wanted to amend his statement. This perplexed me because he had previously changed his statement after Rob Fournier had clearly apprised him of the potential ramifications. Jon first said that Cohane was not present in the gym for any recruiting or preseason activities. He then amended his statement to say that he did recall Cohane being present. . . .

Dkt. #261, p.60.

---

[27] By affidavit dated June 20, 2011, submitted in support of plaintiff's response to defendants' motions for summary judgment, Jonathan Kleidon explains:

16. After Coach Cohane resigned, Mr. Maher met with the team in the locker room and told everyone, "The University will be accepting the MAC report." He told us, "You have one more chance to change your affidavits," and that if we did not tell the truth then we would lose our scholarships and eligibility.

17. After I learned Coach Cohane resigned, I went to meet with Mr. Maher in his office in order to clarify my affidavit to comport with my September interview. I told them that I wanted to clarify my testimony because I realized that I had been manipulated and given incorrect answers in the second interview. Mr. Maher became very upset with me, and, fearing that I would lose my scholarship, I did not push the issue . . ..

Dkt. #217-2.

In an affidavit dated December 9, 1999,[28] Rick Fox altered the substance of his affidavit dated October 27, 1999 to "recall Coach Cohane being present in the gym" when he participated with various team members in informal five-on-five activities prior to October 15th.  Dkt. #241-2, p.22.

In an affidavit dated December 9, 1999,[29] Mike Sinclair altered the substance of his affidavit dated October 27, 1999, to state that "[t]o the best of my knowledge, I cannot confirm or deny if any coaches were present in the gym" when he twice played against prospects in informal scrimmages and participated in informal five-on-five activities in the gym prior to October 15th.  Dkt. #241-2, p.41.

NCAA Enforcement staff representative Kevin Pearson interviewed Ryan Peterson at Seton Hall on December 9, 1999.  Dkt. #243-17, p.2.  In his summary of the interview, which was tape recorded, Mr. Pearson explained that he transferred from Buffalo to Seton Hall "because during his sophmore season the team went 5-24; some of the student-athletes left the men's basketball program; it did not appear that any talented prospects had been recruited; and Peterson did not like then Buffalo head men's basketball coach Tim Cohane as a person because he did not feel that Cohane treated people well."  04-CV-181 at Dkt. #122-20, p.2.  With respect to pre-season practices, "Peterson explained that the team scrimmaged five-on-five each day for approximately

---

[28] SAC Fournier declares that this affidavit was drafted by SUNY Buffalo officials.  Dkt. #255, ¶ 18.

[29] SAC Fournier declares that this affidavit was drafted by SUNY Buffalo officials.  Dkt. #255, ¶ 18.

one hour and that Cohane was generally present" and sometimes "came on the court and

provided instruction or 'quick teaching points.'"  04-CV-181 at Dkt. #122-20, p.2.  With

respect to prospects,

> Peterson reported that Cohane observed recruits playing against
> student-athletes.  Peterson stated that during the fall, recruits played
> with the team in the triple gym and that Cohane usually observed
> through the window in the door.  Peterson further stated that during
> the spring, recruits played against student-athletes in both the main
> and the triple gyms and that if the scrimmages occurred in the main
> gym, Cohane generally watched from the track above.

> . . . Peterson stated that in the spring after the season had
> concluded, prospects visited the Buffalo campus and played against
> the team on most weekends.  Peterson stated that he saw Cohane a
> couple of times but that the student-athletes always knew he was
> there, and as a result, they played hard.

04-CV-181 at Dkt. #122-20, p.3.


In an affidavit dated December 17, 1999,[30] Damien Foster revised his affidavit

dated October 29, 1999 to state that, to the best of his knowledge, he could not confirm

nor deny if any coaches were present in the gym during scrimmages against prospects or

informal five-on-five activities in the gym prior to October 15th.[31]  Dkt. #241-2, p.20.


By letter to President Greiner and AD Arkeilpane dated December 22, 1999,

copied to the NCAA Commissioner and NCAA Enforcement staff representatives, SAC

---

[30] SAC Fournier declares that this affidavit was drafted by SUNY Buffalo officials.  Dkt. #255, ¶ 18.

[31] In an affidavit dated July 6, 2011, Damien Foster affirmed that he signed the December 17, 1999 affidavit after AAD Maher informed the team that SUNY agreed with the MAC report and warned students that conflicting statements could put their eligibility and scholarship at risk and after Coach Eisenberg threatened ten game suspensions for students who supported plaintiff. 04-CV-181 at Dkt. #121-20, p.5.

Fournier outlined corrective measures

> identified by the [MAC] to satisfy the infractions disclosed through the investigation conducted by the [MAC]. Based upon precedent, consultation with the NCAA and the exigencies of this particular case, the following corrective steps would be effective in resolving the issues of wrongdoing outlined by this case. It should be noted that two actions already have had a recognized impact on the disposition of this case – the resignation of the named members of the men's basketball staff and the cooperative approach adopted by the institution throughout this process.

Dkt. #190, p.71. With respect to the issue of staff, SAC Fournier stated:

> Although characterized as a resignation, the effect of the change in leadership in the men's basketball staff is important. As the report indicates, there is a substantial amount of credible information to indicate complicity in these infractions. To that end, the decision of the University at Buffalo's men's basketball staff to either resign or accept appointments outside the department is identified as a corrective procedure.

Dkt. #190, p.71. The MAC also proposed penalties, including delaying the start of pre-season conditioning and pre-season practice, reducing scholarships, reducing the number of official visits by prospects, limiting off-campus recruiting, providing additional compliance reports and accepting additional corrective measures during a period of probation through September 1, 2001. Dkt. #190, p.73.

By letter to SAC Fournier dated December 22, 1999, plaintiff responded to the report by stating:

> A grave injustice has already occurred in that my reputation and character have been unjustly attacked by individuals who had but one objective, my removal as head coach of the men's basketball program at the University at Buffalo. Simply stated, this investigation, orchestrated by [SUNY Buffalo] and its athletic director, Robert

Arkeilpane, was an investigation with a preordained result. . . .[32] The methodology of the inquiry was highly unusual and violative of due process inasmuch as I was never advised of the nature of the allegations despite my repeated requests for this information. Furthermore, I have been advised that a number of individuals who were contacted felt that they were threatened or intimidated by the investigation and that misrepresentations were made to them during the course of the investigation.

Perhaps most alarmingly, many of the players, coaches and managers most relevant to this investigation were never contacted or interviewed in any way by the Conference, presumably because the University at Buffalo did not provide this information to the Conference. As I indicated from our very first communication, I wanted to offer every assistance possible to the Conference in reviewing this situation; but inasmuch as no one ever apprised me as to what the allegations were, I could not direct them to the proper sources for information.

Dkt. #196-6, p.2. Plaintiff explained:

---

[32] As an example of the affidavits submitted in support of plaintiff's response to the allegations, Alex Vasiliev affirmed that Coach Eisenberg "conducted a campaign behind Coach Cohane's back to get him fired" and "was often seen talking to and influencing Mike McKie, Clement Smith, Davis Lawrence, Brian Keenan, Kerry Hendrickson, and Louis Campbell . . . to keep these players as a united force to remove Cohane." Dkt. #226-12, p.2. Alex Vasiliev also stated that "Davis Lawrence, Kerry Hendrickson, Rick Fox and Brian Keenan said that they will testify to anything necessary to help get Coach Cohane fired." Dkt. #226-12, p.1. Similarly, by affidavit dated December 30, 1999, Jonathan Kleidon stated:

8. Coach Cohane ran a clean program. We considered him a man of integrity.

9. It is my opinion that it was Coach Cohane's emphasis on discipline that disenchanted some players. For this reason they were willing to assist Mr. Arkeilpane in his effort to fire Cohane.

10. It was well known that Mr. Arkeilpane had a vendetta against Cohane.

11. It was well known that Coach Eisenberg was trying to assist Arkeilpane in his vendetta against Cohane.

12. I was part of building an excellent program. It was fun and it had integrity and it was competitive. It is my firm belief that we would have had a good team this year. It has been ruined by the investigation into minor allegations that were blown way out of proportion just because Mr. Arkeilpane, Mr. Maher and Coach Eisenberg wanted a different head coach.

Dkt. #238, p.41.

Of the twelve staff coaches during my tenure as head coach at the University at Buffalo, there are two that have left on bad terms and who would have motivation to discredit my program: Fred Batchler and Ron Torgalski. Fred Batchler was an Assistant Coach when one of our players, Rob Harris, was arrested for his alleged involvement with an incident in a Buffalo bar. Mr. Batchler never advised me of the incident when he was contacted that night by Mr. Harris. In fact, I did not learn of the arrest until I found out on my own some eleven days later. I was upset with Mr. Batchler for not telling me about such a serious incident involving one of my players and I reprimanded him for this conduct. As a result, he became angry with me and quit.

Ron Torgalski had coached at the University at Buffalo for five years when I assigned him to be Basketball Director. He was upset about this and decided to begin attending Canisius College in [an] effort to obtain a Master's Degree. He played racquetball with Bob Arkeilpane almost every day. Arkeilpane arranged for Torgalski to be paid an additional $14,000 as the Assistant Baseball Coach which was taken from my personal summer basketball camp fund against my wishes and without my authorization. Therefore, Mr. Torgalski was not only bitter at me for assigning him out of the coaching job after five years, but he was now also loyal to Mr. Arkeilpane for securing some extra money to help him while he attended graduate school. Again, is it a mere coincidence that Mr. Torgalski and Mr. Batchler are the only two former coaches who have given testimony against me? Furthermore, it is interesting to note that Mr. Torgalski and Mr. Batchler can assert allegations against me for conducting tryouts only if they themselves were in the gym. However, they were not charged with such a violation nor were they forced to resign.

Dkt. #196-6, pp.3-4. In his defense, plaintiff

included over 90 affidavits from over twenty individuals who were never interviewed by the MAC or were interviewed but their testimony was excluded from the report. Each of these affidavits directly contradicts the perceptions and inferences in the report. Most

importantly, these are individuals who have no bias whatsoever and are not subject to the improper influence exercised by others.[33]

Dkt. #196-6, p.8.

Plaintiff also provided a detailed response to each of the 18 allegations. For example, with respect to the first allegation, plaintiff denied ever attending "a five-on-five game prior to the official commencement of the season with the intention to evaluate players." Dkt. #186-6, p.9. He noted that "five-on-five play only took place in the afternoon" and that

_____

[33] For example, Jasper Walker, staff member for the men's basketball team during the 1993-1994 and 1999-2000 seasons, submitted an affidavit on behalf of plaintiff stating that

> 2. Coach Cohane insisted upon discipline and fairness in his basketball program. He stressed that he would not tolerate any violations of NCAA rules amongst his players and staff. [Coach] Cohane is a man of impeccable integrity.

> 3. Both years that I worked with him, Coach Cohane held a meeting at the beginning of the academic year in which he told the coaching staff that we could not observe prospective student-athletes who were participating in off-season pick-up games during recruiting visits. He also indicated that no coach could ever provide coaching instruction or even observe pre-season informal team workouts. He informed all of his coaches and players that no player could use coaching staff telephones to place personal long-distance telephone calls at the school's expense.

> 4. . . . . At no time, during any of those practice sessions, did any member of the coaching staff ever direct comments toward or instruct any partial qualifier or non-qualifier.

Dkt. #229-16. Similarly, Ryan Chaffe, a member of the basketball team during the 1999-2000 season who left SUNY Buffalo after his freshman year, stated that he never saw Coach Cohane in the gym while he was playing pick-up basketball during unofficial visits to SUNY Buffalo; never observed Coach Cohane or any other coach at pre-season workouts; and was unaware of any instance in which Coach Cohane ever observed a PSA playing pick-up basketball during the off-season. Dkt. #216, p.5. Ryan Chaffe also affirmed that "[a] number of players on the 1999-2000 team did not like Coach Cohane and they wanted to get him fired so that Rock Eisenberg could become the new coach" and that he was positive that several members of the 1999-2000 team lied to the MAC/NCAA investigators. Dkt. #216, p.5.

> students have confused the five-on-five games with the individual
> workouts prior to the start of the season.  I only conducted myself in
> an evaluative nature at the player's individual workouts.  This is
> permitted under the NCAA bylaws.

Dkt. #196-6, p.9.

With respect to the second allegation, plaintiff identified numerous student-athletes who were awarded scholarships even though they never played in tryouts as alleged in the MAC report.  Dkt. #196-6, p.11.  Plaintiff denied Blake Johnson's allegations, explaining, *inter alia*, that he had already seen him play on several occasions with his junior college and that "it is important to note that Blake Johnson is unhappy with me because the scholarship ultimately went to another player, Damien Foster."  Dkt. #196-6, p.11.

Plaintiff attempted to discredit Ms. Lynch by noting that she did not work on Saturday, which is the day the prospects would play. Dkt. #196-6, p.12.  "Furthermore, while the students in question were allegedly trying out in the past few years, Ms. Lynch was only employed as basketball secretary until 1996 and would therefore not even have been involved in the men's basketball program for the majority of the time in question." Dkt. #196-6, p.12.

Plaintiff claimed that Nate Johnson alleged that he was injured at a compulsory practice rather than an informal scrimmage because he wanted to obtain medical insurance coverage for his shoulder injury and noted that student-athletes present at the

time denied the allegations, but their denials were not included in the MAC report. Dkt. #196-6, p.12.

With respect to the third allegation, plaintiff denied permitting "any workouts with players who did not meet the academic guidelines outlined in NCAA Bylaw 14.3, explaining:

> The Mid-American Conference report states that Nadav Goldschmied was the team manager who conducted the alleged workouts with ineligible players. . . . In a sworn affidavit which is contained in Tab No. 3, Mr. Goldschmied explicitly denied that he ever conducted workouts with ineligible players in violation of NCAA bylaws when questioned by Bill Maher. An affidavit from Frank Valenti confirms that no such workouts ever took place and Terry Pfeufer who was present at several practices confirms that Mr. Goldschmied was never assigned to work with non-qualifying players.

Dkt. #196-6, p.13. In response to the related eighth allegation, plaintiff stated that non-qualifying players "never, at any time, took part in drills during the practice or regular season." Dkt. #196-6, p.18.

With respect to the fourth allegation, plaintiff explained that

> NCAA regulations state that no more than three coaches and one restricted coach are permitted on the University Basketball staff. However, many team managers are allowed as long as there is approval from compliance personnel. The MAC report alleges that Nadav Goldschmied was a fifth coach in violation of the NCAA regulation.

> However, one of four permissible coaches, Dean Cooper has advised me that Mr. Goldschmied's managerial position [was] approved with Compliance Director Bill Maher prior to the commencement of Mr. Goldschmied's duties as team manager. An affidavit from Mr. Cooper regarding this issue will be forwarded to the Conference upon my receipt. Mr. Goldschmied has confirmed this as well. Mr. Goldschmied was never approved as a team coach. Moreover, a

> student-manager assisting a coach in such things as breakdown drills
> is common practice at basketball programs throughout the country.
> Finally, various coaches have come forward to certify that Mr.
> Goldschmied performed the duties of a manager, not a coach.

