UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TIMOTHY M. COHANE,

                  Plaintiffs,

   v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, TOM HOSTY, STEPHANIE
HANNAH and JACK FRIEDENTHAL, WILLIAM
M. GREINER, President of the State University
of New York at Buffalo, DENNIS BLACK, Vice
President for Student Affairs, ROBERT
ARKEILPANE, Athletic Director, WILLIAM
MAHER, Compliance Director, ERIC
EISENBERG, MID AMERICAN CONFERENCE,
by its Commissioner, Richard Chryst, and
ROBERT FOURNIER, Esq.,

                  Defendants.

**DECISION AND ORDER**
04-CV-181S(Sr)

## I.  INTRODUCTION

In this consolidated action, Plaintiff, a former basketball coach at the State University of New York at Buffalo, seeks relief pursuant to 42 U.S.C. § 1983 for Defendants' alleged violations of his procedural and substantive due process rights. Plaintiff also asserts a claim under New York state law for tortious interference with contract.  Presently before this Court are the objections of Plaintiff and Defendants Mid-American Conference and Robert Fournier (the "MAC Defendants") to the Honorable H. Kenneth Schroeder, Jr.'s August 8, 2013 Report, Recommendation and Order recommending that Defendants' summary judgment motions be granted and the complaints be dismissed.

1

## II. BACKGROUND

Plaintiff commenced the initial action against the MAC Defendants and officials of the State University of New York at Buffalo on January 17, 2003 in the Eastern District of New York. (Docket No. 55-1 in 1:04-cv-943 ("SUNY Docket").) The matter was transferred to this Court in November 2004. Plaintiff filed a second action against the National Collegiate Athletic Association ("NCAA") and several NCAA employees in this Court on March 19, 2004. (Docket No. 1 in 1:04-cv-181 ("NCAA Docket").)  In both actions, Plaintiff similarly accuses the MAC and NCAA Defendants of acting under the color of state law by jointly engaging with SUNY officials to violate Plaintiff's substantive and procedural due process rights as guaranteed by the Fourteenth Amendment.  The MAC Defendants are further alleged to have tortiously interfered with Plaintiff's SUNY Buffalo employment contract and his subsequent resignation agreement.

These actions stem from investigations into Plaintiff's alleged violations of MAC and/or NCAA rules governing off-season practice, observation of practices or scrimmages with prospective student athletes, and scouting.  MAC is a NCAA Division I-A athletic conference.  (SUNY Docket No. 198 ¶¶ 9, 11.)  SUNY Buffalo is a member of both MAC and the NCAA. (Id. ¶ 12; SUNY Docket No. 199-1 ¶¶ 8, 14.)  MAC's Committee on Infractions ("MAC COI") is responsible for determining whether specific violations of NCAA and/or MAC rules have occurred with respect to both member institutions and individuals. (SUNY Docket No. 199-1 at 38.)  The MAC COI does not have any direct authority to assess penalties against an individual staff member of a member institution; however, the committee does recommend appropriate disciplinary action. (SUNY Docket No. 198 ¶ 20.)

In 1999, SUNY Buffalo 'self-reported' alleged violations of NCAA rules by its men's

basketball program to MAC. (SUNY Docket Nos. 198 ¶ 28; 210 ¶ 28.)   As a result, Defendant Robert Fournier, MAC's Senior Associate Commissioner of Compliance at the time, conducted an on-campus investigation of the allegations that fall. (SUNY Docket Nos. 198 ¶¶ 25, 29-30; 210 ¶¶ 25, 29.)   Defendants argue that Fournier conducted the investigation with mere administrative support provided by SUNY Buffalo. (SUNY Docket Nos. 198 ¶ 30; 255 ¶¶ 6-7.) In contrast, Plaintiff argues that Fournier conducted a joint investigation with SUNY, complete with SUNY officials participating in interviews and procuring inculpatory affidavits, with the goal of removing Plaintiff from his position as head coach. (SUNY Docket Nos. 210 ¶ 30; 261 at 87.)

On November 16, 1999, Defendant Fournier presented to SUNY Buffalo a report detailing 18 allegations of misconduct against the men's basketball program (the "MAC 18" report). (SUNY Docket No. 229-11 at 13-23.)   Each allegation was followed by a description of the supporting evidence.   SUNY Buffalo was afforded the opportunity to consider the allegations and either concur, offer modifications, or refute the allegations. (Id. at 13.)

On November 29, 1999, SUNY Buffalo informed Plaintiff that it was considering suspending him in connection with the alleged improprieties and conducted a hearing at which Plaintiff was represented by counsel and presented with a copy of the MAC 18 report. (SUNY Docket No. 196-5 at 2-3, 11-12.)   During that hearing, Plaintiff was questioned regarding an allegation that was not included in the MAC 18 report, specifically that Mitch Gillam, a prospective assistant coach whom Plaintiff was precluded from hiring, was seen improperly scouting at a basketball game at another school. (Id. at 107-116.) Plaintiff denied that Gillam was acting on his behalf or ever provided him with scouting

information. (Id. at 115-116.)

SUNY Buffalo accepted the findings in the MAC 18 report on December 1, 1999 and suspended Plaintiff that same day. (SUNY Docket Nos. 189-1 ¶ 91; 211 ¶ 91; 234-4 at 2; 261 at 58.)  On December 3, 1999, Plaintiff and SUNY Buffalo entered into an agreement by which Plaintiff would resign and SUNY would pay him the remainder of his contract, the sum of $265,000. (SUNY Docket No. 194 at 5-7.)  The parties acknowledged in the agreement that Plaintiff retained the opportunity to provide a written response to MAC regarding the allegations in the MAC 18 report. (SUNY Docket No. 194 at 5-6.)  A mutual general release was executed at that time in which Plaintiff waived all claims against SUNY Buffalo "existing as of or prior to the execution of this Memorandum of Understanding." (Id. at 8.)  Plaintiff submitted a 30-page response to the MAC 18 report in a letter dated December 22, 1999. (SUNY Docket No. 196-6.) Plaintiff argued therein that much of the testimony relied upon came from student witnesses recruited by another coach, and he therefore offered affidavits from additional students in support of his objections. (See e.g. id. at 16, 18, )

In a December 22, 1999 letter, Fournier informed SUNY Buffalo of MAC's recommended corrective measures in light of the found infractions. (Docket No. 190 at 71-73.) Fournier identified SUNY's decision to accept Plaintiff's resignation and the additional staffing changes made by SUNY as important corrective measures, and further recommended 12 additional corrective measures, including the placement of the men's basketball program on probation. (Id.)  SUNY Buffalo accepted these recommendations in their entirety. (SUNY Docket No. 238 at 12.)