Dkt. #196-6, p.14.


By letter dated January 3, 2000, AAD Maher provided SAC Fournier with an

NCAA Secondary Infraction Self-Report, advising that

> It has been established that a violation of NCAA Bylaw 11.6.1.1. was
> committed when an individual closely associated with our men's
> basketball program engaged in scouting activities with two future
> opponents.
>
> The University is submitting this violation as an amendment to the
> case that is currently being considered by the MAC Committee on
> Infractions.  I have assembled what I believe to be the relevant
> materials for your review.

Dkt. #241, p.41.  The NCAA Self Report Violation Form, dated December 1, 1999,

explains that the Niagara University basketball coach contacted SUNY Buffalo to report

that Mitch Gillam was present in the Niagara gym for an exhibition contest and that Mitch

Gillam was observed in Coach Cohane's office the next morning and shortly thereafter a

scouting report[34] written by Mr. Gillam was provided to the coaching staff and players.

Dkt. #241, p.42.  SUNY Buffalo further advised that videotape from Niagara University

and Cornell University established that Mr. Gillam was present at a Niagara University

game on November 10, 1999 and also at Cornell University game on November 17, 1999.

Dkt. #241, p.42.

_____

[34] The scouting report is at Dkt. #241, pp.30-39. AAD Maher testified at his deposition
that Coach Eisenberg provided him with a copy of the scouting report, which Coach Eisenberg
indicated he had obtained from Clement Smith.  Dkt. #234-12, p.2.  Coach Eisenberg testified
at his deposition that he found the scouting report on the floor of the men's basketball office.
Dkt. #232-3, pp.5-7.

By letter dated January 4, 2000, President Greiner advised SAC Fournier that
SUNY Buffalo had reviewed the MAC's proposed corrective measures and was prepared
to accept them in their entirety.  Dkt. #238, p.12.

In an affidavit dated January 12, 2000,[35] Nelson Townsend stated that

> 2. In Fall 1997, an alleged Men's Basketball NCAA violation was
> reported to me by Compliance Director William Regan.  After review, I
> suspended the involved Campus Assistant Coach, Frank Valenti for a
> ten-day period.
>
> 3. The action I took to suspend Coach Valenti was based on the
> seriousness of the alleged offense.  Since this offense occurred after
> warnings issued to all coaches as recent as two weeks prior to the
> incident, a major penalty was applied. The fact that Mr. Valenti
> disputed the charge and offered a feasible explanation for his
> presence in the practice facility, resulting in my acting to suspend with
> pay rather than without pay.

Dkt. #261, p.65.

In an affidavit dated January 13, 2000,[36] Mike Rielly, Head Trainer at SUNY
Buffalo, stated that he had no knowledge of whether the coaching staff observed
prospects during campus visits and explained the deterioration of Coach Cohane's
relationship with Trainer Karl Kozlowski.  Dkt. #241-2, p.38.

At some point following receipt of the report of scouting allegations from SUNY
Buffalo, SAC Fournier revised the MAC 18 report to add a nineteenth allegation which is

---

[35] SAC Fournier declares that this affidavit was drafted by SUNY Buffalo officials.  Dkt.
#255, ¶ 19.

[36] SAC Fournier declares that this affidavit was drafted by SUNY Buffalo officials.  Dkt.
#255, ¶ 19.

not relevant to the current lawsuit and a twentieth allegation ("MAC 20 report"), stating

"that Mitch Gillam (either a representative of the institution's athletics interests or an

assistant coach) scouted in-person basketball contests with upcoming University at

Buffalo opponents Niagara University and the University of Cornell. Dkt. #227, p.25. In

support of this allegation, SAC Fournier stated that:

> Niagara University and Cornell University have both supplied
> videotape of Mr. Gillam in attendance at their respective contests
> prior to games with the University at Buffalo. Additionally, a hand-
> written scouting report of the opponent is offered. Further,
> Compliance Director Bill Maher happened to visit Mr. Cohane's office
> the morning after the Niagara University game that was allegedly
> scourted and observed Mr. Gillam in the coach's office having a
> discussion.

Dkt. #227, p.25.


In addition to adding two allegations, the MAC 20 report revised several

sentences in support of the first and second allegations. For example, with respect to the

first allegation, SAC Fournier added the following:

> Former student-athlete Ryan Peterson, interviewed by the NCAA at
> Seton Hall, has confirmed that these activities [observation of pre-
> season five-on-five play] took place and were regularly observed by
> Coach Cohane.

> * * *

> First year participant Rick Fox observed Coach Cohane in the facility
> for these workouts. Two other student-athletes, Mike Sinclair and
> transfer Damien Foster, could neither confirm or deny such activities
> took place.

Dkt. #227, p.16. SAC Fournier declares that he added the affidavits of Damien Foster,

Rick Fox and Mike Sinclair to the MAC 20 report "and removed the student-athletes' prior

affidavits so that the Committee had the most current statements from these student-

athletes and what I believed to be the statements that best reflected their intended true positions and recollections since they were the most recent sworn statements." Dkt. #255, ¶ 18. He also added the affidavits of Mike Rielly and Nelson Townsend to the MAC 20 report. Dkt. #255, ¶ 19.

SAC Fournier declares that he made these changes after speaking to the NCAA about the additional violations reported by SUNY Buffalo and being advised by the NCAA that they should be included in the MAC report. Dkt. #255, ¶ 16. However, SAC Fournier "inadvertently failed to change the date on the report" when he added the two additional allegations. Dkt. #255, ¶ 17; See Dkt. #244-17, p.2. Thus, there is no indication that the MAC 20 report supplements or otherwise revises the MAC 18 report. Plaintiff declares that he "never saw the MAC-20 report until discovery in 2007." Dkt. #220, ¶ 42.

In a notation of a telephone conversation with SAC Fournier on January 13, 2000, Associate Counsel Rosenthal indicated that SAC Fournier "would like a show cause order against Cohane from NCAA." Dkt. #261, p.91 & 04-CV-181 at Dkt. #123-2, p.3.

The MAC COI met on January 16, 2000. There is no record of this proceeding before the Court as the MAC's practice appears to be not to record such proceedings. Dkt. #229-18. SAC Fournier declares that plaintiff was present at the hearing when SAC Fournier "presented the additional allegation on scouting" and played a video and that plaintiff "had an opportunity to respond." Dkt. #255, ¶ 24. At his deposition, plaintiff

testified that he made a presentation to the MAC COI, which lasted an hour or two, at which point he was asked to leave. Dkt. #196-3, pp.44-45. Plaintiff understood that the hearing lasted ten hours and was reported to have been the longest hearing in MAC history. Dkt. #196-3, pp.46-47.

By letter dated January 18, 2000, the MAC informed SUNY Buffalo that its COI "has voted unanimously to adopt the findings of the report, and the corrective measures identified therein." Dkt. #238, p.13. In addition, the MAC COI voted to make three additional recommendations to assist SUNY Buffalo in resolving the impermissible activities detailed in the report, including "issuing a formal Letter of Reprimand to Head Coach Tim Cohane for his acknowledgment of wrongdoing before the Committee in some of the infractions and his possible involvement in others as noted in the report." Dkt. #238, p.13. The MAC also informed SUNY Buffalo that "the case has been forwarded to the NCAA Enforcement staff for their review and final adjudication." Dkt. #238, p.14.

By Memorandum dated January 24, 2000, NCAA Enforcement staff representative Ronald Barker noted his observations from the January 16, 2000 MAC COI hearing, including his impression that "[t]his case quickly came down to two camps within the school: Cohane and some of his staff with a few student-athletes against current assistant coach Eric Eisenberg and the rest of the student-athletes." Dkt. #229-1, p.1. Mr. Barker noted the disgust of several student-athletes with the process and claims of intimidation and fear by student-athletes which caused them to provide conflicting testimony and opined "that the NCAA should proceed with caution remembering that

there are two definite camps and that each side may be influencing student-athletes to testify in a certain way."  Dkt. #229-1, p.2.

By letter dated February 8, 2000, the NCAA informed SUNY Buffalo of its investigation of "the self-reported violations referenced in the January 18, 2000, report from the [MAC] to the enforcement staff."  Dkt. #196-9.

NCAA Enforcement staff representative Kevin Pearson interviewed plaintiff on March 15, 2000.  Dkt. #196-4, p.9.

In an interview summary dated March 16, 2000, NCAA Enforcement staff representative Tom Hosty summarized a telephone conversation with SAC Fournier on March 9, 2000.  Dkt. #261, pp.77-78.  Mr. Hosty stated that SAC Fournier telephoned to complain that he was not going to be included in the NCAA Enforcement staff's on-campus interviews of witnesses at SUNY Buffalo during the week of March 13, 2000, and was advised that the NCAA Enforcement staff

> made a judgment that it would be in the best interest of the case if the conference was not a part of the interviews.[37]  The first reason was

---

[37] By e-mail to SUNY Buffalo officials dated February 29, 2000, Dennis Black noted:

> Key issues: the NCAA says it generally limits campus representation during the interviews to one person.  Given the fact that Rob has been through the process and does not represent the campus interests per se, legal counsel Rosenthal would be preferred.  There also may be a concern over Rob already having a relationship with the interviewees (i.e., statements of alleged intimidation).

04-CV-181 at Dkt. #123-8.

that the enforcement staff wanted to keep the number of individuals in the interview room to a minimum so as not to heighten the tensions for any witnesses. Second, the enforcement staff did not want Fournier to be a part of the interviews in an effort to test the credibility of the witness, in light of the fact that Fournier had previously interviewed all the individuals. The writer underscored to Fournier that the enforcement staff intended to maintain the integrity of the investigation, and in its judgment, felt this was the best way to proceed.

Dkt. #261, p.77. Mr. Hosty noted SAC Fournier's statement that unlike other conferences, he, on behalf of the MAC, took a hard-line stance when investigating NCAA violations. Dkt. #261, p.78.

Coach Eisenberg left his employment at SUNY Buffalo effective April 13, 2000 and returned to Tilden High School in Brooklyn, New York, where he is currently Dean of Students and Athletic Director. Dkt. #232-3, p.2.

NCAA Enforcement staff representative Kevin Pearson traveled to Buffalo to conduct interviews in May of 2000. Dkt. #196-24, p.4. Mr. Pearson testified at his deposition that it was his position that this matter was a "secondary" case that should not proceed to Letter of Official Inquiry ("LOI"), because of credibility issues with some witnesses, but Tom Hosty disagreed. Dkt. #235-9, p.2 & Dkt. #235-10, pp.2-3. He specifically recalled credibility issues with Coach Eisenberg, whom he described as "as shady character" who "seemed to be pretty influential with some of the student athletes." Dkt. #235-10, p.3. Upon Kevin Pearson's departure from the NCAA Enforcement staff, Tom Hosty assigned the case to NCAA Enforcement staff representative Stephanie Hannah. 04-CV-181 at Dkt. #119-16, p.46.

Plaintiff met with NCAA Enforcement staff representative Stephanie Hannah on

September 12, 2000.  Dkt. #196-25, p.4. In her interview summary, Ms. Hannah noted

that plaintiff instructed Mitch Gillam

> to scout opponents and to feel free to sit right behind the opposing
> coach, because Gillam was not a Buffalo staff member.  Cohane
> stated, "I was basically telling Arkeilpane 'screw you.'" Cohane noted
> that he never had seen any scouting reports Gillam composed based
> on his observation of the opposing teams.

04-CV-181 at Dkt. #123-13, p.2.


By letters dated November 20, 2000, the NCAA informed plaintiff and SUNY

Buffalo that an official inquiry was warranted.  Dkt. ##196-10 & 196-11.  Specifically, Mr.

Cohane was informed that:

> You are named in some of these allegations.  The purposes of this
> letter are to: (a) provide a copy of these allegations to you: (b) notify
> you of opportunities to respond and participate in the consideration of
> these allegations; and (c) explain possible punitive actions that could
> be taken if such allegations are found by the NCAA Division I
> Committee on Infractions or the NCAA Infractions Appeals
> Committee.

Dkt. #196-11, p.2.  The NCAA's LOI included the following alleged violations:

1. observation and instruction by plaintiff during informal
   scrimmages between the 1995-1996 and 1999-2000 academic
   years;

2. plaintiff conducted tryouts for prospective students, *to wit*,
   Michael Machreiner, Mike McKie, Davis Lawrence, Kerry
   Hendrickson and Brian Keenan;

3. plaintiff permitted Nadav Goldschmied to provide skill-related
   instruction to Clement Smith, Davis Lawrence and Mike McKie
   despite their status as nonqualifiers and that Nadav
   Goldschmied's participation constituted coaching, thereby
   exceeding the limitation on the number of coaches;

4. Kerry Hendrickson's intended unofficial visit was deemed an official visit because coaching staff provided him with local automobile transportation, resulting in two visits financed by SUNY Buffalo;

5. Coach Cohane allowed student-athlete Louis Campbell to store his personal items at Coach Cohane's home during the summers of 1997 and 1998;

6. Mike McKie and Clement Smith were permitted to attend practices during the 1998-1999 academic year even though they were nonqualifiers;

7. student-athletes were allowed to use telephones in the staff offices for long distance calls from February 1998 through October 1999;

8. Coach Cohane arranged for Fred Batchelor to scout St. Bonaventure University during the fall of 1996 and instructed Mitch Gillam to scout Niagara University and Cornell University during the fall of 1999;

9. Coach Cohane violated the extra-benefit legislation in September of 1998 by inviting parents of student-athletes to attend a picnic at his residence;

10. Coach Cohane engaged in unethical conduct by failing to maintain high standards of honesty;

11. Coach Cohane failed to exercise appropriate institutional control of the men's basketball program by creating and fostering an environment of noncompliance with NCAA legislation; and

12. SUNY Buffalo failed to adequately monitor the men's basketball program for NCAA compliance and report violations of NCAA legislation.

Dkt. #236-13, pp.6-15. Ms. Hannah drafted the LOI and testified in her deposition that in doing so, she relied upon the evidence gathered during the NCAA investigation, including SUNY Buffalo's self report. 04-CV-181 at Dkt. #119-6, pp.44-45 & 119-7, p.45.

Once an LOI is issued, the NCAA enforcement staff creates a custodial file, essentially turning over their case file to the interested parties for review. Dkt. #196-22. Accordingly, on November 28, 2000, the NCAA provided materials collected by the NCAA Enforcement staff during its inquiry to a custodian in New York City, the location chosen by plaintiff. Dkt. #258-4, p.3 & Dkt. #258-5, p.5. The materials were supplemented on December 4, 2000. Dkt. #258-4, p.10. On December 15, 2000, at plaintiff's request, the NCAA transferred those materials to Pittsfield, Massachusetts. Dkt. #258-3 & 258-5, p.6.