SUNY Buffalo self-reported an additional allegation on January 3, 2000, specifically

4

that "an individual closely associated with [the] men's basketball program[, Mitch Gillam,] engaged in scouting activities with two future opponents." (Docket No. 241 at 41-42.) Sometime between receipt of the self-report and January 16, 2000, Fournier revised the MAC 18 report to including the scouting allegation and one other allegation not relevant to the current action (the "MAC 20" report). (SUNY Docket No. 227 at 15-25.) The MAC 20 nonetheless remained dated November 16, 1999. (Id.) Fournier avers that he "inadvertently failed to change the date on the report." (Docket No. 255 ¶ 17.)  He also added three additional student athlete affidavits submitted by SUNY Buffalo "and removed these student-athletes' prior affidavits so that the [MAC] Committee had the most current statements from these student athletes and what I believed to be the statements that best reflected their intended true positions and recollections since they were the most recent statements." (Docket No. 255 ¶ 18.)  Plaintiff asserts that he never saw the MAC 20 report until discovery in 2007. (SUNY Docket No. 220 ¶ 42.)

The MAC Committee on Infractions ("MAC COI") held a hearing on January 16, 2000 at which Plaintiff appeared. (SUNY Docket Nos. 220 ¶ 46; 255 ¶ 24.)  Fournier asserts that he presented the additional allegation of scouting, and that Plaintiff was present when Fournier played a video in support of that allegation and had an opportunity to respond. (SUNY Docket No. 255 ¶ 24.)  Plaintiff similarly testified at his deposition that he was present for Fournier's presentation, he himself also made a presentation, and then he was asked to leave. (SUNY Docket No. 196-3 at 43-45.)

The MAC COI, by letter dated January 18, 2000, adopted the findings in the MAC 20 and the recommended correction measures.  (SUNY Docket No. 238 at 13-14.)  The Committee also voted to make three additional recommendations, including "issuing a

formal Letter of Reprimand to [Plaintiff] for his acknowledgment of wrongdoing before the Committee in some of the infractions and his possible involvement in others as noted in the report." (Id.)  The case was then forwarded to the NCAA enforcement staff for review and "final adjudication." (Id. at 14.)

A preliminary inquiry by the NCAA then commenced.  NCAA Enforcement staff Kevin Pearson conducted interviews of student athletes and administrators in Buffalo, including Plaintiff, in March and May 2000. (SUNY Docket Nos. 196-4 at 9; 196-24 at 3-4.) The NCAA determined that Fournier and MAC should not be a part of the NCAA interviews, in part "to test the credibility of the witnesses" previously interviewed by Fournier (SUNY Docket No. 261 at 77) in light of "statements of alleged intimidation." (NCAA Docket No. 123-8 at 4.) As a result of his investigation, Pearson believed the matter was a "secondary" case that should not proceed to a letter of official inquiry, and he informed the NCAA Enforcement Director, Defendant Tom Hosty, of his concern. (SUNY Docket Nos. 235-9 at 2; 235-10 at 2-3; NCAA Docket No. 119-16 at 47; see SUNY Docket No. 196-22 at 6 (discussing distinction between secondary and major infractions).) Pearson believed that "there were clearly issues with credibility with some witnesses, and [he] had a hard time because of that in making it a major case." (SUNY Docket No. 235-10 at 2-3.)

The investigation nonetheless continued, and upon Pearson's departure from the NCAA, Hosty assigned Defendant Stephanie Hannah to complete the interview process. (NCAA Docket No. 119-16 at 46.)  By letters dated November 20, 2000, the NCAA informed Plaintiff and SUNY Buffalo that an official inquiry was warranted. (SUNY Docket Nos. 196-10; 196-11; 236-13.)  The letter to Plaintiff informed him of his ability to "participate in consideration of these allegations" and the opportunity to submit a written

6

response to the NCAA Committee on Infractions ("NCAA COI"). (SUNY Docket No. 196-11.)

Following notification of the official inquiry, the NCAA staff created a custodial file containing information collected during the investigation. (SUNY Docket No. 196-22 at 5.) The file was initially maintained by a custodian in New York City and then transferred to one in Pittsfield, Massachusetts, both locations requested by Plaintiff. (SUNY Docket Nos. 258-3 at 2-3; 258-4 at 3-4; 258-5 at 5-6.)  In December 2000, SUNY Buffalo provided the NCAA with copies of taped interviews conducted during the MAC investigation that were requested by Plaintiff, but these tapes were not received by the custodian until January 2, 2001, the day after Plaintiff's response to the NCAA inquiry was due. (SUNY Docket Nos. 192 at 91; 196-22 at 17.) Hosty testified that he informed Plaintiff's counsel that a request for additional time could be made. (SUNY Docket No. 196-22 at 17.)

The NCAA enforcement staff met with Plaintiff and his counsel on January 8, 2001. (SUNY Docket No. 196-22 at 10, 18.) This was originally scheduled to be a prehearing conference following receipt of Plaintiff's written response. (Id. at 18.) Although the response was not filed on the January 2, 2001 date, the meeting nonetheless went forward to allow Plaintiff the opportunity to walk the enforcement staff "through their case, their defense, because [Hosty] believe[d] that they were trying to persuade us to drop the allegations." (Id. at 18-19; NCAA Docket No. 119-20 at 33-35.)

Plaintiff filed a written response to the NCAA official inquiry on January 11, 2001, wherein he detailed the use of intimidation in the interview process and the changing testimony from witnesses.  (SUNY Docket No. 196-8.) This response also addresses the MAC interview tapes and the Mitch Gillam scouting allegation. (Id. at 17-18, 62-67.) A

7

formal prehearing conference was held on January 17, 2001. (SUNY Docket No. 196-22 at 19.)

The NCAA COI conducted a hearing on February 9, 2001, at which Plaintiff appeared with counsel. (SUNY Docket Nos. 196-12, 196-13; NCAA Docket No. 124-5 at 6.)  Defendant Jack Friedenthal was the presiding chairman. (SUNY Docket Nos. 196-12 at 3.) Plaintiff challenged the propriety of the MAC investigation at that time, arguing that "[u]nlike during the NCAA process, where the enforcement staff has provided materials to the custodian, the MAC never provided affidavits, interview tapes, nothing that would in any way have enabled [Plaintiff] to properly address the individual allegations made by witnesses against him." (SUNY Docket No. 196-12 at 9, 11.) The Committee questioned the enforcement staff on, among other things, the fact that many of the affidavits supporting the allegations had handwritten notations taking "a little bit of the sting out" of the prepared statement. (SUNY Docket No. 196-12 at 21.) Because this raised questions whether "people [were] being driven to some position that may not be theirs," the staff was further questioned on the procurement of these affidavits. (Id. at 21-28.)   The allegations of intimidation and the questionable veracity of the witnesses were also addressed at length. (See e.g. SUNY Docket Nos. 196-13 at 3, 17-18.)