By letter dated December 15, 2000, AAD Maher provided Thomas Hosty at the NCAA with copies of the taped interviews that were conducted during the MAC investigation, stating, "I understand that Tim Cohane has requested these in preparation for his response to the NCAA Official Inquiry." Dkt. #192, p.91. The eighteen tapes include interviews with Alexeev, Vasiliev, Sinclair, McKie, Foster, Lawrence, Campbell, Kleidon, Harris, Smith, Keenan, Fox, Sinclair, Vasiliev, Alexeev, Libomi, Hendrickson, Harris, Lawrence, Eisenberg, Kleidon, Campbell, McKie, Hendrickson, McKie, Smith, Keenan, Jones, Goldschmied, Cooper, Torgalski, Eisenberg, McMillan, Eisenberg, Eisenberg, Rielly, Lynch, Kozlowski, Valenti, and Cohane. Dkt. #192, p.92. Although plaintiff's response to the NCAA's official inquiry was due on January 2, the MAC tapes were not received by the custodian until January 3. Dkt. #196-22, p.17. Mr. Hosty testified that he spoke with plaintiff's counsel and "made it clear" that it was plaintiff's "right to ask for additional time," but that such a request "would probably postpone the February hearing." Dkt. #196-22, p.17.

Mr. Hosty testified at his deposition that he recalled "listening to some of the MAC tapes," but could not remember which interviews he reviewed. 04-CV-181 at Dkt. #119-16, pp.43-44. More specifically, Mr. Hosty recalled

> getting the MAC file that had a number of affidavits in it, and I remember getting the MAC tapes, and I remember listening to some of the MAC tapes, but I remember the enforcement staff did its own independent investigation of the matter. And I'm pretty sure that we at least read all the affidavits, and we would have been aware of what those statements would have been, and certainly we would have compared it with what the witnesses reported to us in our own interviews or what they reported to Mr. Cohane in his investigation, because he supplied us with some affidavits as well.

04-CV-181 at Dkt. #119-16, p.44.


Once the parties have reviewed the custodial file and responded to the NCAA's official inquiry, the NCAA Enforcement staff conducts a prehearing conference with the interested parties "to try to ascertain what are the remaining issues, whether any additional investigation is necessary, and whether the enforcement staff is going to amend or withdraw allegations." Dkt. #196-22, p.7. NCAA Enforcement staff representatives Stephanie Hannah and Tom Hosty conducted a prehearing conference with SUNY Buffalo on January 8, 2001. Dkt. #196-22, p.10. Although his response was not in, Mr. Hosty recalled that plaintiff's counsel requested the meeting to go forward with enforcement staff on January 8, 2001, so that "they could personally verbally walk us through their case, their defense, because I believe they were trying to persuade us to drop the allegations." Dkt. #196-22, p.18. Plaintiff's counsel similarly testified that he "was hoping to convince Mr. Hosty and Ms. Hannah that this was not a major violations case, especially in light of all these problems with their witnesses." 04-CV-181 at Dkt. #119-20, p.34.

Plaintiff, through counsel, submitted a 73 page response to the NCAA on

January 11, 2001. Dkt. #196-8. Plaintiff argued that thirteen witnesses establish that AD

Arkeilpane

> used his power as Director of Athletics and the assistance of Mr. Maher
> to threaten, intimidate and coerce UB's student-athletes and
> employees into providing testimony against Mr. Cohane in the MAC
> investigation. As a consequence, their actions tainted and corrupted
> both the MAC investigation and the resulting NCAA investigation. They
> have forced Mr. Cohane to defend himself against witnesses who now
> admit, under oath, that they provided false information adverse to Mr.
> Cohane only because Mr. Arkeilpane and/or Mr. Maher threatened to
> withhold their degrees or terminate their scholarships if they refused to
> do so.[38]

Dkt. #196-8, p.16. Plaintiff also noted that

> In September of 1999, ten players explained on tape to Mr. Fournier
> and Mr. Maher that they did not witness Mr. Cohane violating NCAA
> legislation. Despite the fact that these ten witnesses clearly
> exonerated Mr. Cohane in the September interviews, Mr. Fournier
> returned again in October to interrogate the same witnesses. By
> October, many of them changed their stories. In fact, six out of the ten
> witnesses who originally testified in Mr. Cohane's favor completely
> changed their stories and provided information to support a finding of
> NCAA rules violations. The conduct of Mr. Arkeilpane and Mr. Maher,
> in the time period between the September and October interviews, fully
> explains the reason why these student-athletes changed their
> testimony.

Dkt. #196-8, p.18. Plaintiff emphasized multiple instances of student-athletes feeling

intimidated to change their affidavits to support accusations against plaintiff and threats

should they attempt to cooperate with plaintiff's defense. Dkt. #196-8, pp.24-25. Plaintiff

---

[38] For example, Alex Vsiliev affirmed that AAD Maher "was very upset with him when he
found out that he had gone to plaintiff's house following plaintiff's resignation and informed him
that if he signed affidavits for plaintiff, he "would not be able to graduate." Dkt. #219-2.
Similarly, Damien Foster affirmed that Maher told the team that he was aware that Coach
Cohane was asking people to sign affidavits and threatened the players that there would be
serious consequences if they signed conflicting affidavits. Dkt. #226-12, p.1.

also complained about the fact that despite repeated requests, Rick Fox's October 27, 1999 affidavit was not provided to plaintiff by either SUNY Buffalo or the MAC. Dkt. #196-8, p.23. Finally, plaintiff argued that

> It is not enough to merely exclude the evidence from the MAC investigation. Because Mr. Arkeilpane and Mr. Maher "poisoned the well," even the unbiased NCAA investigation has been irreparably tainted. Once witnesses have been forced to lie about an issue, no measure of future unbiased investigation can repair the damage done to the process.

Dkt. #196-8, p.29.

With respect to the specific allegations, plaintiff noted that the only date specifically mentioned with respect to the observation during informal scrimmages allegedly occurred when plaintiff was on vacation in Arizona. Dkt. #196-8, p.40. Thus, plaintiff complained that he was being forced to defend his absence at preseason scrimmages and informal pick up games with prospects over the course of five years. Dkt. #196-8, p.40. With respect to the observation of prospects, plaintiff notes that

> during the . . . audio-taped interview with the MAC, Mr. Keenan specifically indicates that he never made any visits to UB until June of 1999. By doing so, he contradicts the claim in the allegation that the informal scrimmages took place between January and May of 1999. Further, during the entire summer of 1999, Mr. Cohane was out of town for all but one day before the students returned to campus.

Dkt. #196-8, p.58. Plaintiff also noted that Brian Keenan obtained the scholarship he had been seeking following Mr. Cohane's resignation. Dkt. #196-8, p.58.

With respect to Mr. Gillam and the scouting allegations, plaintiff explains that

> Since he was not hired for the coaching position at UB, Mr. Gillam was unemployed. However, he still desired to become a college coach. In

order to enhance his college career coaching opportunities, Mr. Gillam
began attending as many college basketball practices and games as
possible during the 1999-2000 college basketball season.

* * *

At no time while he was attending such practices, scrimmages and
games was he working for any college or university.  However, in order
to develop his knowledge and hone his coaching skills, Mr. Gillam took
extensive notes about what he had observed during the practices,
scrimmages and games.  After each game that he observed, Mr.
Gillam compiled his notes and drafted "scouting" reports as if he were
preparing them as a coach of an opposing team.  His sole purpose in
preparing the scouting reports was to improve his scouting skills.

In his sworn statement, Mr. Gillam unequivocally states that Mr.
Cohane never asked him to attend any of those practices, scrimmages
and games.  He did so completely on his own.  Mr. Gillam further
states, under oath, that he never discussed a Buffalo opponent with
Mr. Cohane after he had observed the team. . . .

* * *

Mr. Gillam further states in his affidavit: "I did not discuss my
observations of Cornell and Niagara, nor did I share my written
'scouting' report, with Mr. Cohane or anyone else associated with
Buffalo.  In fact, throughout the entire time that I observed practices,
scrimmages and games during the 1999-2000 season, I never once
discussed or shared any of my observations with Mr. Cohane."

Dkt. #196-8, pp.64-65.  Plaintiff also notes that although the NCAA Enforcement staff's

interview summary of plaintiff's September 12, 2000 interview indicates that plaintiff

instructed Mitch Gillam to scout Niagara and Cornell, the

tape recording of the interview clearly establishes that Mr. Cohane
never stated that he instructed Gillam to scout opponents.  Mr.
Cohane's tape-recorded statement indicates only that Mr. Cohane
informed Gillam that he was allowed to attend any game that he
wanted.  Mr. Cohane never said or implied that he instructed Mr. Gillam
to scout.

Dkt. #196-8, p.65.  Plaintiff also notes the absence of any direct evidence to demonstrate

that anyone at SUNY Buffalo received the report as this allegation is based upon AAD

Maher's recollection of Mr. Eisenberg's recollection that the report was obtained from student-athletes. Dkt. #196-8, p.66.

The formal prehearing conference was conducted with plaintiff on January 17, 2001. Dkt. #196-22, p.19. Despite repeated requests, plaintiff first received Mr. Fox's October 27, 1999 affidavit at the NCAA's pre-hearing conference. Dkt. #196-12, pp.57-58. Following the prehearing conference, Tom Hosty and Stephanie Hannah prepared a case summary, which is the NCAA Enforcement staff's "hearing brief" or "summation of the evidence that they believe supports the allegations," and provided copies to plaintiff, SUNY Buffalo and the Committee on Infractions by letter dated January 29, 2001. Dkt. #196-22, pp.7-8; 04-CV-181 at Dkt. #112-21. The case summary relies upon information obtained during NCAA Enforcement staff interviews[39] and addresses alleged conflicts between affidavits obtained during the course of the MAC investigation and affidavits obtained by plaintiff. 04-CV-181 at Dkt. #112-21. For example, the case summary addresses Zaid Alkhas' affidavits dated November 18, 1999 and January 7, 2001 as follows:

> The enforcement staff takes the position that while Alkhas seems to have recanted his previous statement that Cohane provided coaching instruction during scrimmages, Alkhas continues to indicate that Cohane was present during the scrimmages. The enforcement staff notes that the affidavit Cohane had Alkhas sign can be interpretative regarding Alkhas' statement that during the scrimmages, Cohane did not evaluate or instruct anyone. It may be reasonable to conclude that Alkhas' statement to the conference investigator is consistent with his affidavit to Cohane, as Alkhas' conference affidavit states that Cohane

---

[39] NCAA Director of Enforcement, Tom Hosty, declares that during its investigation, "the NCAA Enforcement staff conducted more than 35 interviews of approximately 30 witnesses, including Cohane." Dkt. #112-32, ¶ 6.

provided instructive statements about "drop step, box-out, shooting" after the scrimmages, not during them.[40]  Alkhas' affidavit to Cohane simply says that Cohane did not provide instruction during the scrimmages. Further, nowhere in Alkhas' affidavit to Cohane does the young man deny that Cohane observed the scrimmages while he was present.

04-CV-181 at Dkt. #112-20, p.14.  Similarly, the case summary

also notes that Kleidon's affidavit to Cohane does not negate Kleidon's statements to the enforcement staff that Cohane was present in the gym for five to 10 minutes at a time and sat on a bench near the free-throw line.  Based just on Kleidon's statement, it is difficult to believe that Cohane was not observing the scrimmage activities in violation of NCAA legislation, Kleidon's own personal opinion as to what observing means, notwithstanding.

04-CV-181 at Dkt. #112-21, pp.16-17.

With respect to plaintiff's arguments regarding the motivation of Fred Batchelor,

the case summary clarifies that

Batchelor did not assist Harris in getting out of jail; rather, he referred the young man to a family lawyer when Harris came to him for guidance the day after he got himself out of jail.  Second, Batchelor admitted that he should have informed Cohane of Harris' legal problem at the time and that his failure to do so was a mistake.  Third, while Batchelor may have been unhappy as an assistant coach for Cohane, the enforcement staff notes that this does not mean Batchelor provided false statements in this inquiry.  Finally, the enforcement staff finds Batchelor's testimony regarding Cohane's involvement in violations to be compelling in light of the fact that Batchelor also reported his own involvement in violations.

04-CV-181 at Dkt. #112-21, pp.17-18.  Moreover, in response to plaintiff's argument that

Ryan Peterson "colored" his responses to the NCAA Enforcement staff, the case

---

[40] Zaid Alkhas' affidavit dated November 18, 1999, states that, "[s]ometimes after these games Cohane would tell me what I needed to work on to get better – drop step, box-out, shooting." Dkt. #241-2, p.11.

summary reports that a second interview was conducted in which Ryan Peterson

> stated that he unequivocally "stood by" the statements he made during
> his first interview with the enforcement staff, whereby he reported
> Cohane's involvement in observing preseason scrimmages. . . .
> Concerning the pressure Peterson supposedly felt, as noted in his
> January 9, 1999, affidavit, Peterson reported that was incorrect, as he
> had no direct or indirect knowledge of the information in Paragraph No.
> 3 of this affidavit, which states, "the AD and compliance director told
> the team that they would lose their scholarships and eligibility if they did
> not give testimony saying the coach Cohane was evaluating us and
> instructing players in the gym during preseason workouts and while
> recruits were playing." Regarding the portion of the January 9, 1999,
> affidavit about his eligibility, Peterson explained that because he had
> transferred to Seton Hall, he did not want to be involved in the
> investigation; however, after initially declining to cooperate, he was
> informed that he had to submit to an interview with the NCAA or risk
> losing his eligibility. Peterson reiterated that he provided what he knew
> to be truthful information during his subsequent interview with the
> enforcement staff.

04-CV-181 at Dkt. #112-21, pp.19-20. Regarding the affidavit signed for plaintiff, Ryan

Peterson informed the NCAA Enforcement staff that plaintiff "presented to him the

prepared affidavit . . . he spent 'about 45 seconds' reviewing the affidavit prior to signing it

and indicated that his entire conversation with Cohane that day lasted approximately 10

minutes." 04-CV-181 at Dkt. #112-21, p.19. Finally, in response to plaintiff's allegations

of intimidation and coercion, the NCAA Enforcement staff noted

> no indication that witnesses felt this way during the subsequent
> enforcement staff investigation. The enforcement staff believes that
> such assertions need to be understood in their full context. It is the
> enforcement staff's understanding that during the conference
> investigation, the athletics administration had a concern that its
> student-athletes may have been less than forthcoming to the
> investigator. Therefore, the administrators advised the student-athletes
> that if they did not come forth with information and tell the truth, then
> their eligibility could be at risk. Later, in the spring of 2000, after the
> basketball season was completed and after some student-athletes had
> exhausted their NCAA eligibility, the enforcement staff requested
> interviews with student-athletes. The enforcement staff now
> understands that some of the student-athletes, who had exhausted

their eligibility, made it known to the institution that they would not interview with the enforcement staff. The institution informed these student-athletes that the institution had a code of conduct with which they expected the student-athletes to comply, and if they did not, then the issuance of their degrees could be at risk. The student-athletes then decided to interview with the enforcement staff.