At the conclusion of the NCAA COI hearing, Chairman Friedenthal advised Plaintiff that he would have "fifteen days from the date the [COI's] report is released to accept or appeal the decision.  If you accept the decision, then any penalties will be in effect from that day.  If you exercise your option to appeal . . . [a]ll appealed penalties will be stayed until the adjudication of your appeal." (SUNY Docket Nos. 196-13 at 28; NCAA Docket No. 112-5 at 70.)

The NCAA COI issued a written determination in a report made public on March 21, 2001. (SUNY Docket No. 196-15.)  The Committee noted that it had been "required to weigh the credibility of a large number of affidavits that were submitted by both the university and counsel for [Plaintiff] . . , some of which were from the same individuals, yet contained conflicting information." (Id. at 4.)  Many of the affidavits submitted by Plaintiff were found to be less credible because "they were drafted by counsel a few days prior to the hearing, sent out for signature and returned immediately without any alterations." (Id.) Further, "the evidence submitted by the university, the conference and the enforcement staff (some of which involved affidavits) was more objective in that it did not contain the rote, 'canned' language found in the affidavits submitted on behalf of [Plaintiff]." (Id. at 17.) "Lastly, and perhaps most importantly, the committee had the opportunity to question [Plaintiff] in person during the hearing.  The committee found him to be evasive, deceptive and simply not credible." (Id. at 17.)

The NCAA COI found four infractions substantiated, including a finding that Plaintiff engaged in unethical conduct, and two secondary violations. (Id.) With respect to Plaintiff, the Committee determined that the appropriate penalty would be as follows:

> The former head men's basketball coach [Plaintiff] will be informed in writing by the NCAA that, due to his involvement in certain violations of NCAA legislation found in this case, if he seeks employment or affiliation in an athletically related position at an NCAA member institution during the period of time commencing with the date this report was released[,] March 21, 2001, and concluding on December 2, 2002 (three years subsequent to his release from the employ of the University at Buffalo)[,] he and the involved institution shall be requested to appear before the Division I Committee on Infractions to consider whether the member institution should be subject to the show-cause procedures of Bylaw 19.6.2.2-(1), which could limit the coach's athletically related duties at the new institution for a designated period.

(SUNY Docket No. 196-15 at 19-20.)  Plaintiff was provided with a copy of the NCAA

9

Infractions Report and informed of his opportunity to appeal to the NCAA Infractions Appeals Committee by submitting a Notice of Appeal form prior to April 4, 2001. (SUNY Docket No. 196-15 at 1.)  The letter further informed Plaintiff that "[i]f there is no appeal, the committee's findings of violations and penalties are effective when the 15-day appeal period has expired or the date of April 4, 2001." (Id. at 2.)  Plaintiff timely filed a Notice of Appeal on April 3, 2001. (SUNY Docket Nos. 196-19 at 3; 196-29 at 2; NCAA Docket No. 112-31 at 3.)

A written appeal by Plaintiff followed in which he challenged, among other things, the penalty imposed as excessive. (SUNY Docket Nos.196-19 at 6-7; NCAA Docket No. 112-31 at 6-7.) The NCAA COI responded and Plaintiff filed a rebuttal.  (SUNY Docket No. 196-19 at 3; NCAA Docket No. 112-31 at 3.) A hearing before the NCAA Division I Infractions Appeals Committee was held on August 22, 2001. (SUNY Docket No. 196-17 (transcript); NCAA Docket No. 112-31 at 7.) Plaintiff appeared without counsel and was permitted to make a presentation, during which time he again emphasized the allegedly improper manner of the investigations and the credibility of the evidence against him.  (See e.g. SUNY Docket No. 196-17 at 7, 17-18, 30-43, 50-51, 53-56.)  He also discussed his statements to Mitch Gillam prior to the alleged scouting incident. (Id. at 46-47.) Plaintiff additionally argued that, even if he was found to have committed the infractions alleged, the punishment recommended by the NCAA COI was disproportionate to that imposed for similar violations. (Id. at 11-12, 30-31, 43-44, 52.)  Plaintiff was also permitted a rebuttal to the NCAA COI's response presentation. (Id. at 95-109.)

On October 12, 2001, the Appeals Committee issued a report on the issues raised by Plaintiff in his appeal, including the argument that "a procedural error affected the

10

reliability of the information that was utilized to support the [infraction] committee's findings." (SUNY Docket Nos. 196-19 at 6-7; NCAA Docket No. 112-31 at 6-7.) The Appeals Committee acknowledged that "there was much conflicting evidence in the case," and the "investigators did not interview all persons who . . . [the Appeal Committee] believes[] had relevant information." (SUNY Docket No. 196-19 at 8; NCAA Docket No. 112-31 at 8.)   The Appeals Committee therefore believed "that there was additional information that would have been helpful in resolving the case." (Id.)

> As a result of the limited interviews, this case evolved into a battle of affidavits – some asserting facts giving rise to a violation and others denying facts that would give rise to a violation.   This Committee does not believe this is the most effective way to resolve factual disputes.   It is far more helpful for the NCAA enforcement staff to interview witnesses having relevant information so that they can be asked all relevant questions about the circumstances involved.   Notwithstanding these concerns about the investigation of this case, we conclude that the findings are not clearly contrary to the evidence.

> Certain language in the report of the Committee on Infractions regarding the ethical conduct violation was also troublesome to us.   The Committee on Infractions' rationale suggests that the conduct of [Plaintiff] during the hearing and in connection with affidavits submitted on his behalf contributed to the finding of an ethical conduct violation.

> We believe that it is important to state clearly that a person's assertion of innocence, however vigorous, against charges of violations should not ordinarily be the subject of an unethical conduct finding.   **In this case, the Infractions Appeals Committee does not believe the former head coach's conduct in presenting his defense should in any way give rise to an ethical conduct violation**.

(SUNY Docket Nos. 196-19 at 8-9 (emphasis added); NCAA Docket No. 112-31 at 8-9.)

With respect to Plaintiff's arguments of procedural improprieties, the Appeals Committee stated that:

> Information provided at the appeal hearing established that the NCAA

enforcement staff made information developed by the MAC available to the [Plaintiff] in a timely manner.  In addition, [Plaintiff] was permitted to submit supplemental material after the deadline.  The Committee does not believe there was procedural error that affected the outcome of this case.

(SUNY Docket No. 196-19 at 9-10; NCAA Docket No. 112-31 at  9-10.)