04-CV-181 at Dkt. #112-21, p.26. In conclusion, the case summary argued that

while Cohane may question the credibility of some witnesses, it seems implausible to think that over 20 witnesses would all lie in concert, in an effort to remove Cohane and replace him with Eisenberg. Some of these witnesses were not even at the institution or in the men's basketball program at the same time. Furthermore, Eisenberg did not replace Cohane, and in fact, Eisenberg was not retained by the new head coach, Reggie Witherspoon.

04-CV-181 at Dkt. #112-21, p.26.

The NCAA COI conducted a hearing on February 9, 2001, which ran from 8:30 am through 7:30 p.m. Dkt. #196-12 & 04-CV-181 at Dkt. #124-5, p.6. At the beginning of the hearing, Chairman Friedenthal noted that he had afforded plaintiff the opportunity to respond to the January 24, 2001 amendment to allegation 8,[41] but that plaintiff's supplemental response had "very little to do with Allegation No. 8 in its changed form and, in my opinion, [counsel] did not live up to the obligations that led me to grant him the right to put in an additional response." Dkt. #112-5, p.4. At his deposition, plaintiff's prior counsel testified that this comment "completely poisoned the well on me, because he made a statement to the whole Infractions Committee that was . . . a lie." 04-CV-181 at Dkt. #119-20, p.55. Plaintiff's counsel felt that Chairman Friedenthal, "was definitely, from

---

[41] Based upon "information developed in a January 8, 2001 meeting between Cohane, his legal counsel and the enforcement staff; in Cohane's January 12 [sic] response; and in a January 17 enforcement staff interview of [Fred] Betchelor," the NCAA Enforcement staff amended Allegation No. 8 in the NCAA's LOI to clarify Fred Batchelor's role in the fall of 1996 scouting violation. 04-CV-181 at Dkt. #112-21, p.49.

the very beginning of that conference, making it clear that he just didn't want to hear the full story from us." 04-CV-181 at Dkt. #119-20, p.56.

One of the issues raised by the NCAA COI during the hearing was the role of the MAC report during the NCAA investigation. Dkt. #196-12, p.9. Plaintiff's counsel emphasized that

> The major problem that occurred during the course of the MAC investigation was that Mr. Cohane was never provided with any of the support documentation upon which the MAC and ultimately the University of Buffalo relied . . ..
>
> That is the issue that Mr. Cohane has had throughout this process. Unlike during the NCAA process, where the enforcement staff has provided materials to the custodian, the MAC never provided affidavits, interview tapes, nothing that would in any way have enabled Mr. Cohane to properly address the individual allegations by witnesses that were made against him.

Dkt. #196-12, p.11.

The NCAA COI was concerned that they had "never seen a case that has [s]o many missiles flying back and forth with affidavits, counter-affidavits, and so on," causing them to spend some time on the MAC's process of obtaining the affidavits and the circumstances in which additions, deletions and corrections were handwritten on the affidavits. Dkt. #196-12, pp.20-32. With respect to the merits of the allegations regarding observation of scrimmages, for example, the NCAA enforcement staff emphasized that

> sixteen individuals reported that Cohane watched pre-season scrimmages. This group of sixteen is comprised of current and former student-athletes, assistant coaches, an assistant athletic trainer, and the former men's basketball secretary.
>
> The enforcement staff takes the position that because this possible

violation was reported by sixteen people directly involved with the men's basketball program, the weight of the evidence, not to mention the mere volume of it, supports that the violation occurred.

In an effort to refute the information reported by the sixteen individuals, Cohane provided numerous affidavits from people upon whom he relies to support his position that the violation did not occur.

The staff believes that careful examination of the affidavits shows that Cohane does not effectively or persuasively support that he did not observe pre-season scrimmages.

The staff points out that in Cohane's supplemental reply to the letter of official inquiry, under Tab 12, the coach lists forty-three individuals whose statements he believes refute Allegation No. 1.

It is important to note that of the forty-three individuals, ten indicated that Cohane was, in fact, present in the gym during pre-season scrimmages.

Six others don't address the issue of whether Cohane did or did not watch the scrimmages. Two individuals deny that Cohane observed scrimmages, but then admitted that they were not present in the gym when the pre-season scrimmages were conducted.

Finally and perhaps most important is that five former student-athletes who became members of the team prior to October 10, 1997, reported that Cohane was not in the gym during pre-season scrimmages, which directly contradicts the testimony of Cohane, himself, who acknowledged that he occasionally was in the gym for reasons other than to observe.

Dkt. #196-12, pp.13-14. NCAA Enforcement staff took the position that "to orchestrate a situation in which sixteen individuals reported the information contained in Allegation No. 1 should be a difficult task." Dkt. #196-12, p.46.

The NCAA COI also discussed the allegations of intimidation and the circumstances involved with student-athletes changing affidavits subsequent to plaintiff's dismissal. Dkt. #196-12, pp.46-47 & 58-62. NCAA Enforcement staff clarified that

the enforcement staff, after the intense period during the MAC investigation, interviewed many of these same individuals and additional individuals further removed from the trying times of the fall of 1999.

While Jon Kleidon may make a claim that he felt pressure during the MAC investigation, he makes no such claim that he felt pressure when he interviewed with the enforcement staff.[42]

In the enforcement staff interview, we asked him to give a narrative and he did. In that narrative he describes Coach Cohane coming into the pre-season scrimmages, sitting down on the bench at the free throw line, and watching the practice for ten to fifteen minutes.

Jon has never backed off that comment or recanted that even in affidavits subsequently signed for Coach Cohane.

We also interviewed other individuals such as Ryan Peterson at Seton Hall, who did not feel the pressures that were supposedly occurring during the MAC investigation. He was removed from those elements.

We also interviewed other individuals, guys like Coaches Torgalski and Batchler, who didn't feel any pressure and did not allege to have that kind of pressure.

We also interviewed other individuals, Pat Lynch, the former secretary, who was secretary during the time that supposedly pressure was being exerted.

There were other individuals that were reported and the enforcement staff did conduct interviews with all of these individuals. The interviews . . . asked them to give narratives and details, and they did.

_____

[42] However, by affidavit dated June 20, 2011, submitted in support of plaintiff's response to defendants' motions for summary judgment, Jonathan Kleidon explains that:

23. After the 1999-2000 season ended, my NCAA eligibility had expired. I was on track to graduate in May 2000. I was notified by the school that I was to be interviewed by the NCAA and the University. I had no intention of speaking with the NCAA or the University in yet another interview. However, Mr. Maher told me that if I did not interview, I would not receive my degree. Due to Mr. Maher's threat to withhold my degree, I agreed to the interview. . . . .

Dkt. #217-2.

Their stories were not such that they were all in alignment with one another as to indicate that they were trying to get their stories straight together under pressure. There is nothing like that.

These guys gave a lot of details and each one's story was a little bit different, but the commonalities were incredible.

So I just don't want anyone to lose sight of the fact that there are no such claims that people felt pressured when the enforcement staff interviewed these individuals and they still provided testimony regarding these matters.

Dkt. #196-12, p.64.

Plaintiff's counsel continued to press the inconsistencies and possibility of intimidation, pointing out that with respect to the Goldschmied coaching charge, for example,

In their MAC tape each one of these witnesses testifies that they weren't worked out during their non-qualifier years. Clement Smith, at Tape count 336; Mike McKie, at Tape count 266; and Davis Lawrence, at Tape Count 143.

Each one of these witnesses testifies that they were not being worked out during their non-qualifier year.

After that, they changed their story, and it is completely consistent. I know that it must seem implausible to you. When I first met with Mr. Cohane, it seemed implausible to me, until I really came to grips with what was going on and I heard the witnesses testify.

This is what happened. They provided testimony at the MAC. We have the tapes. They are inconsistent. They switched, Why? Because they are being threatened, and it happened again here.

Dkt. #196-13, p.3. AAD Maher conceded that he did not tape record conversations he had with student-athletes subsequent to their initial interviews with SAC Fournier. Dkt. #196-12, p.61. Chairman Friedenthal commented

that with so many players who were willing to say anything at any time, many of them against their coach, changing their stories, raises some

question in my mind as to the level of recruitment of players at Buffalo over this period of time and what kind of people were coming into your program.

The[y']re certainly, and I suppose maybe they are just kids, but would hope that this isn't typical of the program where people are asked questions and there are charges that half of them are lying to get the coach and the other half are changing their stories back and forth and none of them seem to be honorable.

Dkt. #196-13, p.18.

By letter dated February 14, 2001, President Greiner extended his appreciation to the NCAA IAC for permitting his appearance at the hearing by telephone and reiterated SUNY Buffalo's implementation of meaningful corrective measures to address the infractions and clearly emphasize SUNY Buffalo's "clear commitment to redressing the violations in a substantive and serious manner." 04-CV-181 at Dkt. #124-5. President Greiner also noted SUNY Buffalo's "concerns over possible two-time NCAA violator status" and expressed its "hope that both the remote time of the actual infractions and our prompt and full response when they were uncovered some years later will be taken into account in mitigation of the application of the five year rule." 04-CV-181 at Dkt. #124-5. In response, Chairman Friedenthal informed President Greiner that

Through the materials your staff submitted to us, and what we learned during the course of our hearing, I believe we obtained the information contained in your letter. Of course our decision will be based on what was formally presented to us.

04-CV-181 at Dkt. #124-5.

The NCAA COI released its report on March 21, 2001. Dkt. #196-15. In reaching its decision, the NCAA COI noted that it

was required to weigh the credibility of a large number of affidavits that were submitted by both the university and counsel for the former men's head basketball coach . . . some of which were from the same individuals, yet contained conflicting information.  The committee was concerned about the nature of many of the affidavits submitted on behalf of the head coach.  A significant number of these documents were drafted by counsel a few days prior to the hearing, sent out for signature and returned immediately without alterations.  A number of them contained the same, rote language and were crafted in such a way so as to lead the individual signing the document to attest to general conclusions that were favorable to the head coach's cause, rather than reflecting the exact information the individual may have actually reported.  The committee believed that this undermined the credibility of such information. Further, of some concern to the committee was the fact that these affidavits were improperly included in the head coach's "supplemental reply." . . . In considering the head coach's supplemental reply, the committee was of the view that it was little more than a thinly veiled, last-minute attempt to overcome substantial evidence against him by submission of questionable affidavits.

Finally, as discussed in greater detail in Finding II-E, the committee did not find the testimony of the head coach at the hearing to be credible.

Dkt. #196-15, pp.4-5.  The NCAA COI found the following infractions:

• Impermissible observation of preseason basketball activities;

• Impermissible tryouts;

• Impermissible Extra Benefits (Long Distance Telephone Use);

• Violation of Scouting Legislation;

• Violation of Coaching Staff Limitations;

• Unethical Conduct;[43] and

---

[43] In support of the finding of unethical conduct, the NCAA COI explained that

it appeared that the evidence submitted by the university, the conference and the enforcement staff (some of which involved affidavits) was more objective in that it did not contain the rote, "canned" language found in the affidavits submitted on behalf of the head coach.  Also, the student-athletes had an opportunity to review the affidavits developed during the conference investigation to ensure their accuracy.  In many cases, the student-athletes made edits and changes to

• Failure to Monitor & Report Violation of NCAA Legislation.

Dkt. #192, pp.104-119.  The NCAA COI also found secondary violations of recruiting, eligibility, provision of extra benefits and administrative legislation.  Dkt. #192, p.120.  In addition to the penalties and corrective actions imposed during the MAC process, the NCAA COI imposed the following penalties upon SUNY Buffalo:

• public reprimand and censure;

• two years of probation commencing March 21, 2001; and

• limitation of eight official paid visits for men's basketball program during the 2001-02 and 2002-03 academic years.

Dkt. #192, p.122.  With respect to plaintiff, the NCAA COI determined that:

The former head men's basketball coach will be informed in writing by the NCAA that, due to his involvement in certain violations of NCAA legislation found in this case, if he seeks employment or affiliation in an athletically related position at an NCAA member institution during the period of time commencing with the date this report was released, March 21, 2001, and concluding on December 2, 2002 (three years subsequent to his release from the employ of the University at Buffalo), he and the involved institution shall be requested to appear before the Division I Committee on Infractions to consider whether the member institution should be subject to the show-cause procedures of Bylaw 19.6.2.2-(l), which could limit the coach's athletically related duties at the new institution for a designated period.

Dkt. #192, p.122.

_____

these documents, something which was not seen in the affidavits submitted on behalf of the head coach.  Moreover, in the eyes of the committee, the assistant coaches provided information that was consistent, truthful and, in some cases, clearly implicated themselves in violations.  Lastly, and perhaps most importantly, the committee had the opportunity to question the head coach in person during the hearing.  The committee found him to be evasive, deceptive and simply not credible.

Dkt. #192, pp.117-118.

In reporting the NCAA's findings, the Associated Press noted that

Cohane released a statement from his home in Rhode Island, denying any wrongdoing, and urged the school to appeal the decision.

"I am confident that a higher-level appeal will bring more clarity to these issues and that I will be fully vindicated," said Cohane, who coached the team for parts of seven seasons. "Our program was one of the highest integrity, and those who testified otherwise were either biased or manipulated."

Dkt. #112-27. More specifically, the Associated Press reported:

As the Buffalo men's basketball team prepared for a two-year probation for violating NCAA guidelines, former coach Tim Cohane insisted he and his program were railroaded.

The NCAA Infractions Committee determined in a ruling on Wednesday that Cohane and his staff broke rules by working out prospective recruits in scrimmages, observing practices out of season, using others to scout opponents and providing players with benefits by allowing them to make long-distance phone calls for free from the school.

Cohane, in an interview with The Associated Press, questioned those charges and said he was planning to appeal them within 30 days.

"There wasn't one specific date and time ever alleged when this happened. It was all speculative innuendo," said Cohane, who resigned in December 1999 after seven seasons with the Bulls. "Basically, what I feel is that somehow the school had to justify what happened when they forced [my] resignation."

As for some of the most serious charges laid against him and his staff, Cohane said it was merely an accident that coaches happened to be in the same gym in which Bulls players were working out outside of NCAA's allowed practice period.

"There isn't any program you wouldn't find some coach in the gym sometime in the offseason," said Cohane, now living in Rhode Island. "All you have to do is read between the lines. . . . I wish somebody would use some common sense and look at what's evident."

The NCAA saw things differently.

Accusing Cohane and the coaching staff of acting deliberately, infractions committee chairman Jack Friedenthal said: "You never know what goes through someone's head when they're doing this, but it's a clear, unmistakable violation[.]"

Friedenthal said what saved Buffalo from further sanctions is that the school reported the violations, cooperated with the NCAA and imposed its own sanctions on the program last September.

* * *

"After two years of investigations, what they come up with is coaches were in the gym in the offseason," Cohane said. "I would say that speaks to the integrity of our program, if that's all they can come up with."

Dkt. #112-27.

By letter providing plaintiff with a copy of the NCAA COI's findings of violations and penalties, plaintiff was advised of his right to appeal and that in the absence of an appeal, the COI's "findings of violations and penalties are effective when the 15-day appeal period has expired or the date of April 4, 2001. Dkt. #196-15. Plaintiff filed a timely appeal by letter dated April 2, 2001. Dkt. #196-29. The filing of the appeal stayed the show cause order against plaintiff. Dkt. #211, ¶ 176.