The Appeals Committee found, however, that "the show cause order of three years running from the date of [Plaintiff's] termination from employment at the institution (December 2, 2000) is excessive." (SUNY Docket No. 196-19 at 10; NCAA Docket No. 112-31 at 10.)  The Committee expressly stated:

[Plaintiff] has had a long career free of violations of NCAA legislation.  In this case, the evidence was sharply conflicting.  Although the Committee on Infractions made findings of violations that were supported by the evidence, we believe that a shorter show cause penalty is appropriate under the facts of this case and more consistent with penalties in previous case.

(SUNY Docket No. 196-19 at 10; NCAA Docket No. 112-31 at 10.)  Accordingly, the show cause penalty was modified to terminate as of October 12, 2001, the date of the report. (SUNY Docket No. 196-19 at 10; NCAA Docket No. 112-31 at 10.)

The present litigation ensued.  In the NCAA action, Defendants moved to dismiss the § 1983 claim on the ground that they were not state actors, and to dismiss the tortious interference claim as time barred.  (NCAA Docket No. 15.) This Court granted the motion in its entirety, concluding that with respect to the § 1983 claim, the Supreme Court's decision in NCAA v. Tarkanian, 488 U.S. 179, 191, 109 S. Ct. 454, 461, 102 L. Ed. 2d 469 (1988) compelled the conclusion that the NCAA is not a state actor.  (NCAA Docket No. 30.)  On appeal, the Second Circuit affirmed the dismissal of the state law tortious interference claim, but reversed the dismissal of the § 1983 cause of action against the NCAA defendants. (Docket No. 36.) The Circuit Court rejected the conclusion that

12

Tarkanian should be interpreted "as holding categorically that the NCAA can never be a state actor when it conducts an investigation of a state school." (Id. at 6.) Instead, the Court found that the allegations "in the complaint, if proven, could show that the University wilfully participated in joint activity with the NCAA to deprive [Plaintiff] of his liberty." (NCAA Docket No. 36 at 5-6.) The matter was remanded to this Court and, following discovery, the NCAA Defendants moved for summary judgment. (NCAA Docket No. 112.)

Similarly, in the SUNY action, the SUNY Defendants moved to dismiss the 42 U.S.C. § 1983 claim as insufficient, and this Court declined to grant such relief. (SUNY Docket No. 63.)  The SUNY and the MAC Defendants separately moved for summary judgment dismissing the amended complaint. (SUNY Docket Nos. 189, 197.)  Judge Schroeder initially issued a report recommending that both motions be granted. (SUNY Docket No. 264.) On April 18, 2013, Judge Schroeder granted Plaintiff's renewed motion to consolidate the SUNY and NCAA actions, and informed the parties that he would issue a new Report, Recommendation and Order that would replace the prior decision and resolve all the pending summary judgment motions.

In the August 8, 2013 Report and Recommendation, Judge Schroeder granted the NCAA Defendants' motion on the ground that the NCAA was not acting under the color of state law and, alternatively, on the ground that Plaintiff's allegations were insufficient to support a claim of either substantive or procedural due process. (NCAA Docket No. 139 at 125.) Specifically, the procedural due process claim failed because "(1) the stayed show cause penalty does not constitute a tangible burden upon potential employers as required to invoke the procedural protections of the due process clause; and (2) the NCAA afforded plaintiff adequate process or, alternatively, plaintiff is a public figure with sufficient access

13

to the media to refute the allegations against him regardless of the adequacy of the process afforded by the NCAA."  (Id.)

Judge Schroeder further concluded that the MAC Defendants' motion should be denied "with respect to their argument that they did not act under the color of state law." (NCAA Docket No. 139 at 100.) The Magistrate Judge found that "the MAC's investigation and report was influenced by SUNY Buffalo to such a degree that the report cannot be fairly characterized as independent of SUNY Buffalo." (NCAA Docket No. 139 at 98-100.) Nonetheless, because Plaintiff could not sustain a claim of either substantive or procedural due process, Judge Schroeder also granted the SUNY and MAC Defendants summary judgment on the § 1983 claim. (Id. at 126.) Finally, the Report recommended that the tortious interference with contract claim against the MAC Defendants be dismissed due to Plaintiff's failure to establish the elements of such a claim and because it is barred by the applicable three-year statute of limitations. (Id. at 123-125.)

### III. DISCUSSION

This Court previously referred both the SUNY Buffalo and NCAA actions to Magistrate Judge Schroeder for the purpose of, among other things, hearing and reporting upon all dispositive motions in those matters. (SUNY Docket No. 200; NCAA Docket No. 114.) Pursuant to 28 U.S.C. § 636(b)(1)(C), any party may serve and file written objections to a report and recommendation of a magistrate judge within fourteen days after being served with a copy. Local Rule of Civil Procedure 72(b) further requires that written objections to a magistrate judge's report "shall specifically identify the portions of the

proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."  After *de novo* review of those portions of the report and recommendation to which proper objections are made, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." See 28 U.S.C. § 636(b)(1)(C); United States v. Gardin, 451 F. Supp. 2d 504, 506 (W.D.N.Y. 2006).

In contrast, general or perfunctory objections which are merely "a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge" are improper. Camardo v. General Motors Hourly-Rate Emp. Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y. 1992)(no "second bite at the apple" will be permitted).  The district court may adopt those parts of the report to which no objection or an improper objection is raised so long as such are not clearly erroneous. Gardin, 451 F. Supp. 2d at 506.

In his submissions, Plaintiff objects to Judge Schroeder's Report and Recommendation on the grounds that: (1) there was evidence of "corrupt willful participation;" (2) the NCAA did not provide adequate process; (3) all Defendants violated his substantive due process rights; (4) the show cause penalty was imposed and upheld; (5) the show cause penalty was imposed by governmental actors; (6) the SUNY and MAC Defendants could be held liable for imposition of a material state-imposed burden of Plaintiff's rights; (7) Plaintiff's status as a public figure is irrelevant; and (8) the MAC

tortiously interfered with his contract.[1] (NCAA Docket No. 148.)

In an abundance of caution, the MAC Defendants filed objections to Judge Schroeder's report and recommendation despite the fact that they are not aggrieved by his ultimate conclusion.  See generally Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2004) (generally, the failure to timely object to a magistrate's report waives further judicial review).  The MAC Defendants object to Judge Schroeder's recommended finding that they were sufficiently engaged in joint action with SUNY Buffalo officials to be deemed state actors for the purpose of Plaintiff's § 1983 claim. (Docket No. 142.) The MAC Defendants further argue that the failure of the report to address the issue of qualified immunity was error.