SUNY Buffalo appealed the penalty as "disproportionate when compared to the penalty imposed on the former coach," arguing that the "former coach whose actions led to the violations and who has been determined to be guilty of unethical conduct will only be subject to a show-cause order concluding on December 2, 2002," while SUNY Buffalo would be penalized for a total of three years. Dkt. #231, p.2.

The NCAA Division I Infractions Appeals Committee ("NCAA IAC"), met on August 22, 2001.  Dkt. #196-17.  Plaintiff appeared without counsel and repeated his prior arguments, including the motivations of his accusers and inconsistencies and contradictions in the evidence, but also noted that there were 152 NCAA cases of preseason observation, but not one had been classified as a major violation; 52 NCAA cases of scouting violations, but not one had been classified as a major violation; and that every major violation with respect to tryouts involved cash payments to a prospect.  Dkt. #196-17, pp.10-11.  Plaintiff expressed concern that "most of the evidence that was presented by the [NCAA COI] in their appeal[] response was the [MAC] affidavits" and although the NCAA Enforcement staff representative indicated that the NCAA IOC conducted its "own independent investigation," the NCAA IAC expressed recognition "that the MAC investigation was an integral part of the NCAA's case."  Dkt. #196-17, pp.6-7, 80 & 83.  However, in response to plaintiff's continued allegations of conspiracy, the NCAA IAC questioned the motivation of so many witnesses to fabricate testimony, many against their own interests.  Dkt. #196-17, p.104.  The transcript of the proceeding is 111 pages long.  Dkt. #196-17.

In accordance with the NCAA's practice at that time, a copy of the draft NCAA IAC report was provided to NCAA Enforcement staff representative Tom Hosty several days before the report was expected to be released "for vetting purposes for factual accuracy . . . . to review the facts and confirm the facts are accurate"  04-CV-181, at Dkt. #119-16, p.23.  If factual inaccuracies were discovered, Mr. Hosty explained that NCAA Enforcement staff would advise the NCAA IAC.  04-CV-181, at Dkt. #119-16, pp.24-25.  Thus, by e-mail dated October 2, 2001, NCAA Vice-President for Enforcement Services,

David Price, informed Michael Slive, NCAA IAC Chair, that he had read the draft of the

SUNY Buffalo report and noted "some serious factual errors that need to be addressed,"

including the statement that enforcement staff interviewed only one of at least four

prospects alleged to be involved in improper tryouts, noting that "we interviewed four of

the five prospects involved in the improper tryouts, and were unable to locate the fifth

because he was in Germany."  Dkt. #244-6.  In the same e-mail, VP Price also identified

as erroneous a statement that enforcement staff did not interview the institution's athletic

director employed at the time that many of the violations are alleged to have occurred,

noting that enforcement staff "interviewed Nelson Townsend on May 4, 2000."  Dkt. #244-

6.  Although agreeing that enforcement staff did not interview Mike Gentile, VP Price

noted that Mr. Gentile

> was employed only during the first two years of the five years when
> violations occurred.  The information he reported to Cohane about out-of-
> season practice was not contested and we believed Cohane was in violation
> of even Gentile's interp[retation].  We did interview the two compliance
> officers employed during the other three years.

Dkt. #244-6.  VP Price also took issue "with the idea that we did not interview many of the

participants and that the case was a 'battle of affidavits,'" explaining that he and Tom

Hosty both

> felt frustrated during the hearing that misleading statements were being
> made and that the enforcement staff was being attacked without
> having an opportunity to respond.  I'll save those comments for another

day after the Buffalo case has been released.[44]  But the factual mischaracterizations need to be corrected.

Dkt. #244-6.  As a result of this communication, the NCAA IAC delayed release of the report, but ultimately chose not to alter any of the factual statements in the report.  04-CV-181 at Dkt. #119-16, pp.26-27 & Dkt. #120-13, p.79.

In a report dated October 12, 2001, the NCAA IAC determined that

Although there was much conflicting evidence in the case, the [IAC] concludes that the findings of violations are not clearly contrary to the evidence and therefore upholds the findings. Nonetheless, many aspects of this case are troublesome.

The investigators did not interview all persons who, the [IAC] believes, had relevant information.  For example, the NCAA enforcement staff interviewed only one of "at least four" . . . prospective student-athletes alleged to be involved in improper tryouts. In addition, the institution's athletic director [Nelson Townsend] and the compliance officer [Mark Gentile] employed during the time that many of the violations are alleged to have occurred were not interviewed.  This inconsistent investigation may have been due to the enforcement staff incorporating and supplementing an investigation by the representatives of the [MAC].  In any event, we believe that there was additional information that would have been helpful in resolving this case.

As a result of the limited interviews, this case evolved into a battle of affidavits – some asserting facts giving rise to a violation and others denying facts that would give rise to a violation.  This Committee does not believe this is the most effective way to resolve factual disputes.  It

---

[44] In an e-mail exchange dated October 4, 2001 among the NCAA Enforcement staff and NCAA COI staff, Jerry Parkinson, Coordinator of Appeals for the NCAA COI noted:

Obviously, something went awry in the Cohane case, or the draft would not have had so many factual errors.  The three of us know, of course, that the problem is exacerbated by precluding staff from responding directly at the IAC hearings. But the IAC must be somewhat embarrassed about the errors, and I suspect they may be open to a discussion of how to facilitate a full and accurate hearing of the cases.

04-CV-181 at Dkt. #127-4.

is far more helpful for the NCAA enforcement staff to interview witnesses having relevant information so that they can be asked all relevant questions about the circumstances involved. Notwithstanding these concerns about the investigation of this case, we conclude that the findings of violations are not clearly contrary to the evidence.

Certain language in the report of the [COI] regarding the ethical conduct violation was also troublesome to us. The [COIs'] rationale suggests that the conduct of the former head coach during the hearing and in connection with affidavits submitted on his behalf contributed to the finding of an ethical conduct violation.

We believe it is important to state clearly that a person's assertion of innocence, however vigorous, against charges of violations should not ordinarily be the subject of an unethical conduct finding. In this case, the [IAC] does not believe the former head coach's conduct in presenting his defense should in any way give rise to an ethical conduct violation.

We conclude, however, there are facts in this case found to be true and credible by the [COI] that support the ethical conduct violation [footnote setting forth such evidence omitted].

The former head coach claimed on appeal that there were procedural errors in this case that require reversal of the findings. In part, this claim was based on his not receiving information about the investigation in a timely manner. The case is somewhat complicated in that the initial investigation was done by the MAC. The MAC made the information available to the NCAA which in turn made it available to the former head coach. Information provided at the appeal hearing established that the NCAA enforcement staff made information developed by the MAC available to the former head coach in a timely manner. In addition the former head coach was permitted to submit supplemental material after the deadline. The Committee does not believe there was procedural error that affected the outcome of this case.

The former head coach asked the [IAC] to review the penalty in this case to determine whether it was excessive or inappropriate based on all the evidence and circumstances in accordance with Bylaw 32.10.2. The Committee believes the show cause order of three years running from the date of the former head coach's termination from employment at the institution (December 2, 2000) is excessive.

The former head coach has had a long career free of violations of NCAA legislation  In this case, the evidence was sharply conflicting.

> Although the Committee on Infractions made findings of violations that were supported by the evidence, we believe that a shorter show cause penalty is appropriate under the facts of this case and more consistent with penalties in previous cases. Comparing this penalty to penalties imposed in other cases, the Committee concludes this penalty should terminate as of the date of this report.

Dkt. #196-19, p.8-10. Thus, the NCAA IAC affirmed the findings of violations, but modified the show cause penalty to terminate as of October 12, 2001. Dkt. #196-19, p.10. As a result, Shepard Cooper, Director of the NCAA COI, testified at his deposition that anyone seeking information about plaintiff would be informed of the NCAA violations committed by plaintiff, but would also be advised that there are no procedural impediments to hiring him. Dkt. #232-1. Mr. Cooper declares that a search of the NCAA log of inquiries from member institutions about coaching candidates reveals "that no institution has inquired about Mr. Cohane's history of NCAA bylaw violations." 04-CV-181 at Dkt. #112-33. However, plaintiff has been employed as an assistant men's basketball coach at the College of William & Mary and as the Associate Head Coach of the men's basketball team at Roger Williams University. Dkt. #112-35, ¶ 122.

In a separate report, the NCAA IAC denied SUNY Buffalo's appeal of the penalty reducing the number of official visits permitted during the 2001-2002 and 2002-2003 academic years. Dkt. #196-18.

By letter dated October 18, 2001, Jerry Parkinson, Coordinator of Appeals for the NCAA COI advised NCAA Commissioner Michael Slive that

> As I see it, my role is simply to show the IAC that the COI's findings are supported by the evidence *presented to the COI at its hearing*. Often the COI is unaware of allegations of investigative improprieties at the

time of its hearings, and if such allegations are made for the first time on appeal, the alleged improprieties certainly could have had no impact on the COI's findings.

Occasionally, issues regarding investigative procedures do arise at COI hearings. In the Cohane case, for example, the COI noted the "unusual" number of affidavits and counter-affidavits . . . and, accordingly, questioned the participants extensively . . . about how the affidavits were obtained. As a result of that probing, the COI was impressed with the thoroughness and professionalism of MAC investigator Rob Fournier, and thus found some of the affidavits obtained in the MAC investigation to be persuasive. In this context, it did not seem particularly important to the COI whether the information in the affidavits was obtained directly from enforcement staff interviews or from another equally reliable source, in this case, the conference's experienced senior associate commissioner for compliance, who is also an attorney.

* * *

It is unfortunate that I may not have provided the IAC the most complete picture of the investigation in this case. But . . . there is no reason for me to be privy to all issues that arise during the investigative process. My role in this process . . . is to be "well-acquainted with the facts discussed at [the COI's] hearing" and to persuade the IAC that *those facts* support the COI's findings. I also felt hampered to some degree by Mr. Cohane's presentation of new "eidence" at the appeal hearing through, among other things, a computer-based graphics program. I had no opportunity to review this information prior to it being presented at the hearing. Finally, I was particularly troubled by the IAC's decision not to hear my closing arguments. I am convinced that I could have addressed Mr. Cohane's contentions more fully in closing remarks and provided the IAC with a clearer picture of both the investigation and the evidence presented to the COI at its hearing.

* * *

Finally, I feel compelled at least to ask a question about the IAC's instruction that an individual's conduct in presenting his defense should not "in any way give rise to an unethical conduct violation." In the Cohane case, the COI candidly conceded that much of the evidence was contradictory, but nonetheless found Mr. Cohane to be "evasive, deceptive and simply not credible." The IAC characterized Mr. Cohane's presentation as simply a "vigorous assertion of innocence," but, with all due respect, the IAC did not have the same opportunity as

the COI to spend hours at the hearing listening to Mr. Cohane and observing his demeanor.  My question is whether the COI is to ignore what it views to be lying (and failure to take responsibility for one's actions) in a case in which the clear weight of the evidence points toward wrongdoing.  Isn't knowingly furnishing false or misleading evidence a clear example of unethical conduct, or at least support for such a finding?

04-CV-181 at Dkt. #124-10.


Plaintiff commenced the action against the SUNY Buffalo defendants by filing a complaint in the United States District Court for the Eastern District of New York on January 17, 2003.  Dkt. #1.  An amended complaint was filed on May 13, 2003.  Dkt. #2. The amended complaint asserts two causes of action: (1) deprivation of liberty interest without due process of law in violation of 42 U.S.C. § 1983 against all defendants; and (2) tortuous interference with contractual relations against defendants MAC and Fournier. Dkt. #2.  The action was transferred to this district on November 23, 2004.  Dkt. #49.  By Decision and Order entered March 10, 2006, the Court denied SUNY at Buffalo's motion to dismiss.  Dkt. #63.


On March 19, 2004, plaintiff filed a separate action alleging that the NCAA and its staff: (1) engaged with SUNY Buffalo officials to deprive plaintiff of his liberty interest in his reputation without due process of law in violation of 42 U.S.C. § 1983; and (2) tortuously interfered with the contractual relationship between plaintiff and SUNY Buffalo. 04-CV-181 at Dkt. #1.  By Decision and Order entered September 27, 2005, the Hon. William M. Skretny granted defendants' motion to dismiss, finding that the NCAA's investigation did not constitute state action and that the tortuous interference claim was

barred by the statute of limitations. 04-CV-181 at Dkt. #30. The Court of Appeals for the

Second Circuit affirmed dismissal of the tortuous interference claim, but reversed

dismissal of the first cause of action, determining that plaintiff's allegations,

> if proven, could show that the University willfully participated in joint
> activity with the NCAA to deprive Cohane of his liberty. Cohane could
> show that without the State's assistance and the exercise of its
> coercive authority upon the student witnesses, the NCAA could not
> have issued the defamatory report and imposed sanctions on Cohane.
> Certainly, the NCAA may be able to rebut these claims and show that it
> did not engage in concerted action with the University, but at this point
> in the litigation, it was error for the District Court to interpret *[NCAA v.*
> *Tarkanian,* 488 U.S. 179 (1988)] as holding categorically that the
> NCAA can never be a state actor when it conducts an investigation of a
> state school.

*Cohane v. NCAA*, 215 Fed. Appx. 13, 2007 WL 247710, at *3 (2d Cir. Jan. 25, 2007).


## DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the

court must assess whether there are any material factual issues to be tried while resolving

ambiguities and drawing reasonable inferences against the moving party, and must give

extra latitude to a *pro se* plaintiff." *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y.

1997) (internal citations omitted).


A fact is "material" only if it has some effect on the outcome of the suit.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

## 42 U.S.C. § 1983

42 U.S.C. § 1983 "permits an individual deprived of a federal right by a person acting under color of state law to seek compensation in federal court." *Wimmer v. Suffolk Cty Police Dep't*, 176 F.3d 125, 136 (2d Cir. 1999). To prevail on a claim pursuant to § 1983, "plaintiff must prove that the challenged conduct was attributable at least in part to a person acting under color of state law, and that the conduct deprived the plaintiff of a

right, privilege or immunity secured by the Constitution or laws of the United States." *Id.* at 137.


Under Color of State Law

"Section 1983 addresses only those injuries caused by state actors or those acting under color of state law." *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir.), *cert. denied*, 506 U.S. 819 (1992); *See American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful.").


The SUNY Buffalo defendants do not dispute their status as a state actor. *See NCAA v. Tarkanian*, 488 U.S. 179, 183 & 192 (1988) ("A state university without question is a state actor" and their executives "unquestionably act under color of state law" when "performing their official functions.").


The MAC defendants, however, deny that they acted under color of state law. Dkt. #197-1, p.18. Likewise, the NCAA defendants argue that there is no evidence to suggest that they acted under color of state law. Dkt. #112-36, pp.39-49.