## A.    Plaintiff's § 1983 Due Process Claim

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 is therefore limited to only those injuries caused by state actors or those acting under color of state law.  Spear v. Town of West Hartford, 954 F.2d 63, 68 (2d Cir. 1992); *cert denied*, 506 U.S. 819 (1992).  "A private actor may be liable under § 1983 only

---

[1]Plaintiff's brief is extremely unorganized and at times incomprehensible.  The final 33 pages of the brief, labeled "Part II," appears to take issue with the manner in which Judge Schroeder summarized the parties' submissions in the Report's background statement.  This recitation of "distorted facts" speak generally to relevancy rather than accuracy.  Further, these 'examples of distorted facts' are not presented in relation to any legal argument, and are therefore insufficient to form an appropriate objection for consideration. See Camardo, 806 F. Supp. at 382.

if there is a sufficiently close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Sykes v. Bank of Am., 723 F.3d 399, 405-6 (2d Cir. 2013) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) (internal quotation marks omitted)).

Further, liability may be imposed only for an actor's personal involvement in a constitutional tort, and may not be imposed under a theory of *respondeat superior*.  See Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003). Accordingly, private employers may not be held liable under § 1983 for the constitutional torts of their employees "unless the plaintiff proves that 'action pursuant to official . . . *policy* of some nature caused a constitutional tort.' " Rojas v. Alexander's Dep't Store, 924 F.2d 406, 409 (2d Cir. 1990), *cert denied*, 502 U.S. 809 (1991) (emphasis in original) (quoting Monell v. Dep't of Social Serv. of the City of New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)); Meijia v. City of New York, 119 F. Supp. 2d 232, 275 (E.D.N.Y. 2000).

Notably, § 1983 does not itself provide a source of substantive rights, but instead provides the mechanism by which a plaintiff may seek vindication of federal rights conferred elsewhere.  Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Here, Plaintiff is alleging that Defendants acted jointly to deprive him of his liberty interest in his good name and reputation without due process of law in violation of his substantive and procedural due process rights guaranteed by the Fourteenth Amendment. (SUNY Docket Nos. 55 ¶ 7; 246 at 8; NCAA Docket Nos. 1 ¶¶ 48-50; 131 at 9.) "To formulate a claim under the Due Process Clause of the Fourteenth

Amendment, a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest." <u>Valmonte v. Bane</u>, 18 F.3d 992, 998 (2d Cir. 1994); <u>see</u> U.S. Const. amend. XIV, § 1.

      1.   <u>Procedural Due Process</u>

A procedural due process claim is analyzed in two steps: " 'the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.' " <u>Valmonte</u>, 18 F.3d at 998 (quoting <u>Kentucky Dep't of Corr. v. Thompson,</u> 490 U.S. 454, 460, 109 S. Ct. 1904, 1908, 104 L. Ed. 2d 506 (1989)).  Here, Judge Schroeder correctly concluded that this claim failed as a matter of law.

*i. Stigma Plus*

With respect to the first step, "[a] person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty of property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." <u>Patterson v. City of Utica</u>, 370 F.3d 322, 329-30 (2d Cir. 2004); <u>see</u> <u>Siegert v. Gilley</u>, 500 U.S. 226, 233, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991) (defamation by itself is a tort actionable under state law, not a constitutional deprivation).  Instead, "an action can be grounded in 42 U.S.C. § 1983 when that plaintiff can demonstrate a stigmatizing statement plus a deprivation of a tangible interest." <u>Vega v. Lantz</u>, 596 F.3d 77, 81 (2d Cir. 2010).  Such a cause of action is commonly referred to as a "stigma-plus" claim. <u>Patterson</u>, 370 F.3d at 330.

"To establish a 'stigma plus' claim, a plaintiff must show (1) the utterance of a

statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." Vega, 596 F.3d at 81 (internal quotation marks omitted).  Although the "plus" requirement is not clearly defined, it does not include "the deleterious effects which flow directly from a sullied reputation" such as "the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation." Valmote, 18 F.3d at 1001; see Davis v. N. N.Y. Sports Officials' Council, No. No. 7:09-CV-0514 (GTS/GHL), 2010 WL 3909688, *8 (N.D.N.Y. Sept. 30, 2010).

Plaintiff asserts that the "plus" in this case is the NCAA's imposition of a " 'show cause' order,[2] which, along with the 'unethical conduct' charge and [Plaintiff's] placement on the NCAA's 'Pink File,' permanently marred [his] professional employment record." (SUNY Docket No. 246 at 18; NCAA Docket No. 131 at 33.) A requirement that a prospective employer show good cause before hiring a plaintiff has been found a sufficient burden on future employment to satisfy the plus requirement. See Valmote, 18 F.3d at 1001 (plaintiff's inclusion on child abuse and maltreatment registry and requirement that prospective child-care employers show good cause for hiring her constituted sufficient burden on future employment).

Judge Schroeder concluded as much, but nonetheless found that the plus requirement was not satisfied because "the show cause penalty was stayed for the

---

[2]Plaintiff's resignation took place more than 3 years prior to the commencement of either action, therefore any claim that his employment termination satisfied the 'plus' requirement is barred by the applicable statute of limitations. See generally Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013).

duration of its imposition," and therefore it could not "be said to have imposed a tangible burden upon any potential employer." (Docket No. 139 at 115.)  Plaintiff objects to this conclusion on the grounds that the "show cause penalty was not vacated" and the imposition of this penalty remains part of NCAA records. (Docket No. 148 at 20-25.) This Court disagrees.

Plaintiff was informed at both the NCAA COI hearing and in the letter providing him with the March 21, 2001 Infractions report that he had fifteen days in which to exercise his right to appeal the decision, during which time no penalty would go into effect. (SUNY Docket Nos. 196-15 at 1-2; 196-13 at 28; NCAA Docket No. 112-5 at 70.) If Plaintiff did exercise his appeal rights, "[a]ll appealed penalties [would] be stayed until the adjudication of [his] appeal." (SUNY Docket Nos. 196-13 at 28; NCAA Docket No. 112-5 at 70.) Because Plaintiff timely filed a notice of appeal prior to the end of the fifteen-day period, the show cause penalty was stayed for the duration of the proceedings before the NCAA Appeals Committee. (SUNY Docket Nos. 196-19 at 3; 196-29 at 2; NCAA Docket No. 112-31 at 3.)  At the conclusion of those proceedings, the NCAA Appeals Committee modified the show cause penalty to terminate as of October 12, 2001, the date of the Committee's decision. (SUNY Docket No. 196-19 at 10; NCAA Docket No. 112-31 at 10.)

Accordingly, Judge Schroeder correctly concluded that the show cause order was stayed for the duration of its existence.  As such, there was never any actual or potential burden on prospective employers that would amount to a tangible, state-imposed interference with Plaintiff's future employment. Vega, 596 F.3d at 81; Cf. Valmonte, 18 F.3d at 1001.  Without this added 'plus,' the record of the show cause penalty's existence amounts to no more than stigmatizing statements which are by themselves insufficient to

20

establish a constitutional deprivation. See Siegert, 500 U.S. at 233; Patterson, 370 F.3d at 329-30.