Plaintiff argues that the MAC and NCAA defendants were sufficiently entwined with SUNY Buffalo so as to warrant a finding of state action. Dkt. #246, pp.12-16 & 04-CV-181 at Dkt. #135, pp.19-30.

"In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action." *Tarkanian*, 488 U.S. at 192. In resolving this question, the Court begins by identifying the specific conduct of which the plaintiff complains. *Sullivan*, 526 U.S. at 51. In this case, the essence of plaintiff's complaint is that the MAC failed to conduct an independent investigation into allegations of violation of NCAA regulations and that the NCAA relied upon that investigation in determining such violations occurred.

The defendants' conduct may be attributable to the state if at least one of the following tests is satisfied: (1) the entity acts pursuant to the coercive power of the state or is controlled by the state (the compulsion test); (2) the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state or the entity's functions are entwined with state policies (the joint action or close nexus test); or (3) when the entity has been delegated a public function by the state (the public function test).[45] *Sybalski v. Indep. Group Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (internal quotations omitted), *quoting Brentwood Academy v. Tennessee Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001). The inquiry is fact specific. *Brentwood*, 531 U.S. at 298.

---

[45] For the public function test to be satisfied, private actors must be delegated functions that were traditionally under the exclusive authority of the state. *Sybalski*, 546 F.3d at 255. Plaintiff does not argue that this test applies.

<u>Compulsion Test</u>

Plaintiff argues that the compulsion test applies to the MAC because the MAC is comprised exclusively of public universities and governed by the presidents of these public universities and because the members of the MAC COI were all employees of public universities. Dkt. #246, p.13.

In *NCAA v. Tarkanian*, the Supreme Court examined the relationship between a public university in Nevada and an athletic association of approximately 960 members and determined that because the vast majority of members were located in states other than Nevada, "[i]t necessarily follows that the source of the legislation adopted by the NCAA is not Nevada but the collective membership, speaking through an organization that is independent of any particular State." 488 U.S. at 193.[46] The Supreme Court noted, however, that the analysis could "be different if the membership consisted entirely of institutions located within the same State, many of them public institutions created by the same sovereign." *Id.* at 193 n.13. Thereafter, in *Brentwood*, the Supreme Court considered a statewide association incorporated to regulate interscholastic athletic competition and found the "nominally private character of the Association overborne by the pervasive entwinement of public institutions and public officials in its composition and workings." 531 U.S. at 298. Specifically, the Supreme Court emphasized that "to the extent of 84% of its membership, the Association is an organization of public schools represented by their officials acting in their official capacity to provide an integral element

_____

[46] Any argument that the NCAA acted pursuant to the coercive power of New York state would be foreclosed by this analysis. Plaintiff does not argue otherwise.

of secondary public schooling." *Id.* at 299-300. The Supreme Court also noted that the Association's ministerial employees were eligible for membership in the state retirement system. *Id.* at 300.

In the instant case, although the MAC is governed by representatives of its thirteen public university members, those universities – as in *NCAA v. Tarkanian* – encompass multiple states. In fact, SUNY Buffalo is the only member of the MAC from New York, while more than 45% of the MAC's membership derives from Ohio, which is also where the MAC is incorporated. Moreover, there is nothing in the record to suggest that MAC employees derive employment benefits from any state, let alone New York. Thus, it cannot be said that New York is exerting coercive power over the administration of the MAC as would be required to satisfy the compulsion test.

Joint Action Test

To satisfy the joint action test, there must be "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood*, 531 U.S. at 295 (internal quotations omitted). This test "specifically examines the state's link to the challenged action." *Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1082 (2d Cir. 1990), *cert. denied*, 499 U.S. 960 (1991). "Put differently, a private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the State or its agents.'" *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002), *quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). The touchstone of joint action is often a plan, prearrangement,

conspiracy,[47] custom, or policy shared by the private actor and the state actor.  *Missere v. Gross*, 826 F. Supp.2d 542, 567 (S.D.N.Y. 2011).  However, "[c]ommunications between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor."  *Fisk v. Letterman*, 401 F. Supp.2d 362, 377 (S.D.N.Y. 2005).

### MAC defendants

Plaintiff argues that the SUNY Buffalo and MAC defendants conspired to prepare a shoddy report that would support the removal of plaintiff from his employment and the issuance of a "show cause" penalty against him.  Dkt. #246, pp.14-16.

SUNY Buffalo responds that its involvement in the MAC investigation was limited to "administrative support."  Dkt. #256, ¶ 5.

While the Court finds evidence of a conspiracy to be lacking, it is persuaded that SUNY Buffalo defendants were sufficiently involved in the substance of the MAC's investigation and reporting of the alleged NCAA violations so as to warrant a finding that the MAC engaged in joint action with SUNY Buffalo.  More specifically, the Court finds that the MAC's investigation and report was influenced by SUNY Buffalo to such a degree that the report cannot be fairly characterized as independent of SUNY Buffalo.  AD

---

[47] To proceed pursuant to a claim of conspiracy, plaintiff must demonstrate: (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Ciambriello*, 292 F.3d at 324-325.

Arkeilpane and AAD Maher informed the student-athletes "that the investigation was being conducted by the [MAC] and [SUNY Buffalo]; AAD Maher was "present in a number of the interviews" with student-athletes and conducted the interview with Nadav Goldschmied; AD Arkeilpane informed the student-athletes that SUNY Buffalo was reviewing the information provided during the interviews; and AAD Maher advised the student-athletes that SUNY Buffalo believed the allegations in the MAC report and then warned the student-athletes that in order to avoid the eligibility consequences that could arise should their statements be determined "less than truthful," they should revise their statements before SUNY Buffalo accepted the MAC report.  Dkt. #192, p.23; Dkt. #196-12, p.53;  Dkt. #236-10, p.1 & Dkt. #261, p.60.

As a result, several student-athletes altered their affidavits to comport with SUNY Buffalo's opinion of the allegations contained in the MAC report.  For example, SAC Fournier testified at his deposition that Rick Fox's affidavit of December 9, 1999, Mike Sinclair's affidavit of December 9, 1999, and Damien Foster's affidavit of December 17, 1999 were "supplemented by the institution." Dkt. #242-12, pp.206 & 227.  However, nothing in the MAC 20 report indicates that these affidavits were "supplemented by the institution" and, more importantly, nothing in the MAC 20 report acknowledges the existence of the original affidavits.  SAC Fournier testified at his deposition that he removed the "student athletes' prior affidavits so that the MAC COI had the most current statements from these student-athletes and what [he] believed to be the statements that best reflected their intended true positions and recollections since they were the most recent sworn statements."  Dkt. #255, ¶ 19.  However, SAC Fournier failed to question

these student-athletes as to the cause of their changing recollections and simply accepted SUNY Buffalo's submission of affidavits without concern that they contradicted his recorded interviews with these student-athletes.

Moreover, the MAC conducted no investigation with respect to the Mitch Gillam scouting violation, but submitted that allegation based solely upon the self-report of SUNY Buffalo. Dkt. #245-18, pp.23 & 26-27. SAC Fournier affirms that he added violation 19 & 20 to his report based solely upon SUNY Buffalo's self report and that he added the Rielly and Townsend affidavits provided to him by SUNY Buffalo so that the Committee on Infractions "had the most current information." Dkt. #255, ¶ 19. However, nothing in the MAC 20 report would suggest that these allegations were included without any investigation or verification by the MAC.

The MAC was investigating the alleged violations by invitation of SUNY Buffalo, had no authority to conduct its investigation absent the exercise of SUNY Buffalo's authority over it's students and staff, and conceded that its investigation could be (and was), altered by SUNY Buffalo because it was SUNY Buffalo's responsibility to self-report whatever allegations it believed were supported by the investigation to the NCAA. Taken together these facts demonstrate that SUNY Buffalo was sufficiently involved in the MAC's investigation and reporting of alleged violations so as to warrant a finding of joint action. Accordingly, it is recommended that the MAC defendants' motion for summary judgment be denied with respect to their argument that they did not act under color of state law.

**NCAA defendants**

Plaintiff argues that the NCAA and SUNY Buffalo worked jointly to deny plaintiff due process, as evidenced by the NCAA's reliance upon false information gathered during the MAC investigation; the NCAA's refusal to provide exculpatory evidence to plaintiff; and the NCAA's *ex parte* communication with President Greiner. 04-CV-181 at Dkt. #135, pp.19-30.

The NCAA defendants respond that there is no evidence to support plaintiff's conclusory allegations of an agreement or conspiracy between SUNY Buffalo and the NCAA with respect to the NCAA's investigation in this matter and rely upon their independent interviews of plaintiff, student-athletes and coaches – many of whom were no longer under the control of SUNY Buffalo - as evidence of the independent basis for their findings. 04-CV-181 at Dkt. #112-36, pp.35-36 & 40-50. More specifically, the NCAA defendants argue that "[t]here is simply no evidence that could lead a reasonable juror to infer that Hosty or Hannah reached an agreement with UB to work for the common purpose of destroying Cohane's career, or that Friedenthal later joined in such a scheme when the COI considered the UB infractions matter." 04-CV-181 at Dkt. #112-36, p.42. In other words, the NCAA defendants argue that they had no motive to direct blame toward plaintiff for the benefit SUNY Buffalo. 04-CV-181 at Dkt. #112-36, p.43. The NCAA defendants also rely upon their findings against SUNY Buffalo as persuasive evidence contradicting any claim of SUNY Buffalo control over the NCAA's process. 04-CV-181 at Dkt. #112-36, p.48.

In contrast to SUNY Buffalo's involvement in the MAC investigation and influence over the MAC's report, which SUNY Buffalo submitted to the NCAA as its self-report of NCAA violations, there is no evidence that SUNY Buffalo exerted influence over or acted in concert with the NCAA Enforcement staff in its investigation and resolution of SUNY Buffalo's self-report of NCAA violations. Although it is true that the NCAA utilized SUNY Buffalo's self-report and documents, including affidavits, in preparing their case summary and that the NCAA Enforcement staff and NCAA COI relied upon some of the information contained therein, it is clear that it did so because such information comported with the information obtained during its own interviews with witnesses, not because of any influence SUNY Buffalo exerted over the NCAA's process.

Contrary to plaintiff's argument, there is simply no evidence of collusion between SUNY Buffalo and the NCAA. The NCAA Enforcement staff's acknowledgment in their case summary that some of the student-athletes who had exhausted their eligibility may have been informed by SUNY Buffalo that its student code of conduct required them to interview with the NCAA does not demonstrate that SUNY Buffalo was acting on behalf of or in cooperation with the NCAA when it made such statements to some of its student-athletes. Moreover, there is no evidence that the NCAA intentionally withheld material information from plaintiff, let alone that it did so at the behest (or for the benefit) of SUNY Buffalo. Furthermore, President Greiner's letter to Chairman Friedenthal does not evince connivance, but instead reinforces SUNY Buffalo's concern as to the NCAA's authority over SUNY Buffalo. Finally, there is no evidence to suggest that the SUNY Buffalo defendants knowingly proffered false statements in their self-report, let alone that NCAA

was aware of any potential malfeasance.  As a result, it is recommended that that the NCAA defendants' motion for summary judgment be granted on the ground that the NCAA defendants are not state actors and were not acting jointly with the SUNY Buffalo defendants so as to satisfy the "under color of state law" requirement under 42 U.S.C. § 1983.

Due Process

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . "  U.S. CONST. amend. XIV.  The Due Process Clause contains both a procedural and substantive component.  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  The procedural component bars the deprivation of a constitutionally protected interest in life, liberty or property without due process of law, while the substantive component bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures to implement them.  *Id.* (internal quotation omitted).

Substantive Due Process

The substantive component of the Due Process Clause of the Fourteenth Amendment protects individual liberty against certain government actions regardless of the procedures used to implement them.  *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 125 (1992).  However, it is well-established that substantive due process protections extend only to those interests that are "implicit in the concept of ordered

liberty," *Palko v. Connecticut*, 302 U.S. 319, 325 (1937), and "so rooted in the traditions and conscience of our people as to be as to be ranked as fundamental." *Reno v. Flores*, 507 U.S. 292, 303 (1993). "The most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights." *Planned Parenthood of Southeastern PA v. Casey*, 505 U.S. 833, 848 (1992). In addition, "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 271 (1994), *citing Casey*, 505 U.S. at 847-49 (1992) (describing cases in which substantive due process rights have been recognized).

The Supreme Court has expressed reluctance to expand the concept of substantive due process because the guideposts for responsible decision making in this unchartered area are scarce and open-ended. *Albright*, 510 U.S. at 271, *quoting Collins*, 503 U.S. at 235. "Hence, remaining largely outside the scope of substantive due process jurisprudence are tort law and public employment law." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (internal citations omitted), *cert. denied*, 513 U.S. 1110 (1995). The Court of Appeals explained that "areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because 'substantive due process rights are created only by the constitution.'" *Id.* at 1556, *quoting Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 299 (1985) (Powell, J., concurring); *See also Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010) (employment-related rights are not fundamental and therefore not generally actionable as a violation of substantive due process), *cert. denied*, __ U.S. __, 131 S.Ct. 1680 (2011)*; Silva v. Bieluch*, 351 F.3d 1045, 1047 (11th Cir. 2003)

("Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection."); *Emmerling v. Town of Richmond*, No. 09-CV-6418, 2010 WL 2998911, at *11 (W.D.N.Y. July 27, 2010) ("The right to continued public employment is not a fundamental property interest that is subject to Substantive Due Process Protection."), *aff'd* 434 Fed. Appx. 10 (2d Cir. 2011); *Martin v. Town of Brattleboro*, No. 07-CV-260, 2008 WL 4416283, at *2-3 (D.Vt. Sept. 24, 2008) (collecting cases). "As a result, these state law based rights constitutionally may be rescinded so long as the elements of procedural – not substantive – due process are observed." *McKinney,* 20 F.3d at 1556.

Plaintiff argues that defendants deprived him of "his substantive due process liberty interest in his good name, reputation, and continued employment as an NCAA head basketball coach by proffering and submitting false testimony during the SUNY/MAC and SUNY/NCAA investigations, proffering and submitting false testimony to the MAC COI and NCAA COI, and permitting false testimony to be proffered to the NCAA IAC." Dkt. #246, p.16. Plaintiff also argues that the SUNY Buffalo, MAC and NCAA defendants' "use of government control over student-athletes' eligibility, scholarship, and student status to strongarm college students to signing false affidavits to call into question Cohane's integrity and professional competence then using those false statements to deprive Cohane of his good name reputation are the very acts that poison the well of Fourteenth Amendment substantive due process." 04-CV-181 at Dkt. #135, p.40. As set forth above, however, even if these allegations were supported by the record, such a claim would sound in procedural, rather that substantive, due process. *See Velez v.*

*Levy*, 401 F.3d 75, 94 (2d Cir. 2005) (dismissing substantive due process claim where plaintiff alleged conspiracy to fabricate investigation to support plaintiff's removal from public office where what was shocking about the alleged conduct was defendants' motive to deprive plaintiff of liberty interest without procedural due process).  Accordingly, it is recommended that the motions for summary judgment be granted in so far as they seek dismissal of plaintiff's substantive due process claims.