Further, the material  burden or alteration of the plaintiff's status or rights must be *state* imposed. See Vega, 596 F.3d at 81. Contrary to Plaintiff's further objections (Docket No. 148 at 25-29), Judge Schroeder correctly concluded that neither the SUNY nor the MAC Defendants could be held liable for imposing the show cause order. (NCAA Docket Nos. 139 at 115-117.)  Inasmuch as can be discerned, Plaintiff argues that the NCAA must be considered a state actor because it "adopted the tainted SUNY/MAC investigation." (Docket No. 148 at 28.)  He relies on Velez v. Levy in support of his argument that the stigma and the plus need not issue from the same actor. 401 F.3d 75 (2d Cir. 2005). There, the Second Circuit found that, in the context of a motion to dismiss, a sufficient stigma plus claim was stated where a university chancellor terminated the plaintiff's employment following stigmatizing statements made about her by board members. Velez, 401 F.3d at 90. The Court reasoned that "the board members imposed a 'stigma' and asked for a 'plus,' and that the [c]hancellor, against the backdrop of, and based upon, the board members' statements, imposed the very same 'plus' requested by the board members, thereby adopting the 'stigma.' " Id.  Accordingly, this case does not support the conclusion that the adoption of stigmatizing statements made by state officials alone transforms a private entity into a state actor. Instead, the entity imposing the 'plus' in Velez, the university, was already a state actor.

Plaintiff also argues that Velez supports the conclusion that the SUNY and MAC Defendants could be found liable for the plus because they had the " 'power to provide process to the [P]laintiff,' " but "deliberately misused that power." (Docket No. 148 at 28

21

(quoting Velez, 401 F.3d at 93 (declining to impose liability on board members who did not have the power to provide pre-termination process).) Although these Defendants did have the authority to provide process with respect to the underlying allegations – and Defendants argue that they did in fact provide such process – only the NCAA could have provided an opportunity to be heard with respect to the show cause order that it imposed. Moreover, as discussed further below, the NCAA Committee on Appeals ultimately did not adopt the MAC investigation, or even that of the NCAA COI.

*ii. Adequate Process*

The second step of a procedural due process analysis "examines whether the procedures attendant upon that deprivation were constitutionally sufficient.' " Valmonte, 18 F.3d at 998.  The availability of adequate process defeats a stigma-plus claim.  Segal v. City of N.Y., 459 F.3d 207, 213 (2d Cir. 2006).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972); Monserrate v. N.Y. State Senate, 599 F.3d 148, 158 (2d Cir. 2010).  " 'The touchstone of due process, of course, is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.' " Monserrate, 599 F.3d at 158 (quoting Spinelli v. City of N.Y., 579 F.3d 160, 169 (2d Cir. 2009)).

Plaintiff objects to the conclusion that "the NCAA provided [him] access to their case file, as well as additional information from the MAC investigation which [P]laintiff requested." (NCAA Docket No. 139 at 120; see NCAA Docket No. 148 at 17.)  He also argues that the withholding of these materials evidences corrupt, willful collusion between the NCAA and SUNY Buffalo. (NCAA Docket No. 148 at 6-11.) The allegedly withheld

22

materials are notes made by Defendant William Maher in connection with the original

SUNY self-report to MAC prior to Plaintiff's resignation and "the two different November 16,

1999 reports (MAC 18 and MAC 20)." (NCAA Docket No. 148 at 17.)  Plaintiff does not

explain how this specifically prejudiced the NCAA proceedings against him.[3] <u>See</u>

<u>Monserrate</u>, 599 F.3d at 159-60 (a plaintiff need not be given copies of all materials

considered by a decision maker so long as he "received sufficient opportunity to clear his

name").  Further, it is undisputed that Plaintiff received a copy of the MAC 18 report in

November 1999. (SUNY Docket No. 196-5 at 11-12.) He was also informed of the alleged

scouting violation involving Mitch Gillam prior to SUNY's self report of this allegation and

its inclusion in the MAC 20 report. (SUNY Docket Nos. 196-5 at 107-116; 241 at 41-42),

and disputed his culpability for the same in both the MAC and NCAA proceedings.  (SUNY

Docket Nos. 196-3 at 44-45; 255 ¶ 24; 196-8 at 17-18, 62-67; 196-17 at 45-48.)

This Court also rejects Plaintiff's conclusory assertion that, because a question of

fact was found with respect to the MAC Defendants' alleged joint action with SUNY

officials,  there must also be "a question of fact as to whether NCAA enforcement staff

adopted an investigation they knew was improper," thereby denying Plaintiff adequate

process. (NCAA Docket No. 148 at 16-19.) The alleged improprieties in both the MAC and

the NCAA COI's investigation were raised by Plaintiff before the NCAA Appeals

Committee.  That Committee, which did not include any named individual Defendant,

---

[3]Although not included in his present objections, Plaintiff argued in opposition to summary judgment that Maher's notes "would have clearly shown Sidney Brown's (as well as other witnesses') inconsistent statements."  (SUNY Docket No. 246 at 29 n. 21.)  However, Plaintiff was well aware of these inconsistencies, as evidenced by the "battle of affidavits" which resulted during the various proceedings. (SUNY Docket Nos. 196-19 at 8-9.)  Indeed, Plaintiff specifically discussed Sidney Brown's exculpatory statements before the NCAA COI. (SUNY Docket No. 196-12 at 49.)

credited several of these arguments in reducing Plaintiff's penalty. (SUNY Docket No. 196-19 at 8-9; NCAA Docket No. 112-31 at 8-9.)  The fact that Plaintiff ultimately did not obtain the full relief sought from the Appeals Committee does not mean that the afforded process was inadequate.

        2.    <u>Substantive Due Process</u>

Plaintiff argues that Defendants violated his substantive due process rights by "arbitrarily and capriciously depriv[ing] him of his liberty right to be employed as a head NCAA basketball coach." (NCAA Docket No. 148 at 19-20.)   A valid substantive due process claim may be based on evidence of governmental conduct that " 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " <u>Velez</u>, 401 F.3d at 93 (quoting <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 847 n. 8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). However, "where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process." <u>Velez</u>, 401 F.3d at 94; <u>see</u> <u>Conn v. Gabbert</u>, 526 U.S. 286, 293, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999) (same).

Here, Plaintiff perfunctorily asserts that his substantive due process claim is supported by the "shocking plethora of egregious conduct" documented elsewhere in his submissions. (NCAA Docket No. 148 at 20.) In other words, this claim is supported by the same allegations on which his procedural due process claim rests. Where what is shocking about a defendant's alleged actions is his or her motive to deprive the plaintiff of liberty without procedural due process, a substantive due process claim must either be subsumed in the more particular procedural due process claim or must fail. <u>Velez</u>, 401 F.3d at 94.