Procedural Due Process

"A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004).  In other words, "[d]efamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation."  *Siegert v. Gilley*, 500 U.S. 226, 233 (1991).  Thus, to prevail on a claim of deprivation of a liberty interest in one's reputation without due process of law, *i.e.*, a stigma-plus claim, a plaintiff must demonstrate the utterance of a statement sufficiently derogatory to injure plaintiff's reputation, that is capable of being proven false and that plaintiff claims is false, and a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.  *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010).

*Statute of Limitations*

The SUNY Buffalo defendants argue that any injury occurring prior to January 17, 2000 is time barred.  Dkt. #189-2, p.17. The MAC defendants argue that the statute of

limitations bars consideration of any allegedly stigmatizing statements uttered prior to January 17, 2000.  Dkt. #254, pp. 19-21.

Plaintiff argues that his stigma plus claim could not accrue until the NCAA imposed the show cause order on March 21, 2001.  Dkt. #246, p.38.

SUNY Buffalo responds that plaintiff cannot rely upon the NCAA's imposition of the show cause penalty to extend the accrual of his claim against the SUNY Buffalo and MAC defendants.  Dkt. #253, p.4.

The statute of limitations for an action commenced in New York pursuant to 42 U.S.C. § 1983 is three years.  *Owens v. Okure*, 488 U.S. 235, 251 (1989).  The accrual date for such a claim is a question of federal law.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).  "The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980), *cert. denied*, 450 U.S. 920 (1981).

Plaintiff commenced this action against the SUNY Buffalo and MAC defendants by filing of a summons and complaint on January 17, 2003.  Dkt. #1.  Thus, to be timely, plaintiff's claims must have accrued no later than January 17, 2000.  As the statute of limitations could not begin to run before all the elements of plaintiff's cause of action existed, plaintiff's reliance upon the NCAA's March 21, 2001 imposition of the show cause

penalty to satisfy the plus element of his stigma plus due process claim renders his claim

timely.  Whether SUNY Buffalo and MAC defendants can be held liable for the NCAA's

imposition of the plus element of his claim is a different  question which will be addressed

*infra*.


### Stigma

Plaintiff argues that the stigma requirement is satisfied "because the

presentations and supporting documentation for the MAC, NCAA COI, and NCAA IAC

hearings labeled Cohane as dishonest and unethical" and because the "underlying basis

for these documents and hearings was the SUNY/MAC joint investigation."  Dkt. #246,

p.18.  Plaintiff reiterates that

> the stigmatizing statements at issue here are those questioning
> Cohane's integrity found in MAC-18 [report], MAC-20 [report], SUNY's
> Response to the NCAA [LOI], the March 21, 2001 [NCAA COI] Report,
> and the October 12, 2001 NCAA IAC Report. These reports falsely
> accuse Cohane of unethical conduct, dishonesty, and of being evasive,
> deceptive, and not credible.
>
> Additionally, the above reports contained false statements of
> witnesses, which were known by the Defendants to be false and used
> against Cohane.

Dkt. #246, p.21 & 04-CV-181 at Dkt. #135, p.33.


SUNY Buffalo defendants argue that the stigmatizing statements are

substantially true and that there is no evidence that any SUNY Buffalo defendant publicly

made a derogatory statement about plaintiff or that stigmatizing statements appear in his

personnel file.  Dkt. #189-2, pp.38-40 & Dkt. #253, p.25.

The MAC defendants similarly argue that plaintiff cannot demonstrate that the stigmatizing statements were false or that they were made public since the MAC's report was only disclosed to SUNY Buffalo and the NCAA.  Dkt. #197-1, pp.37-38 & 45.

The NCAA defendants argue that plaintiff has failed to identify defamatory statements allegedly uttered by defendants Hosty, Hannah or Friedenthal and that the opinions contained in the COI report are not defamatory.  Dkt. #112-36, pp.32-33.

The Court has no difficulty concluding that allegations in the MAC report and NCAA COI and NCAA IAC reports stigmatize the plaintiff.  *See Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006) ("Statements that denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession will satisfy the stigma requirement."); *Patterson*, 370 F.3d at 330 (statements that call into question plaintiff's good name, reputation, honor or integrity constitute stigma).  Moreover, the record before the Court plausibly suggests a question of fact as to the veracity of allegations within the MAC report and NCAA COI and NCAA IAC reports. *See Brandt v. Board of Co-Op Educ'l Servs.*, 820 F.2d 41, 43 (2d Cir. 1987) (to establish a right to a name clearing hearing, plaintiff is required to "raise the issue of falsity regarding the stigmatizing charges – not prove it.").

Where communication of stigmatizing statements has not been made public by the governmental entity, such statements cannot form the basis of a claim that the

plaintiff's reputation was impaired. *Bishop v. Wood*, 426 U.S. 341, 348 (1976); *See Velez,* 401 F.3d at 87 (defamatory statement must be sufficiently public to create or threaten a stigma); *Patterson*, 370 F.3d at 330 (plaintiff must demonstrate stigmatizing statements were made public). However, public disclosure is not a "self-defining concept" and "what is sufficient to constitute 'public disclosure' will vary with the circumstances of each case." *Brandt*, 820 F.2d at 44. For example, dissemination of the stigmatizing statements to potential employers may satisfy the stigma requirement. *Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir. 1994)(defendant's inclusion of plaintiff on a central register of suspected child abusers satisfies public disclosure requirement where employers are required to check register before hiring). Moreover, the inclusion of stigmatizing statements "in an employee's personnel file may satisfy the contemporaneous public disclosure element of a stigma-plus claim." *Segal*, 459 F.3d at 213, *citing Brandt*, 820 F.2d at 45.

The Court finds that defendants' dissemination of the MAC report to the NCAA is sufficient to satisfy the publication requirement. In addition, the Court finds a question of fact with respect to publication of plaintiff's personnel file. Although AAD Maher testified at his deposition that he would only provide the dates of plaintiff's employment to prospective employers and would direct any further inquiries to SUNY Buffalo's Human Resources Department, there is no indication as to what information SUNY Buffalo's Human Resources Department would disclose. *See Brandt*, 820 F.2d at 44 (finding question of fact as to likelihood of disclosure to plaintiff's prospective employers where defendant did not stipulate that it would never disclose the charges to plaintiff's

prospective employers). SUNY Buffalo's declaration that it "would not release [plaintiff's] official personnel file unless and until [plaintiff] signed a release authorizing the disclosure of information contained in his file" (Dkt. #195), does not address the question of what information, *e.g.*, the Letter of Reprimand recommended by the MAC COI, is contained within plaintiff's personnel file. Moreover, it is of no consequence to the publication element of a stigma plus claim that plaintiff could refuse disclosure of his personnel file to a prospective employer since the decision to permit disclosure of stigmatizing statements or the decision to deny a potential employer access to them could be equally damaging to plaintiff's chances for future employment. *Brandt*, 820 F.2d at 45.

### *Quasi-Judicial Immunity*

The MAC defendants argue that any statements contained in their report or findings or in response to questions by the NCAA would be entitled to absolute privilege as statements made during the course of quasi-judicial or administrative proceedings. Dkt. #189-2, pp.41-42 & Dkt. #197-1, p.47.

Plaintiff responds that defendants failed to assert this affirmative defense in their answer, thereby waiving it. Dkt. #246, pp.41-42. In any event, plaintiff argues that the defendants were not acting in a judicial role as is necessary for the defense to apply. Dkt. #246, p.41.

"Judges are granted absolute immunity from liability for acts taken pursuant to their judicial power and authority . . . for the benefit of the public, whose interest it is that

the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Oliva v. Heller*, 839 F.2d 37, 39 (2d Cir. 1988), *quoting Pierson v. Ray*, 386 U.S. 547 (1967). This protection is extended to others who perform functions closely associated with the judicial process, including court clerks, law clerks, prosecutors, administrative law judges and hearing examiners, grand jurors and witnesses in judicial proceedings. *Id.* Because the investigation and enforcement of alleged violations of rules promulgated by a voluntary association are not judicial in nature, the Court concludes that this affirmative defense does not apply in this case.

### Plus Requirement

SUNY Buffalo and MAC defendants argue that plaintiff cannot establish the plus element of his claim because he resigned before SUNY Buffalo charged him with disciplinary violations and because the NCAA's show cause sanction, which neither SUNY Buffalo nor the MAC defendants imposed, was overturned. Dkt. #189-2, pp.34-35; Dkt. #197-1, pp.46-48 & 51.

The NCAA defendants argue that plaintiff had no constitutional right to coach at an NCAA member school. Dkt. #112-36, p.27. In addition, the NCAA defendants argue that the show cause penalty was not imposed by the state, but was issued by a private association pursuant to its bylaws. Dkt. #112-36, p.28. In any event, the NCAA defendants argue that the show cause penalty was never effective. Dkt. #112-36, p.28. Finally, the NCAA defendants argue that stigma associated with the NCAA's COI Report, however great, cannot satisfy the plus requirement. Dkt. #112-36, p.29.

Plaintiff argues that he has satisfied the "plus" requirement "because the SUNY Defendants' stigmatizing statements were an actual cause of the NCAA imposing a 'show cause' order, which, along with the 'unethical conduct' charge and Cohane's placement on the NCAA's 'Pink File,' permanently marred Cohane's professional employment record." Dkt. #246, p.18 & 04-CV-181 at Dkt. #135, p.37. Plaintiff argues that the NCAA's imposition of the plus was dependent upon the stigmatizing statements provided by SUNY defendants in their response to NCAA allegations and in the MAC reports which were adopted by the NCAA. Dkt. #246, pp.28-29 & 04-CV-181 at Dkt. #135, pp.38-39. Plaintiff argues that "but for SUNY and MAC Defendants' officious intermeddling investigations, the NCAA would have been powerless to impose a 'show cause' on Cohane and make findings regarding his integrity." Dkt. #246, p.29 & 04-CV-181 at Dkt. #135, p.39.

A negative impact on "job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation," is insufficient for purposes of the plus. *Valmonte*, 18 F.3d at 1001; *See Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir.)("defamation, even if it leads to a significant loss of employment opportunities, is not a deprivation of a liberty interest unless it occurs in the course of dismissal or refusal to rehire the individual as a government employee or during termination or alteration of some other legal right or status."), *cert denied*, 493 U.S. 816 (1989). Thus, the findings of the MAC and the NCAA, however damaging they may be to plaintiff's reputation, and however they may have been or may yet be published, *to wit*, *via* SUNY Buffalo's personnel file, the NCAA's Individual Records File or the NCAA's public infractions database, are insufficient for purposes of satisfying the plus requirement.

Rather, "loss of reputation must be coupled with some other tangible element in order to rise to the level of a protectible liberty interest." *Valmonte*, 18 F.3d at 999. For example, stigmatizing statements made in the course of termination of government employment are sufficient to establish the plus requirement. *See Siegert*, 500 U.S. at 233, *citing Paul v. Davis*, 424 U.S. 693, 708-09 (1976) ("the Court has never held that the mere defamation of an individual . . . was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment."). In the instant case, however, plaintiff was not terminated but resigned his position at SUNY Buffalo, receiving $265,000 in exchange for his release of existing claims. Dkt. #194, p.8. Plaintiff concedes that his "complaint is not predicated on his forced resignation." Dkt. #246, p.37.

The Court of Appeals for the Second Circuit has expanded its understanding of the plus requirement to encompass "termination or alteration of some other legal right or status" as well. *Velez*, 401 F.3d at 88, *quoting Neu,* 869 F.2d at 667. For example, placement of an individual on a government registry of child abusers, where potential employers are required not only to consult, but to justify in writing to the state a decision to hire an individual who appears on the registry, satisfies the plus requirement because the refusal of employment is based on more than an individual's damaged reputation, but on the added burden an offer of employment would place on employers. *Valmonte*, 18 F.3d at 1001-02. Similarly, in *DiBlasio v. Novello*, the parties conceded that suspension of plaintiff's medical license satisfied the plus requirement. 344 F.3d 292, 295 (2d Cir. 2003), *cert. denied*, 541 U.S. 988 (2004).

Analogizing to *Valmonte*, the Court would find that the imposition of a show cause order requiring prospective employers to appear before the NCAA COI to discuss limitations which might be imposed upon plaintiff's ability to coach at another institution belonging to the NCAA sufficient to satisfy the plus requirement. In the instant case, however, the show cause order was stayed prior to the penalty's effective date of April 4, 2001 and remained stayed until it was lifted on October 12, 2001. Dkt. #196-15; Dkt. #196-29 & Dkt. #211, ¶ 176. As the show cause penalty was stayed for the duration of its imposition, it cannot be said to have imposed a tangible burden upon any potential employer.

In any event, it cannot be overlooked that plaintiff is attempting to impose liability upon the SUNY Buffalo and MAC defendants for a plus imposed by the NCAA. "The 'stigma-plus' test requires that the defamation be accompanied by an injury directly caused by the Government, rather than an injury caused by the act of some third party." *Izzo v. City of Syracuse*, 98-CV-778, 2000 WL 1222014, at *7 (N.D.N.Y. Aug. 3, 2000), *aff'd* 11 Fed.Appx. 31 (2001). In other words, "[s]tate action must accompany both prongs of the "'stigma-plus' test." *Id.; See Malapanis v. Regan*, 340 F.Supp.2d 184, 193 (D.Ct. 2004) ("Government imposition of a 'tangible burden' on future employment prospects may satisfy the 'plus' requirement), *aff'd* 147 Fed. Appx. 219 (2d Cir. 2005). As the Court has previously determined that the NCAA was not acting under color of state law, it follows that SUNY Buffalo and the MAC defendants' motions for summary judgement should be granted on the ground that, even if a show cause order which was stayed for the duration of its imposition could be considered a plus, that plus was not imposed by a state actor.

Plaintiff's reliance upon *Velez* is inapposite as the issue in that case was whether parity was required in the origin of both the stigma and the plus. 401 F.3d at 88. The Court of Appeals held that, in the context of a motion to dismiss, it was sufficient that the stigma inflicted by New York City community school district board members and the plus imposed by the Chancellor appointed by the city to administer and oversee the community boards appeared connected (due to their order of occurrence or origin), and that the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so. *Id.* at 89. In sum, the Court concluded that "[t]here is no rigid requirement, therefore, that both the 'stigma' and the 'plus' must issue from the same government actor or at the same time." *Id.* That the government actors inflicting the stigma and imposing the plus need not be the same government actors in no way suggests, however, that the actors inflicting the stigma and imposing the plus need not both be government actors. *See Id.* (citing the absence of state action as one reason why, in cases in which the stigma and the plus have different origins, one or more defendants whose actions collectively implicate a liberty interest may not be liable for the deprivation of that liberty interest).