Accordingly, Judge Schroeder correctly concluded that "even if [Plaintiff's] allegations were supported by the record, such a claim would sound in procedural, rather than substantive, due process." (NCAA Docket No. 139 at 105.) Plaintiff's reliance on Board of Regents v. Roth does not call this conclusion into question, inasmuch as there the Supreme Court considered only the issue of procedural due process. 408 U.S. 564, 569, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); see Conn, 526 U.S. at 291 (recognizing the same).

      3.    Plaintiff's Status as a Public Figure

Plaintiff also objects to Judge Schroeder's alternative conclusion that because Plaintiff was a public figure with sufficient access to the media, Defendants' were entitled to summary judgment regardless of the adequacy of the NCAA proceedings. (NCAA Docket Nos. 139 at 121-23; 148 at 29-31.)   As recognized in the Report and Recommendation, "[w]hen a public figure has access to the media, a post-deprivation hearing is not necessarily required because the option of calling a press conference to refute any allegations is available." D'Allesandro v. City of Albany, No. 04-CV-788, 2008 WL 544701, *14 (N.D.N.Y. Feb. 26, 2008) (citing Baden v. Koch, 799 F.2d 825, 832 (2d Cir. 1986) ("With his high degree of access to the news media, Baden did not need a formal hearing as a forum in which to repeat his side of the story.  As a public figure, he could presumably have called a press conference and provided any further defense of his record or explanation of his removal from office that he desired to give.")).

Plaintiff argues that his public figure status is irrelevant because Defendants withheld material exculpatory evidence from him, therefore his ability to "speak to the press has little bearing if he is unaware that exculpatory evidence even existed." (NCAA Docket No. 148 at 30.)  As concluded above, Plaintiff has not shown that Defendants withheld any

information from him that he was not otherwise aware of from other sources. This argument is therefore without merit.

This Court nonetheless declines to adopt the recommendation of the Magistrate Judge on this issue. A plaintiff's status as a public figure is a relevant factor in determining how much process is due. See generally Spinelli v. City of N.Y., 579 F.3d 160, 170 (2d Cir. 2009) (sufficient process is determined by weighing private and governmental interests along with the risk of erroneous deprivation) (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).  However, it is not alone determinative.  For example, in Baden, the Second Circuit found that the plaintiff "had already performed the function of [a formal name-clearing] hearing, refuting the charges against him both privately to his employer and publicly when his written refutations were published along with the statements critical of his performance." 799 F.2d at 832.  Thus, "the benefits to Baden of a trial-type hearing would have been marginal at best in view of the less formal process that had been provided to him." Id. at 832-33.  In addition, "[a]s a public figure, he could presumably have called a press conference and provided any *further* defense of his record or explanation of his removal from office that he desired to give." Id. at 832 (emphasis added); see D'Allessandro, 2008 WL 544701 at *13-14 (no deprivation of process where the plaintiff had access to the media *in addition* to opportunities to testify before the Albany Common Council and an adequate post-deprivation procedure by way of a New York Civil Procedure Law Article 78 proceeding).

Further, the 'plus' at issue in these stigma-plus cases was a prior employment termination.  As such, the plaintiffs' statements to the press could arguably be sufficient to overcome any reluctance of a prospective employer to hire the plaintiff that may have been

caused by the defendant's stigmatizing statements.  Here, however, if Plaintiff had not had

the opportunity to challenge the show cause order before the NCAA Appeals Committee,[4]

which he did successfully, a prospective employer would still have been burdened with

showing good cause to hire Plaintiff even if that employer completely accepted his

published version of events. Accordingly, although Plaintiff's status as a public figure

weighs in favor of the conclusion that he was afforded adequate process, it is not a

sufficient independent basis for granting summary judgment to Defendants.

4.      Tortious Interference with Contract

Finally, Plaintiff argues that Judge Schroeder erred in recommending dismissal of

his state law tortious interference claim against the MAC Defendants. (NCAA Docket No.

148 at 31-33.)

> Under New York law, the elements of tortious interference with contract are
> (1) "the existence of a valid contract between the plaintiff and a third party";
> (2) the "defendant's knowledge of the contract"; (3) the "defendant's
> intentional procurement of the third-party's breach of the contract without
> justification"; (4) "actual breach of the contract"; and (5) "damages resulting
> therefrom."

Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (quoting Lama Holding Co.

v. Smith Barney Inc., 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375 (1996)).  This cause of

action is governed by a three-year statute of limitations, and "generally accrues when an

injury is sustained, not discovered."[5] American Fed. Group, Ltd. v. Edelman, 282 A.D.2d

---

[4]Because the process afforded by the Appeals Committee was sufficient, this Court need not, and does not, comment on the sufficiency of the NCAA COI hearing.

[5]The Magistrate Judge relies on Chevron Corp. v. Donzinger for the assertion that a tortious interference with contract claim accrues on the date of the alleged interference. 871 F. Supp. 2d 229, 257 (S.D.N.Y. 2012).  Although Chevron discusses interference with a contract, the New York case on which it relies was discussing the statute of limitations for a claim of tortious interference with prospective economic advantage. Thome v. Alexander & Louisa Calder Found., 70 A.D.3d 88, 108, 890 N.Y.S.2d 16,

279, 279, 722 N.Y.S.2d 870 (N.Y.A.D. 1st Dep't 2001) (claim accrued no later than the date employment contract was terminated); see Kronos v. AVX Corp., 81 N.Y.2d 90, 94, 612 N.E.2d 289, 292 (1993) ("no cause of action for tortious inducement to breach a contract arises until actual damages are sustained"); Andrew Greenberg, Inc. v. Svane, 36 A.D.3d 1094, 1099, 830 N.Y.S.2d 358 (N.Y.A.D. 3d Dep't 2007) (date damages are sustained, and not date of defendant's wrongful act or discovery of injury, determines when claim accrues).

Here, Plaintiff alleges that the MAC Defendants interfered with his "valid written contract of employment" with SUNY Buffalo and his December 3, 1999 resignation agreement. (SUNY Docket No. 55 ¶¶ 164, 172, 175.)  Any alleged interference with the employment contract is barred by the statute of limitations, inasmuch as that contract terminated with Plaintiff's resignation on December 3, 1999, and the action against the MAC Defendants was not commenced until January 17, 2003. (SUNY Docket Nos. 55-1, 194 at 5-7); see American Fed. Group, 282 A.D.2d at 279.