Conversely, even if a show cause order which was stayed for the duration of its imposition could be considered a plus, the Court must consider whether SUNY Buffalo and MAC defendants may be liable for damages resulting from the imposition of that plus. In *Velez*, the Court of Appeals noted that, in cases in which the stigma and the plus have different origins, the determination that a liberty interest has been asserted is a distinct question "from that of whether both the originator of the stigma and the imposer of the plus are liable to the plaintiff." 401 F.3d at 89. The Court of Appeals dismissed the claim against all of the defendants except the Chancellor, explaining:

none of the board member defendants had the power to provide process to the plaintiff. They did not undertake or oversee the investigation, and they could order neither pre-removal review nor post-removal remedies. As a consequence, they cannot be held legally accountable for the alleged process failure.

The same is true as to the investigators . . . . Velez alleges that the investigators acted "in concert" with the Chancellor in effecting her removal from office. . . . But Velez concedes that the investigators had no legal authority to bring about her ouster, for only [the Chancellor] was empowered to impose that "plus." Accordingly, Velez's complaint does not state a theory under which the investigators can be taken to have deprived Velez of her "stigma-plus" liberty interest. They are not alleged to have uttered the "stigma" at issue, and they could not have imposed the "plus" to which she avers. We therefore affirm the district court's dismissal of Velez's liberty interest claim against the investigators.

*Id.* at 93. Thus, *Velez* "makes clear" that "a stigma-plus action cannot lie against a defendant who has no ability to impose a plus, or to provide process to the plaintiff." *Orr v. Wisner*, No. 08-CV-953, 2010 WL 2667918, at *8 (D. Ct. June 29, 2010); *See Anemone v. Metro. Trans. Auth.* 410 F. Supp.2d 255, 270 (S.D.N.Y. 2006) (dismissing stigma plus claim against Inspector General for lack of authority to terminate plaintiff or provide plaintiff the pre-termination hearing that due process required). In other words, since the SUNY Buffalo and MAC defendants lacked the authority to impose the show cause penalty, they could not be held liable for any damages resulting from the imposition of that penalty.

**Due Process**

SUNY Buffalo defendants argue that they had no control over and cannot be held liable for the process plaintiff received following his resignation. Dkt. #189-2, p.30. In any event, SUNY Buffalo argues that plaintiff received adequate process. Dkt. #189-2, pp.27-28 & 30.

The MAC defendants argue that they provided plaintiff with sufficient process, *to wit*, a name clearing hearing.  Dkt. #197-1, p.50.  The MAC defendants note that plaintiff was afforded notice of the January 16, 2000 hearing, provided a copy of the investigative report (albeit without supporting documentation), in advance of the hearing and given the opportunity to submit a written response to the allegations, as well as to present evidence at the MAC COI hearing.  Dkt. #197-1, pp.50-51.

Plaintiff argues that the process was inadequate because he was not provided a copy of the MAC 20 report, supporting documentation was withheld and exculpatory evidence was concealed during the MAC COI hearing.  Dkt. #246, pp.35-38.

The NCAA defendants argue that regardless of whether due process was required, it was afforded plaintiff throughout the NCAA investigation, COI hearing and IAC hearing and that plaintiff's allegations of procedural defects are immaterial.  04-CV-181 at Dkt. #112-36, pp.54-66.

Plaintiff responds that the NCAA failed to correct the MAC's tainted process and instead embellished their corrupt practices.  04-CV-181 at Dkt. #135, p.16. Specifically, plaintiff complains that the NCAA withheld, tampered with and destroyed evidence, presented false information to the NCAA COI and IAC and engaged in improper *ex-parte* communications. 04-CV-181 at Dkt. #135, pp.16-17 & 38-39.

The availability of adequate process defeats a stigma-plus claim.  *Segal*, 459 F.3d at 213.  The touchstone of due process, of course, is the requirement that a person

in jeopardy of serious loss be given notice of the case against him and opportunity to meet it. *Monserrate v. New York State Senate*, 599 F.3d 148, 158 (2d Cir. 2010); *See Patterson*, 370 F.3d at 336 ("The fundamental requirement of the Due Process Clause is that an individual be given the opportunity to be heard at a meaningful time and in a meaningful manner.") (internal quotation omitted); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." ).

To comply with due process requirements, notice "must set forth the alleged misconduct with particularity." *Spinelli v. City of New York*, 579 F.3d 160, 171 (2d Cir. 2009). While the particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case, due process notice contemplates specifications of acts or patterns of conduct as opposed to general, conclusory charges unsupported by specific factual allegations. *Id.* at 172. In the instant case, plaintiff has declared that he "never saw the MAC-20 report until discovery in 2007." Dkt. #220, ¶ 42. Given that the MAC 20 report revised the factual basis for two allegations and added another allegation against him, plaintiff has raised a question of fact as to whether he was provided sufficient notice of the charges against him during the MAC proceedings. *See Patterson*, 370 F.3d at 337 (hearing insufficient to satisfy requirements of due process clause where, *inter alia*, plaintiff not afforded opportunity to defend himself "against all of the allegations made."). Moreover, in light of the absence of any recording of the MAC COI hearing, the Court cannot conclude that plaintiff was afforded the opportunity to be

heard in a meaningful manner by the MAC COI with respect to all of the charges in the MAC 20 report.

However, the NCAA provided plaintiff sufficient notice of the detailed charges against him by virtue of their LOI (Dkt. #196-2 & Dkt. #236-13), and afforded him multiple opportunities to present his defense of the allegations, both in person at the prehearing conference (Dkt. #196-22, p.18 & 19), and NCAA COI hearing (Dkt. #196-12), and in a written submission prior to the NCAA COI hearing. Dkt. #196-8. Moreover, although due process does not require that plaintiff be "given copies of materials considered," *Monserrate*, 599 F.3d at 159, the NCAA provided plaintiff access to their case file, as well as additional information from the MAC investigation which plaintiff requested. Dkt. #192, pp.91-92; Dkt. #258-4, pp.3-4 & Dkt. #258-5, p.5.

Plaintiff argued to the NCAA COI that he was the victim of a conspiracy to oust him and presented affidavits and argument that student-athletes were threatened and signed false affidavits in support of the allegations against him and that defendants withheld documentation in support of their allegations, as well as exculpatory evidence, thereby undermining his ability to defend himself. Dkt. #196-8 & Dkt. #196-12. The NCAA COI expressed concern regarding plaintiff's allegations of intimidation and the existence of contradictory affidavits, but ultimately determined that NCAA violations had been established. Dkt. #196-12 & 196-15. Thus, plaintiff was afforded a meaningful opportunity to be heard with respect to specific allegations prior to the imposition of any tangible burden upon his ability to seek employment at another NCAA institution.

In addition, plaintiff was afforded the opportunity to appeal both the NCAA COI's findings and it's proposed penalty to the NCAA IAC before the show cause penalty became effective, and was successful in modifying the show cause penalty so that it was stayed for the duration of its imposition. Thus, even if it could be determined that the NCAA was acting jointly with SUNY Buffalo when it imposed the show cause penalty and even if a stayed show cause penalty could be found to have imposed a tangible burden upon potential employers, it is the recommendation of the undersigned that defendants' motions for summary judgment be granted on the ground that plaintiff was afforded adequate process by the NCAA.

**Public Figure**

The NCAA defendants argue that because plaintiff is a public figure, with access to the media, a name clearing hearing was not required. Dkt. #112-36, pp.36-37.

Plaintiff responds that defendants' concealment of the defects in their investigation and withholding of exculpatory evidence prevented him from utilizing the media to clear his name and, while conceding that he was a public figure, at least in the City of Buffalo during his tenure as SUNY Buffalo's men's basketball coach, he emphasizes the passage of time between his termination and the imposition of the show cause penalty, at which time he was no longer coaching anywhere. 04-CV-181 at Dkt. #135, p.14.

The determination as to whether a plaintiff in a defamation action is a public figure is "one for the Court, not the jury, to determine." *Hotchner v. Castillo-Puche*, 404 F. Supp. 1041, 1045 (S.D.N.Y. 1975).

> Public figures are those persons who, though not public officials, are involved in issues in which the public has a justified and important interest. Such figures are, of course, numerous and include artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done.

*Id.* (internal quotations omitted), *quoting Cepeda v. Cowles Magazines & Broadcasting, Inc.,* 392 F.2d 417, 419 (9th Cir.), *cert. denied*, 393 U.S. 840 (1968). "Courts have often classified some people, such as sports figures, as . . . public figures based solely [on] their status, position, or associations." *Fodor v. Berglas*, No. 95 Civ. 1153, 1995 WL 505522, at *5 (S.D.N.Y. Aug. 24, 1995). "If a position itself is so prominent that its occupant unavoidably enters the limelight, then a person who voluntarily assumes such a position may be presumed to have accepted public figure status." *Jensen v. Times Mirror Co.*, 634 F. Supp. 304, 312 (D. Conn. 1986).

"When a public figure has access to the media, a post-deprivation hearing is not necessarily required because the option of calling a press conference to refute any allegations is available." *D'Allessandro v. City of Albany*, No. 04-CV-788, 2008 WL 544701, at *14 (N.D.N.Y. Feb. 26, 2008), *citing Baden v. Koch*, 799 F.2d 825, 832 (2d Cir. 1986) ("With his high degree of access to the news media, Baden did not need a formal hearing as a forum in which to repeat his side of the story. As a public figure, he could presumably have called a press conference and provided any further defense of his record or explanation of his removal from office that he desired to give.").

In the instant case, despite having resigned from his position as head coach of the men's basketball program at SUNY Buffalo more than fifteen months earlier, plaintiff was quoted by the Associate Press following release of the NCAA COI report setting forth his perspective on the NCAA proceedings. Dkt. #112-27. Accordingly, the Court recommends that plaintiff be deemed a public figure with sufficient access to the media to refute the allegations against him, such that defendants' motions for summary judgment should be granted regardless of the adequacy of the NCAA proceedings.

**Tortious Interference with Contractual Relations**

Plaintiff's amended complaint in 04-CV-943 alleges that the MAC defendants interfered with his employment contract with SUNY Buffalo and with his December 3, 1999 MOU with SUNY Buffalo. Dkt. #2, ¶¶ 163-177. More specifically, plaintiff appears to allege that the false and misleading MAC report gave SUNY Buffalo a reason to terminate plaintiff and that the SUNY Buffalo defendants violated the December 3, 1999 MOU by relying upon the false and misleading MAC report to support allegations of NCAA violations. Dkt. #2, ¶¶ 163-177.

The MAC defendants argue that this cause of action is barred by the statute of limitations and that the release did not attempt to relieve plaintiff from any liability to the NCAA, but explicitly acknowledged that the MAC and NCAA violation proceedings would proceed. Dkt. #197-1, pp.58-63.

Plaintiff argues that President Greiner's communication to Fournier "of Cohane's termination" creates knowledge of the MOU and that the MAC defendants "intentionally

interfered with the implied covenant of good faith in the [MOU]" by continuing "to further the corrupt bargain they had formed with SUNY Defendants by knowingly submitting false affidavits to the MAC COI and interfering with the NCAA staff investigation," thereby damaging plaintiff's "name, reputation, and integrity, which ultimately created an insurmountable roadblock to Cohane continuing as a college men's head basketball coach." Dkt. #246, pp.49-50.

"Under New York law, the elements of tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract; (4) the actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp*., 449 F.3d 388, 401-02 (2d Cir. 2006) (internal quotations omitted), *quoting Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 424 (1996).

The statute of limitations for a claim of tortious interference with contract is three years and begins to run from the date of alleged interference. *Chevron Corp. v. Donzinger*, 871 F. Supp.2d 229, 257 (S.D.N.Y. 2012). Tortious interference with contract is not a continuing tort. *Id.* at 258. Thus, it does not avail a plaintiff to argue that defendants continued the offending conduct because the statute begins to run once all of the facts necessary to the cause of action were present so as to allow plaintiff to seek judicial relief. *Spinap Corp., Inc. v. Cafagno*, 301 A.D.2d 588 (2nd Dep't 2003).

The MAC defendants' motion for summary judgment should be granted with respect to plaintiff's claim of tortious interference with contract because plaintiff has failed to establish, *inter alia*, the MAC defendants' knowledge of either the employment contract between plaintiff and SUNY Buffalo or the December 3, 1999 MOU between plaintiff and SUNY Buffalo or the breach of any terms contained therein. In any event, this cause of action is barred by the statute of limitations, as plaintiff should have been aware of the MAC defendants' alleged interference with his employment contract and the MOU no later than the MAC COI hearing on January 16, 2000, which is more than three years prior to the filing of this action.

## CONCLUSION

For the reasons set forth above, it is recommended that defendants' motions for summary judgment (04-CV-181 at Dkt. #112 and 04-CV-943 at Dkt. ##189 & 197), be granted. Specifically, it is recommended that:

• the NCAA's motion for summary judgment (04-CV-181 at Dkt. #112), be granted on the ground that the NCAA was not acting under color of state law. Alternatively, the NCAA's motion for summary judgment may be granted on the ground that plaintiff's allegations do not invoke the constitutional protections of substantive due process and, with respect to plaintiff's procedural due process claim, on the grounds that: (1) the stayed show cause penalty does not constitute a tangible burden upon potential employers as required to invoke the procedural protections of the due process clause; and (2) the NCAA afforded plaintiff adequate process or, alternatively, plaintiff is a public figure with sufficient access to the media to refute the allegations against him regardless of the adequacy of the process afforded by the NCAA.

• the MAC defendants' motion for summary judgment (04-CV-943 at Dkt. #197), be granted on the ground that plaintiff's allegations do not invoke the constitutional protections of substantive due process and, with respect to plaintiff's procedural due process claim, on the grounds that: (1) the stayed show cause penalty does not constitute either a tangible or state imposed burden upon potential employers as required to invoke the procedural protections of the due process clause; and (2) the NCAA afforded plaintiff adequate process or, alternatively, plaintiff is a public figure with sufficient access to the media to refute the allegations against him regardless of the adequacy of the process afforded by the NCAA. In addition, it is recommended that the MAC defendants' motion for summary judgment be granted with respect to plaintiff's tortious interference with contract claim on the grounds that plaintiff has failed to establish the elements of such a claim and plaintiff's claim of tortious interference with contract is barred by the statute of limitations.

• the SUNY Buffalo defendants' motion for summary judgment (04-CV-943 at Dkt. #189), be granted on the ground that plaintiff's allegations do not invoke the constitutional protections of substantive due process and, with respect to plaintiff's procedural due process claim, on the grounds that: (1) the stayed show cause penalty does not constitute either a tangible or state imposed burden upon potential employers as required to invoke the procedural protections of the due process clause; and (2) the NCAA afforded plaintiff adequate process or, alternatively, plaintiff is a public figure with sufficient access to the media to refute the allegations against him regardless of the adequacy of the process afforded by the NCAA.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). <u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order</u>. *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning</u>

objections to a Magistrate Judge's Report, Recommendation and Order), may result in

the District Judge's refusal to consider the objection.


DATED: Buffalo, New York
        August 8, 2013


                   ***s/ H. Kenneth Schroeder, Jr.***
                   H. KENNETH SCHROEDER, JR.
                   United States Magistrate Judge