Further, Plaintiff concedes that no express provision of the resignation agreement was breached.  He argues instead that the "MAC Defendants intentionally interfered with the implied covenant of good faith" in the resignation agreement.  (SUNY Docket No. 246 at 49-50.)  "Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (1995).  This implied obligation is "a pledge that neither party shall do anything

---

30 (N.Y.A.D. 1st Dep't 2009) (noting distinction in accrual dates between contract and prospective economic advantage torts), lv denied, 15 N.Y.3d 703 (2010).  The New York Court of Appeals has recognized that "inducing breach of a binding agreement and interfering with a nonbinding 'economic relation' can both be torts, but that the elements of the two torts are not the same" Carvel Corp. v. Noonan, 3 N.Y.3d 182, 189, 818 N.E.2d 1100 (2004).

which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (internal quotation marks omitted). Plaintiff has not alleged any interference with his rights under the resignation agreement.   Indeed, as the MAC Defendants argue, this agreement specifically contemplates that Plaintiff would be afforded an opportunity to respond to the MAC allegations, and he in fact filed such a response. (SUNY Docket Nos. 194 at 5; 196-6; 197-1 at 62.)   Any alleged improprieties in the subsequent investigations do not call into question SUNY Buffalo's performance of any obligation to Plaintiff under the resignation agreement, therefore there is no evidence of an actual breach. See Kronos, 81 N.Y.2d at 94 (no claim unless actual, rather than nominal, damages result from the alleged breach). This cause of action was properly dismissed.

**B.      The MAC Defendant's Objections**

As noted above, although they are not aggrieved by the Magistrate Judge's ultimate conclusion, the MAC Defendants object to Judge Schroeder's recommended finding that they were sufficiently engaged in joint action with SUNY Buffalo officials to be deemed state actors for the purpose of Plaintiff's § 1983 claim, as well as the failure of the report to address the issue of Defendant Fournier's qualified immunity.  (NCAA Docket No. 142.)

1.      Joint Action

The MAC Defendants object to Judge Schroeder's finding that "[w]hile the Court finds the evidence of a conspiracy to be lacking, it is persuaded that [the] SUNY Buffalo defendants were sufficiently involved in the substance of MAC's investigation and reporting of the alleged NCAA violations so as to warrant a finding that the MAC engaged in joint action with SUNY Buffalo." (NCAA Docket Nos. 139 at 98, 142 at 5.)

29

The actions of a nominally private person are attributable to the state when, as relevant here, "the private party 'acted in concert with the state actor *to commit an unconstitutional act*,' i.e., the private defendant was 'a willful participant in joint activity with the State or its agents.' " Missere v. Gross, 826 F. Supp. 2d 542, 566-67 (S.D.N.Y. 2011) (emphasis added) (quoting Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324 (2d Cir. 2002)). "The touchstone of joint action is often a plan, prearrangement, conspiracy, custom, or policy shared by the private actor and the [state actor]." Missere v. Gross, 826 F. Supp. 2d at 567 (quoting Forbes v. City of N.Y., No. 05–CV–7331, 2008 WL 3539936,*5 (S.D.N.Y. Aug. 12, 2008)); see Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 272 (2d Cir. (2d Cir. 1999).

In light of this, the Magistrate Judge's finding that the MAC engaged in joint action with SUNY Buffalo appears to conflict with the conclusion in the same sentence that "evidence of a conspiracy [is] lacking." (NCAA Docket No. 139 at 98.)  Further, the fact that "the MAC's investigation was influenced by SUNY Buffalo" (NCAA Docket No. 139 at 98) is not the same as concluding that the MAC Defendants knowing and willfully participated in any inappropriate use of SUNY Buffalo's authority, thereby warranting the imposition of liability under § 1983.

Nonetheless, there is certainly evidence from which a jury could have concluded, for example, that Defendant Fournier knowingly and willingly participated with SUNY Buffalo officials in the procurement and selective presentation of evidence against Plaintiff. (See e.g. SUNY Docket Nos. 217 ¶ 13 (averment that Fournier told student athlete "that other players had testified against [Plaintiff] and that if [the student's] testimony differed from theirs, [the student] was threatening [his] scholarship and eligibility due to NCAA Rule

10.1); 255 ¶¶ 16-19 (Fournier removed certain prior student affidavits from the MAC 20 report and "inadvertently failed to change the date").) Resolution of the credibility issues raised by the conflicting statements, sometimes from the same witness, and other evidence in the record would be a task best left to a jury. This Court therefore adopts Judge Schroeder's recommendation to deny that part of the MAC Defendants' motion seeking summary judgment on the ground that they did not act under the color of state law, but not the conclusive finding that these Defendants were in fact engaged in joint action with SUNY Buffalo for the purpose of liability under § 1983.

      2.   <u>Qualified Immunity</u>

Although the MAC Defendants' effort to preserve this argument in the event of an appeal is understandable, this Court declines to address the issue of Defendant Fournier's qualified immunity. " 'Without an underlying constitutional violation, qualified immunity cannot attach.' " <u>J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist.</u>, 898 F. Supp. 2d 516, 559 (E.D.N.Y. 2012) (quoting <u>Cathedral Church of the Intercessor v. The Incorporated Vil. of Malverne</u>, 353 F. Supp. 2d 375, 391 (E.D.N.Y. 2005)). Further, there is a threshold question whether qualified immunity is even available to Defendant Fournier that is not addressed in the MAC Defendants' briefs. <u>See</u> <u>Mejia v. City of New York</u>, 119 F. Supp. 2d 232, 260 (E.D.N.Y. 2000) (the possibility of a private actor's "§ 1983 immunity does not automatically follow § 1983 liability").


**IV. CONCLUSION**

This Court has reviewed *de novo* those portions of Judge Schroeder's August 8, 2013 Report and Recommendation to which sufficiently specific objections have been

31

made, and otherwise reviewed the report for clear error.  The Court now accepts the Report and Recommendation with the exception of the conclusion that Plaintiff's status as a public figure constituted a sufficient independent basis for granting all Defendants summary judgment, and the conclusive finding that the MAC Defendants were engaged in joint action with SUNY Buffalo.

## V. ORDERS

IT HEREBY IS ORDERED that the MAC Defendants' Objections (NCAA Docket No. 142) are GRANTED in part and DENIED in part;

FURTHER, that Plaintiff's Objections (NCAA Docket No. 148) are DENIED;

FURTHER, that the August 8, 2013 Report and Recommendation of Judge Schroeder (NCAA Docket No. 139) is MODIFIED to the extent stated above and otherwise ACCEPTED;

FURTHER, that Defendants' Motions for Summary Judgment (SUNY Docket Nos. 189, 197; NCAA Docket No. 112) are GRANTED and the complaints against them dismissed;

FURTHER, that the Clerk of the Court shall close this case.

SO ORDERED.

Dated:   March 23, 2014
            Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court
